## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. LATIKA GIRI, on behalf of herself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL BOARD OF MEDICAL EXAMINERS, c/o CT Corporation System, 1015 15th Street NW, Suite 1000, Washington, DC 20005 <br><br> Defendants. | Case No. 24-CV-410 <br> CLASS ACTION <br> JURY TRIAL DEMANDED |

## COMPLAINT

**Preliminary Statement**

1.      Every year, Defendant National Board of Medical Examiners administers the U.S. Medical Licensing Exam (colloquially known as the Boards) to more than 24,000 graduates of U.S. medical schools and another 22,000 graduates of foreign medical schools. For years, cheating has been, as a recent news article put it, "rampant." Still for people from all over the world NBME handles suspicions of cheating through a process that provides the suspected test-taker notice, an opportunity to be heard, an investigation, and a right to appeal. During that process, the suspected test-taker's score is treated as valid.

2.      But on January 31, NBME emailed a "subset" of test-takers to tell them that, in explicit departure from ordinary procedures, their scores were immediately invalid and that they had two weeks to choose from three options: appeal, with the burden of persuasion on the test-taker, which would take at least ten weeks; re-take the test in the fall; or forfeit the right to sit for the USMLE, and therefore to practice medicine in the U.S., for the next three years irrevocably. Because of the schedule of medical-residency matching, all three options result in graduates being unable to practice medicine for at least a year. All three options force many people to abruptly leave the country within 30 days and cause every affected person to lose their jobs or the opportunity to seek a job.

3.      NBME left no doubt about how it chose which "subset" of test-takers to which it would apply its new, harsh procedural regime: In a press release, NBME explained that its new policies applied to test-takers "associated with Nepal."

4.      Plaintiff Dr. Latika Giri is a Nepali doctor who studied hard and honestly for the Boards and did well. She verifies in this Complaint under penalty of perjury that she did not cheat on the exam or have unauthorized access to exam questions. Still, NBME immediately invalidated her scores on the explicit basis that she is "associated with Nepal," which she is because she is Nepali, as the overwhelming majority of test-takers "associated with Nepal" are.

5.      Because NBME's conduct flagrantly violates Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866, Dr. Giri brings this Action on her own behalf and on behalf of all Nepali doctors affected by NBME's explicit discrimination, seeking damages for the harm already caused and an immediate and permanent injunction preventing further discriminatory treatment.

## Parties

6.      Plaintiff Dr. Latika Giri is a 2022 graduate of the Kathmandu University School of Medical Sciences. She studied for many months—without cheating or committing any irregular conduct under USMLE rules—for the USMLE, earning scores above the U.S. median when she took the exam. She learned on January 31, 2024, that, because she's Nepali, her score had been invalidated.

7.      Defendant National Board of Medical Examiners in a corporation formed under the laws of the District of Columbia. It administers the USMLE.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this Action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

2

9. This Court has general personal jurisdiction over NBME because it is incorporated under the laws of the District of Columbia.

### Background on the USMLE and The Residency Process for Foreign Medical Graduates

10. After medical school, doctors are required to complete a clinical residency during which they learn from, and practice medicine under the supervision of, a licensed doctor.

11. To legally practice medicine in all fifty states and the District of Columbia, graduates of foreign medical schools must first be preliminarily certified by the Educational Commission for Foreign Medical Graduates ("ECFMG," which verifies that they have in fact graduated from a foreign medical school whose degrees are recognized by U.S. authorities and are competent in English), and pass the United States Medical Licensing Exam, known colloquially as "the Boards." After passing the USMLE, graduates earn a final ECFMG certification and are eligible to apply to The Match, which determines which residency program they can pursue.

12. The USMLE is administered in three steps: Step One is an eight-hour written test designed to measure whether test-takers understand scientific concepts and their application to the practice of medicine. Step One is pass–fail; numerical scores are never released.

13. Step Two is a nine-hour written test designed to measure whether test-takers can apply medical knowledge, skills, and understanding of clinical science to the provision of patient care under supervision. Step Two is scored from 1 to 300. As of 2022, a minimum score of 214 is required to pass. The mean score in 2022 was 247,

with a standard deviation of 15 points. Only approximately 25% of test-takers from non-U.S. medical schools scored below 214 in 2022, meaning that 75% of foreign medical graduates who sit for the exam earn a score high enough to enable them to legally practice medicine on their first try.

14.    Step Three is a 16-hour test designed to measure whether test-takers have the knowledge and skills of physicians assuming independent responsibility for patient care. It is divided into a written portion and a clinical-simulation portion. Step Three is scored from 1 to 300. As of 2022, a minimum score of 200 is required to pass. The mean score in 2022 was 227, with a standard deviation of 15 points. Only approximately 9% of foreign test-takers scored below 200 in 2022 on their first try.

15.    Steps One and Two are administered at testing centers all over the world, and many foreign medical graduates take these exams in their home countries or the countries where they went to medical school. Step Three is generally taken in the U.S. Most foreign medical graduates travel to the U.S. to take the Step Three exam on a B1 or B2 visitors' visa, which allows them to stay in the U.S. for only six months. After taking the exam, and sometimes participating in visa-eligible unpaid internship programs, most foreign medical graduates head home to await their results.

16.    Once graduates have taken the USMLE, they are eligible to apply for residency programs through a process called The Match, which is administered by the National Resident Matching Program. Passing scores on Steps One and Two are required for the Match; Step Three is optional, but most residency programs—and all

residency programs highly ranked by the medical community—require a Step Three passing score.

17.     Once foreign medical graduates have completed the USMLE, they are finally certified by ECFMG as eligible to participate in the Match.

18.     The Match cycle begins in September, when applicants may register; they must register no later than January 31. Then, starting on February 1, applicants begin ranking the residency programs they prefer in order, and residency programs begin ranking the applicants they prefer in order. This process continues until February 28, when the programs' and applicants' rankings must be final. Then, on March 11, applicants learn whether they have initially matched and a supplemental process opens for unmatched applicants and program spots. Match Day, when the National Resident Matching Program reveals which applicants will finally go to which residency programs, falls on the ides of March this year.

19.     Graduates' USMLE scores are a very important consideration in residency programs' matching decisions.

20.     Residency programs generally begin in June or July. Most foreign medical graduates who do not otherwise have immigration status in the U.S. get J1 visas, which are for people who travel to the U.S. to participate in eligible educational exchange programs. Some foreign medical graduates get H1B visas, which are for temporary workers in specialty occupations who hold professional-level degrees. Both visas require that the person maintain participation in the residency program.

21.     Cheating is a serious problem for the USMLE all over the world, a problem that many medical graduates described in a recent news article as "rampant." Alicia Gallegos, *U.S. Board Discloses Cheating, Grads Say Problem is Rampant*, MEDSCAPE, Feb. 1, 2024. Because the exams are administered many times throughout the year, and because questions are recycled from one administration to the next, some people take the exam with the purpose of memorizing or copying questions to sell to future exam takers. To make this less likely, USMLE recently reduced the maximum number of times a person is allowed to take the text from six to four—people who are taking the USMLE six times, the thinking goes, are much more likely to be doing so for the purpose of copying questions—and changed Step One from numerically scored to pass–fail.

22.     In response to a cheating scandal in Canada, doctors working for the Medical Counsel of Canada created a statistical method that they claimed could identify when test-takers likely had access to test questions in advance. *See* Timothy J. Wood, et al., *Identifying the Unauthorized Use of Examination Material*, 33 J. EVALUATION & HEALTH PROFESSIONS 96 (2010). This method is, on information and belief, generally accepted in the medical-testing community and is used by the USMLE to identify irregular score patterns.

23.     The basic method starts by calculating a statistic representing each test-taker's predicted ability to answer questions correctly by measuring how she answers questions compared to how other test-takers answer the same questions. *Id.* at 100. (For example, if question 32 is answered correctly by 70% of test-takers but question

38 is answered correctly by only 20% of test-takers, someone who gets 38 right would have a higher ability score than someone who gets 32 right, all else equal.) The board examining the scores then calculates ability scores for test-takers on questions that may have been exposed to the public and compares those scores to ability scores on questions that are known never to have been exposed to the public (generally questions that have never been used before). *Id.* The difference between those two scores is then adjusted by the standard deviations for each of the two scores to create something called a $z$ statistic, which generally represents how far along a normal distribution a given value is relative to the mean and standard deviation of the distribution.

24.     According to the method described above, test-takers with $z$ statistics above a certain value are flagged for additional scrutiny. Crucially, though, a board evaluating scores must rule out alternative explanations before concluding that the $z$ statistic represents evidence of improper behavior. Whenever, for example, test-takers run out of time or encounter technical problems the $z$ statistic may generate a false indication of dishonesty. *Id.* at 101 ("[Step] 7. Rule out alternate explanations . . . For example, were there any technical problems that could have led to the discrepancy in scores?").

25.     According to USMLE's published procedures, whenever NBME suspects that a test-taker cheated, that person "will be advised of the matter and will have an opportunity to provide information that [the person] considers relevant." USMLE then investigates and determines whether the person cheated. After that

determination, the person may appeal to an ad hoc committee that USMLE establishes for that purpose. After the process is complete, the score transcripts of people found to have cheated "will contain a notation of the finding of [cheating]." Crucially, though, *during* the process "anyone alleged to have [cheated] will be prohibited from registering for additional exams; *previously unreleased scores*, if any, *may* be withheld; and pending examination appointments will be canceled." For obvious reasons, USMLE procedures do not require that notations of cheating be published until investigations are complete and cheaters have been reliably separated from non-cheaters though an investigation with an opportunity to be heard.

26.     USMLE procedures also "reserve the right" to cancel scores where there are good-faith suspicions about their validity for reasons including cheating but not limited to it. These procedures provide that scores may be "delayed or withheld" during the investigation process, not canceled outright with no process at all.

### Dr. Giri Studies Hard, Scores Well Honestly, And Abruptly Learns That Her Scores Are Invalid Anyway

27.     Dr. Latika Giri grew up in Nepal and graduated from the Kathmandu University School of Medical Sciences in 2022. She is a Nepali citizen and currently lives in Kathmandu.

28.     Dr. Giri took Step One on February 9, 2023, in Kathmandu; Step Two on May 8, 2023, in India; and Step Three on September 18, 2023, in Connecticut.

29.     Dr. Giri passed Step One, scored a 252 on Step Two, and scored a 229 on Step Three. These scores would be in the 66th and 55th percentiles among U.S.

medical graduates, who score higher on average than foreign medical graduates. (Complete percentile charts for foreign graduates are not immediately available.)

30.     Dr. Giri studied hard for the Boards. And she studied honestly: She verifies in this Complaint, under penalty of perjury, that she did not cheat on the exams and did not have unauthorized access to exam questions.

31.     In January 2024, Dr. Giri was preparing to enter the Match and hoping to enter residency in the summer of 2024.

32.     But on January 31, 2024, she got an email from NBME telling her that her USMLE scores had been "invalidated." NBME accused Dr. Giri of "Extremely improbable answer similarity with other examinees testing on the same form at similar times," "Unusually high performance," and "Abnormal question response times." A copy of the email is attached as an exhibit to Dr. Giri's motion for a TRO or preliminary injunction.

33.     Attached to the email was a document captioned "United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees." A copy is attached as an exhibit to Dr. Giri's motion for a TRO or preliminary injunction.

34.     This document explained that NBME's usual procedures recognize that "different procedures might be warranted in certain circumstances, including situations involving multiple examinees." And so, the document continues, because "[a]n investigation by USMLE program staff raised concerns regarding the outcomes achieved by a subset of USMLE examinees . . . the USMLE Composite Committee

9

has concluded that alternative procedures should be implemented in response to the score-validity concerns relating to these Examinees."

35.    Specifically, NBME was, in this case, suspending the review and appellate procedures that usually apply, and changing the score transcripts of all members of the "subset" of test-takers to "Score Not Available" during the pendency of any investigation.

36.    The document explained that "Irregular behavior [which USMLE defines to include cheating and abusive conduct] is not the only basis upon which scores may be invalidated or reported with a qualification." Instead, any examinee within the "subset" about whom NBME believes itself to have a "good faith basis for questioning the validity of the outcome at issue" has her score invalidated immediately.

37.    NBME gave examinees until February 16, 2024, to choose one of three options. First, they can request that NBME reconsider its decision. "It may take up to ten (10) weeks," NBME wrote, "for your reconsideration request to be evaluated, and perhaps longer." Second, they can agree to retake the test. NBME wrote that in "anticipate[d] [that] retake exams will be offered beginning in mid to late 2024." Finally, examinees can do nothing, in which case their "invalidated outcome(s) will remain unavailable on [their] USMLE transcript and [their] access to USMLE will be suspended for three (3) years."

38.    The retake option is particularly troubling. Nepali test-takers have been told that they will be required to retake the exam under scrutinized conditions, taking

each step in separate years and at test centers specifically chosen by the board. It would likely take at least three years to complete this process, at which point graduates would be considered "old graduates" for matching purposes, and anyway their prior invalid scores will remain on their transcripts, threatening their applications.

39.     If examinees choose options one or two—the only options for them to practice medicine any time in the next three years—they are required to specifically waive their right to sue NBME.

40.     Under the special procedures established for the "subset" of examinees described in the letter, "[i]f the [committee] concludes that the information submitted by or on behalf of an examinee does not provide an adequate basis for overturning the decision to invalidate the score(s) at issue, the Committee will so notify the Examinee." In other words, the burden—unlike in every other investigation the NBME conducts—is on every test-taker in the "subset" to *disprove* suspicion of "irregular behavior."

### NCBE Reveals That it Invalidated Scores Explicitly on the Basis of Nepali Ethnicity or National Origin

41.     On January 31, 2024, the day before graduates become eligible to rank and be ranked on the Match, and the same day NBME emailed test-takers individually, NBME released the following statement:

> The USMLE program regularly monitors and analyzes examinees' test performances for unusual score patterns or variations, and other information that could raise questions about the validity of an examinee's results. As part of an ongoing investigation, the USMLE program has identified a pattern of anomalous exam performance

associated with Nepal, which challenges the validity of test results for a group of examinees. Highly irregular patterns can be indicative of prior unauthorized access to secure exam content. Examinees with results in question are being notified by the USMLE Secretariat's Office that their previous Step scores have been invalidated and that they will be required to take a validation exam(s). The USMLE program is working to notify examinees who need to schedule validation exam(s) and to support score users and other stakeholders impacted by the validation exam requirements.

42.    That same day, ECFMG released a statement reading:

- Invalidated test scores no longer meet the requirements for ECFMG Certification.
- ECFMG Certificates issued to those whose test scores have been invalidated are also invalidated and those individuals are no longer considered to be ECFMG Certified.
- Applicants with invalidated test scores who were previously verified to the National Resident Matching Program® (NRMP®) as meeting the examination requirements for ECFMG Certification will now be verified to the NRMP as not meeting the examination requirements for ECFMG Certification.
- Status Reports on ECFMG Certification previously sent to residency programs, employers, U.S. state medical boards, and/or other organizations will be resent with the updated information, i.e., that an impacted individual is not ECFMG Certified and does not meet the examination requirements for ECFMG Certification.
- Invalidation of USMLE Step 3 scores does not impact ECFMG Certification.
- There may be implications to those who are being sponsored by ECFMG on a J-1 visa.

43.    On February 12, 2024, ECFMG emailed all test-takers in the "subset"

to alert them that they must destroy their ECFMG certificates no later than February

15.

44.     On information and belief, scores "associated with Nepal" are either the scores of Nepali people, the scores of people who went to medical school in Nepal, or the scores of people who took Step One or Two in Nepal.

45.     The overwhelming majority of these people—if not all of them—are Nepali by citizenship, origin, ethnicity or all three. At least some of these people are Nepali by ethnicity but not national origin.

46.     Not all people "associated with Nepal" under NBME's definition took the exams in Nepal. All or almost all took Step Three in the U.S., and many took Steps One and Two in countries other than Nepal, often India and Bangladesh, but elsewhere too.

47.     On information and belief, NBME treated scores "associated with" any country other than Nepal under its ordinary procedures. No one else's scores were immediately invalidated—they all have an opportunity to be heard first. No one else was publicly accused of cheating—they are get a full investigation first. No one else gets their final invalidation disclosed to the world in a press release—they all get to go on with their lives privately if they want. Only Nepali people immediately and publicly lost their scores with no opportunity to be heard first and no individual investigation.

48.     None of them has been presented with any individual evidence of any irregular score, let alone of actual cheating. All they get is a form email with, at most, one line explaining what about their scores lead NBME to invalidate their scores.

49.    And these explanations appear to ignore obvious context. Nepal is a relatively small, developing country with only two university medical schools and two other medical institutions that educate a small population of doctors. Unlike in the U.S. and other large countries, those schools share faculty members, curricula, and exams. Similarly, Nepali medical students all prepare for the same Nepali national exams generally using the same methods and materials. Nepali students would, therefore, be expected to have quite similar answers to similar questions in the absence of any irregular behavior whatever.

50.    At the same time, the USMLE does not take points off for incorrect answers and it is a strictly timed exam. Because most questions on the exam are quite lengthy and there is no harm in randomly guessing, some test-takers (including Dr. Giri) guess immediately as soon as they see that a question involves a given topic on which they have less knowledge than others. Accordingly, Dr. Giri—and many other students who, like her, honestly studied for the exam—sometimes answer questions correctly much faster than they possibly could have read those questions. That's not cheating; that's effective exam strategy.

51.    Similarly, Dr. Giri experienced one or two technical problems during her exam, particularly with the portal used for clinical case simulations, with which she was technologically unfamiliar. This resulted in her prematurely ending that portion of the exam and scoring poorly, and perhaps this is part of why NBME became suspicious of Dr. Giri's answer timing.

52.     NBME would have learned all of this before irrevocably harming Plaintiffs (as explained below) had it applied to them the same policies it would have applied to people from or tracing ancestry to any other place on earth.

### The Harm to Plaintiffs

53.     The immediate invalidation of their USMLE scores has caused Plaintiffs severe harm and it will cause them irreparable harm if it is not enjoined before February 16, 2024.

54.     As of January 31, 2024, Plaintiffs who are applying to medical residencies are all ineligible for the Match, the deadline for which is February 28, 2024. NBME, for reasons that remain opaque to Plaintiffs, requires that they agree never to sue NBME for, among other things, discrimination no later than February 16 if they wish to re-take the exam or attempt to persuade NBME that it was valid in the first place. Both options will take much longer than 12 days. All Plaintiffs will thus miss this year's Match no matter what. And NBME has offered no explanation for why it waited until the day before the Match opened to abruptly suspended Plaintiffs' scores: Dr. Giri and many others took some of the invalidated exams more than a year ago.

55.     Nepali doctors who are currently in their residencies risk losing their visa status and being forced to leave the country immediately. On information and belief, many have already lost their jobs.

56.     Perhaps worst of all, NBME, by loudly and publicly invalidating Nepali doctors' scores, has cast a pall over the hundreds of honest, hard-working Nepali doctors like Dr. Giri who studied hard and did well. Even if this Court enjoins

NBME's explicitly discriminatory practices, harm has already been done to Plaintiffs' reputation in the medical community and, therefore, to their career prospects and professional satisfaction.

## Class Action Allegations

57.   Plaintiffs propose to certify the following class: All USMLE test-takers whose scores were immediately invalidated under the procedures for the "subset" of test-takers described in the document captioned "United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees."

58.   This class meets Rule 23's requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

### *Numerosity*

59.   The class is so large that joinder of all parties would be impracticable.

60.   Approximately 800 people are in the subset of Nepali test-takers targeted by NBME's discriminatory practices.

### *Commonality*

61.   There are questions of law and fact common to members of the class.

62.   The questions of fact common to the members of the class include, without limitation, whether NBME had any statistical evidence of irregular behavior that could possibly justify disparate treatment on the basis of ethnicity and national origin.

63.   The questions of law common to the members of the classes include, without limitation, whether NBME can possibly show that its discriminatory

16

treatment is justifiable under the law and whether NBME can possibly show that its explicit targeting of test-takers "associated with Nepal" did not constitute discrimination on the basis of ethnicity in violation of Section 1981.

### *Typicality*

64.    Dr. Giri took the USMLE and had her scores invalidated on the basis of her ethnicity, national origin, or both. She is within the "subset" defined by NBME's discriminatory policies.

65.    Every other member of the proposed class is within the same "subset." Dr. Giri is thus typical of the class.

### *Adequacy*

66.    Dr. Giri's claim, as explained above, is identical to the claims of other class members and she has no known conflicts of interest with any other class member.

67.    She will adequately protect the interests of absent class members.

68.    She proposes Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel. Both firms are experienced in litigating civil-rights class actions.

69.    Class counsel will fairly and adequately represent the interests of the class.

### *Rule 23(b)(2) Factors*

70.    As to its claims for injunctive relief, the Class easily satisfies Rule 23(b)(2)'s requirement that the opposing party acted on grounds that apply generally to the class as a whole so that injunctive relief can apply to the class as a whole.

NBME created a special "subset" of people to whom unusually harsh procedures apply, and that whole subset asks that they all be treated just as members of any other ethnic or national origin group would be treated under NBME's ordinary procedures.

### *Predominance and Superiority*

71.    The questions of fact and law common to the class predominate in this action over any questions affecting only individual members of the class.

72.    A class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. Joinder of all members is impracticable, and there will be no difficulty in the management of this case as a class action. NBME maintains records of all test-takers and knows exactly who is in the class, and all class members were severely harmed in the same way.

### **Claim for Relief**

**Count One: National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

73.    Under the Civil Rights Act of 1964, it is an "unlawful employment practice" to "discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2.

74.    Under D.C. Circuit law, entities are liable for discrimination in violation of Title VII where they interfere with the terms and conditions of people's employment with other people or entities on a discriminatory basis.

75. The USMLE is necessary to obtain employment as a physician in all 50 states and the District of Columbia.

76. Defendant NBME interfered with Plaintiffs' employment as physicians explicitly because of Plaintiffs' Nepali national origin, race, or both, by invaliding the scores necessary to pursue employment.

77. Plaintiffs timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission on February 12, 2024. Plaintiffs may proceed with this Action during the pendency of the EEOC's investigation to prevent severe irreparable harm during the pendency of that investigation.

### *Count Two*: Denial of Equal Rights Under The Law in Violation of Section 1981 of the Civil Rights Act of 1866

78. Under Section 1981 of the Civil Rights Act of 1866, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

79. Under Supreme Court law, Section 1981(a) forbids "discrimination in the making, performance, modification, and termination of contracts" on the basis of ancestry or ethnic characteristics.

80. NBME modified or terminated its contractual agreements with Nepali test-takers on the explicit basis that they were "associated with Nepal." Nepali is both a national origin and a description of ethnicity.

### Prayer for Relief

Plaintiff Dr. Latika Giri respectfully requests:

- An order certifying this Action as a class action, appointing her lead plaintiff, and appointing Gerstein Harrow and Fairmark Partners class counsel;
- An order preliminarily and permanently enjoining NBME from applying different score invalidation procedures to test-takers associated with Nepal than it does to people associated with every other country, specifically an order preliminarily ordering NBME to restore the validity of Plaintiffs' scores during the pendency of this litigation and permanently ordering NBME to restore the validity of Plaintiffs' scores during the pendency of any investigation into irregular conduct pursuant to NBME's ordinary procedures;
- An award of monetary damages to herself and the proposed class;
- An award of attorneys' fees and costs under 42 U.S.C. § 1988; and
- All other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Emily Gerrick
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
*/s/ Kritika Debs*
James Crooks
Kritika Debs
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E

Washington, DC 20001
jamie@fairmarklaw.com
(619) 547-4182

## **VERIFICATION**

I, Dr. Latika Giri, pursuant to 28 U.S.C.A. § 1746, verify under penalty of perjury under the laws of the United States of America that the foregoing allegations that are based on my knowledge are true and correct. Executed on February 12, 2024, at Kathmandu, Nepal.

*Latika Giri*
Latika Giri (Feb 12, 2024 10:34 EST)

Dr. Latika Giri

# 2024.2.11 Giri Complaint FOR FILING

Final Audit Report                                            2024-02-12

| | |
|---|---|
| Created: | 2024-02-12 |
| By: | Charles Gerstein (charlie@gerstein-harrow.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAALQEaiSohfyjMVhRsLzBlYVCJYXtByypw |

## "2024.2.11 Giri Complaint FOR FILING" History

Document created by Charles Gerstein (charlie@gerstein-harrow.com)
2024-02-12 - 3:33:07 PM GMT- IP address: 71.200.108.122

Document emailed to Latika Giri (lgiri2458@gmail.com) for signature
2024-02-12 - 3:33:34 PM GMT

Email viewed by Latika Giri (lgiri2458@gmail.com)
2024-02-12 - 3:34:27 PM GMT- IP address: 74.125.209.32

Document e-signed by Latika Giri (lgiri2458@gmail.com)
Signature Date: 2024-02-12 - 3:34:54 PM GMT - Time Source: server- IP address: 103.163.182.197

Agreement completed.
2024-02-12 - 3:34:54 PM GMT

**Adobe Acrobat Sign**