# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. LATIKA GIRI, on behalf of herself and all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) ) | Case No. 24-cv-410<br>CLASS ACTION<br>JURY TRIAL DEMANDED |
| THE NATIONAL BOARD OF MEDICAL EXAMINERS, c/o CT Corporation System, 1015 15th Street NW, Suite 1000, Washington, DC 20005 ) ) ) ) ) | |
| Defendants. ) ) ) | |

**MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION AND**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

MOTION AND RELIEF REQUESTED ....................................................................... 1

PRELIMINARY STATEMENT ............................................................................... 2

I.    Notice to Defendant and Timing of Relief And Consideration.......................... 2

II.   Summary of The Argument and Issues ...................................................... 3

FACTS ...................................................................................................... 4

I.    Background on the USMLE and The Residency Process for Foreign
      Medical Graduates ............................................................................ 5

II.   This Dispute .................................................................................. 10

      A.    Dr. Giri Studies Hard, Scores Well Honestly, And Abruptly
            Learns That Her Scores Are Invalid Anyway ....................................... 10

      B.    NCBE Reveals That it Invalidated Scores Explicitly on the Basis
            of Nepali Ethnicity or National Origin .......................................... 13

      C.    The Irreparable Harm to Plaintiffs ............................................... 17

ARGUMENT .................................................................................................. 17

I.    Plaintiff Meets The Standard for Obtaining a Temporary Restraining
      Order or Preliminary Injunction .......................................................... 17

      A.    Plaintiffs Are Likely to Succeed on the Merits Because NBME
            Explicitly Discriminated on the Basis of Ethnicity and National
            Origin Without Any, Let Alone a Compelling, Justification. ..................... 19

            1.    NBME Is Liable Under the D.C. Circuit's "Interference"
                  Cases Interpreting Title VII ............................................... 19

            2.    NBME Explicitly Discriminated on The Basis of
                  Ethnicity, National Origin, Or Both, in Clear Violation of
                  Title VII and Section 1981 ................................................ 21

      B.    Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief
            From This Court ................................................................... 22

C.    The Balance of The Equities Favors Relief Because All Plaintiffs Ask For Is to be Treated As NBME Would Treat Any Test-Taker Who Is Not Nepali.................................................................................... 24

D.    The Public Interest Supports Granting The Emergency Relief. .......... 26

CONCLUSION ....................................................................................................... 27

## MOTION AND RELIEF REQUESTED

In this discrimination case, Plaintiffs request this Court's emergency intervention to preserve the status quo and prevent irreparable harm to a group of doctors being discriminated against based on their national origin. Plaintiff represents a proposed class of approximately 800 Nepali doctors whose scores on the medical boards were immediately invalided by Defendant National Board of Medical Examiners on January 31, 2024, explicitly because they were "associated with Nepal" and in explicit departure from the procedures NBME applies to test-takers from anywhere else in the world about whose scores it has concerns. This violates Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. And the extraordinary score cancellation, and the arbitrary and unnecessarily rigid timeline for appeals and challenges that the Board has imposed, threatens immediate irreparable harm to the doctors' ability to participate in the Match for medical residencies, which is finalized on February 28, and threatens the current employment and immigration status of hundreds of doctors already practicing in the United States.

Plaintiff Dr. Latika Giri, on behalf of herself and all others situated, therefore respectfully requests that this Court immediately enjoin Defendant National Board of Medical Examiners from applying different score-invalidation procedures to test-takers associated with Nepal than it does to people associated with every other country, and specifically for an order requiring NBME to restore the validity of Plaintiffs' scores on the United States Medical Licensing Exam during the pendency of this litigation and during the pendency of any investigation into irregular conduct that NBME chooses to conduct pursuant to its ordinary procedures. In other words,

1

the order that Plaintiffs request from this Court would preserve the status quo while the Board follows its own individualized investigative procedure to determine who, if anyone, deserves to have a score invalidated.

The timing is critical here. The Board has imposed a deadline of February 16, 2024, on Nepali test-takers to choose whether to forfeit their legal rights, forfeit their ability to re-take the exam, or appeal NBME's decision. And the Resident Match date of February 28, 2024 is coming soon. Thus, in this Motion, Plaintiffs respectfully request grant Plaintiffs' requested preliminary relief no later than February 14, 2024, so that they may participate in the Match.[1] Separately, Plaintiffs also plan to request that the Court immediately order NBME to extend the test-takers' deadline to respond to the NBME's action, unless NBME will voluntarily agree to such an extension.

## PRELIMINARY STATEMENT

## I. Notice to Defendant and Timing of Relief And Consideration

Counsel for Plaintiffs has consistently attempted to work with counsel for

---

[1] This motion seeks relief on behalf of the proposed class. Although a class has not yet been certified, that is no impediment to granting temporary, emergency relief on a classwide basis. *See* 2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed.) ("Basic requirements for Rule 23(b)(2) class certification") ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion or in conjunction with it."); *see also Rodriguez v. Providence Community Corrections, Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) ("[A] district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers."). Plaintiffs are preparing their class certification motion, but the emergency nature of this proceeding requires them to seek immediate equitable relief before that motion could be filed.

Defendant to obtain interim relief by consent, as described in the attached certificate of counsel, but those efforts have not been successful. Plaintiffs thus now request emergency relief from this Court.

## II.     Summary of The Argument and Issues

Every year, Defendant National Board of Medical Examiners administers the U.S. Medical Licensing Exam (colloquially known as the Boards) to more than 24,000 graduates of U.S. medical schools and another 22,000 graduates of foreign medical schools. For years, cheating has been, as a recent news article put it, "rampant." Still for people from all over the world NBME handles suspicions of cheating through a process that provides the suspected test-taker notice, an opportunity to be heard, an investigation, and a right to appeal. During that process, the suspected test-taker's score is treated as valid.

But on January 31, NBME emailed a "subset" of test-takers to tell them that, in explicit departure from ordinary procedures, their scores were immediately invalid and that they had until February 16 to choose from three options: appeal, with the burden of persuasion on the test-taker, which would take at least ten weeks; re-take the test in mid to late 2024, restricted to a date and location of the USMLE program's choosing; or forfeit the right to sit for the USMLE, and therefore, in many cases, to practice medicine in the U.S., for the next three years irrevocably. Because of the schedule of medical-residency matching, all three options result in graduates whose Step One or Two scores were invalidated being unable to practice medicine for at least a year. NBME requires test-takers to waive their right to sue NBME to either re-take the exam or ask NBME to consider its decision to revoke test-takers' scores. All three

options force many people to abruptly leave the country within 30 days and cause every affected person to lose their jobs or the opportunity to seek a job. Even worse, NBME has pre-emptively cancelled scores on a groupwide, not individualized, basis even while it acknowledges that the investigation is "ongoing." Harrow Decl. ¶ 5.

NBME left no doubt about how it chose the "subset" of test-takers to which it would apply its new, harsh procedural regime: In a press release, NBME explained— not just to affected doctors, but to the world writ large—that its new policies applied to test-takers "associated with Nepal."

Plaintiff Dr. Latika Giri is a Nepali doctor who studied hard and honestly for the Boards and did well. She attaches to her motion for preliminary relief in this case a sworn declaration that she did not cheat on the exam. Still, NBME immediately invalidated her scores on the explicit basis that she is "associated with Nepal," which she is because she is Nepali, as are the overwhelming majority of test-takers "associated with Nepal."

Because NBME's conduct flagrantly violates Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866, Dr. Giri brings this Action on her own behalf and on behalf of all Nepali doctors affected by NBME's explicit discrimination, seeking damages for the harm already caused and an immediate and permanent injunction preventing further discriminatory treatment.

## FACTS

These facts are taken verbatim from Dr. Giri's Complaint, which she has verified under penalty of perjury. Because the "complaint is verified . . . it has the same evidentiary value as a plaintiff's affidavit or sworn declaration." *Grimes v. Dist.*

*Of Columbia.*, 794 F.3d 83, 94 (D.C. Cir. 2015) (citing cases).

## I.    Background on the USMLE and The Residency Process for Foreign Medical Graduates

After medical school, doctors are required to complete a clinical residency during which they learn from, and practice medicine under the supervision of, a licensed doctor.

To legally practice medicine in all fifty states and the District of Columbia, graduates of foreign medical schools must first be preliminarily certified by the Educational Commission for Foreign Medical Graduates ("ECFMG," which verifies that they have in fact graduated from a foreign medical school whose degrees are recognized by U.S. authorities and are competent in English), and pass the United States Medical Licensing Exam ("USMLE"), sometimes known colloquially as "the Boards." After passing the USMLE, graduates earn a final ECFMG certification and are eligible to apply to The Match, which determines which residency program they can pursue.

The USMLE is administered in three steps: Step One is an eight-hour written test designed to measure whether test-takers understand scientific concepts and their application to the practice of medicine. Step One is pass–fail; numerical scores are never released.

Step Two is a nine-hour written test designed to measure whether test-takers can apply medical knowledge, skills, and understanding of clinical science to the provision of patient care under supervision. Step Two is scored from 1 to 300. As of 2022, a minimum score of 214 is required to pass. The mean score in 2022 was 247,

with a standard deviation of 15 points. Only approximately 25% of test-takers from non-U.S. medical schools scored below 214 in 2022, meaning that 75% of foreign medical graduates who sit for the exam earn a score high enough to enable them to legally practice medicine on their first try.

Step Three is a 16-hour test designed to measure whether test-takers have the knowledge and skills of physicians assuming independent responsibility for patient care. It is divided into a written portion and a clinical-simulation portion. Step Three is scored from 1 to 300. As of 2022, a minimum score of 200 is required to pass. The mean score in 2022 was 227, with a standard deviation of 15 points. Only approximately 9% of foreign test-takers scored below 200 in 2022 on their first try.

Steps One and Two are administered at testing centers all over the world, and many foreign medical graduates take these exams in their home countries or the countries where they went to medical school. Step Three is generally taken in the U.S. Most foreign medical graduates travel to the U.S. to take the Step Three exam on a B1 or B2 visitors' visa, which allows them to stay in the U.S. for only six months. After taking the exam, and sometimes participating in visa-eligible unpaid internship programs, most foreign medical graduates head home to await their results.

Once graduates have taken the USMLE, they are eligible to apply for residency programs through a process called The Match, which is administered by the National Resident Matching Program. Passing scores on Steps One and Two are required for the Match; Step Three is optional, but most residency programs—and all residency programs highly ranked by the medical community—require a Step Three passing

score. Once foreign medical graduates have completed the USMLE, they are finally certified by ECFMG as eligible to participate in the Match.

The Match cycle begins in September, when applicants may register; they must register no later than January 31. Then, starting on February 1, applicants begin ranking the residency programs they prefer in order, and residency programs begin ranking the applicants they prefer in order. This process continues until February 28, when the programs' and applicants' rankings must be final. Then, on March 11, applicants learn whether they have initially matched and a supplemental process opens for unmatched applicants and program spots. Match Day, when the National Resident Matching Program reveals which applicants will finally go to which residency programs, falls on the ides of March this year. Graduates' USMLE scores are a very important consideration in residency programs' matching decisions.

Residency programs generally begin in June or July. Most foreign medical graduates who do not otherwise have immigration status in the U.S. get J1 visas, which are for people who travel to the U.S. to participate in eligible educational exchange programs. Some foreign medical graduates get H1B visas, which are for temporary workers in specialty occupations who hold professional-level degrees. Both visas require that the person maintain participation in the residency program.

Cheating is a serious problem for the USMLE all over the world, a problem that many medical graduates described in a recent news article as "rampant." Alicia Gallegos, *U.S. Board Discloses Cheating, Grads Say Problem is Rampant*, MEDSCAPE, Feb. 1, 2024. Because the exams are administered many times throughout the year,

and because questions are recycled from one administration to the next, some people take the exam with the purpose of memorizing or copying questions to sell to future exam takers. To make this less likely, USMLE recently reduced the maximum number of times a person is allowed to take the text from six to four—people who are taking the USMLE six times, the thinking goes, are much more likely to be doing so for the purpose of copying questions—and changed Step One from numerically scored to pass–fail.

In response to a cheating scandal in Canada, doctors working for the Medical Counsel of Canada created a statistical method that they claimed could identify when test-takers likely had access to test questions in advance. *See* Timothy J. Wood, et al., *Identifying the Unauthorized Use of Examination Material*, 33 J. EVALUATION & HEALTH PROFESSIONS 96 (2010). This method is, on information and belief, generally accepted in the medical-testing community and is used by the USMLE to identify irregular score patterns.

The basic method starts by calculating a statistic representing each test-taker's predicted ability to answer questions correctly by measuring how she answers questions compared to how other test-takers answer the same questions. *Id.* at 100. (For example, if question 32 is answered correctly by 70% of test-takers but question 38 is answered correctly by only 20% of test-takers, someone who gets 38 right would have a higher ability score than someone who gets 32 right, all else equal.) The board examining the scores then calculates ability scores for test-takers on questions that may have been exposed to the public and compares those scores to ability scores on

questions that are known never to have been exposed to the public (generally questions that have never been used before). *Id.* The difference between those two scores is then adjusted by the standard deviations for each of the two scores to create something called a *z* statistic, which generally represents how far along a normal distribution a given value is relative to the mean and standard deviation of the distribution.

According to the method described above, test-takers with *z* statistics above a certain value are flagged for additional scrutiny. Crucially, though, a board evaluating scores must rule out alternative explanations before concluding that the *z* statistic represents evidence of improper behavior. Whenever, for example, test-takers run out of time or encounter technical problems the *z* statistic may generate a false indication of dishonesty. *Id.* at 101 ("[Step] 7. Rule out alternate explanations . . . For example, were there any technical problems that could have led to the discrepancy in scores?").    te

According to USMLE's published procedures, whenever NBME suspects that a test-taker cheated, that person "will be advised of the matter and will have an opportunity to provide information that [the person] considers relevant." USMLE then investigates and determines whether the person cheated. After that determination, the person may appeal to an ad hoc committee that USMLE establishes for that purpose. After the process is complete, the score transcripts of people found to have cheated "will contain a notation of the finding of [cheating]." Crucially, though, *during* the process "anyone alleged to have [cheated] will be

prohibited from registering for additional exams; *previously unreleased scores*, if any, *may* be withheld; and pending examination appointments will be canceled." Put differently, until the investigation is complete and the suspected cheater has had a chance to take an appeal, the person's scores remain valid, and they are eligible to continue working as a resident or participate in the Match. For obvious reasons, USMLE procedures do not require that notations of cheating be published until investigations are complete and cheaters have been reliably separated from non-cheaters though an investigation with an opportunity to be heard.

USMLE procedures also "reserve the right" to cancel scores where there are good-faith suspicions about their validity for reasons including cheating but not limited to it. These procedures provide that scores may be "delayed or withheld" during the investigation process, not canceled outright with no individualized process at all.

## II.    This Dispute

### A.    Dr. Giri Studies Hard, Scores Well Honestly, And Abruptly Learns That Her Scores Are Invalid Anyway

Dr. Latika Giri grew up in Nepal and graduated from the Kathmandu University School of Medical Sciences in 2022. She is a Nepali citizen and currently lives in Kathmandu.

Dr. Giri took Step One on February 9, 2023, in Kathmandu; Step Two on May 8, 2023, in India; and Step Three on September 18, 2023, in Connecticut. Dr. Giri passed Step One, scored a 252 on Step Two, and scored a 229 on Step Three. These scores would be in the 66th and 55th percentiles among U.S. medical graduates, who

score higher on average than foreign medical graduates. (Complete percentile charts for foreign graduates are not immediately available.)

Dr. Giri studied hard for the Boards. And she studied honestly: She has verified her complaint, under penalty of perjury, explaining that she did not cheat on the exams and did not have unauthorized access to exam questions.

In January 2024, Dr. Giri was preparing to enter the Match and hoping to enter residency in the summer of 2024. But on January 31, 2024, she got an email from NBME telling her that her USMLE scores had been "invalidated." NBME accused Dr. Giri of "Extremely improbable answer similarity with other examinees testing on the same form at similar times," "Unusually high performance," and "Abnormal question response times." A copy of the email is attached as an exhibit to Dr. Giri's motion for a TRO or preliminary injunction. Deb Decl., Ex. 1.

Attached to the email was a document captioned "United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees." A copy is attached as an exhibit. Deb Decl., Ex. 2.

This document explained that NBME's usual procedures recognize that "different procedures might be warranted in certain circumstances, including situations involving multiple examinees." And so, the document continues, because "[a]n investigation by USMLE program staff raised concerns regarding the outcomes achieved by a subset of USMLE examinees . . . the USMLE Composite Committee has concluded that alternative procedures should be implemented in response to the

score-validity concerns relating to these Examinees." *Id*. at 1.

Specifically, NBME was, in this case, suspending the review and appellate procedures that usually apply, and changing the score transcripts of all members of the "subset" of test-takers to "Score Not Available" during the pendency of any investigation. From the perspective of a hospital seeking new residents in the Match, a "Score Not Available" is akin to the applicant never having taken or passed the required USMLE step. NBME's action, then, effectively rendered Dr. Giri (and all other similarly situated 2024 applicants associated with Nepal) ineligible for residency.

The document explained that "Irregular behavior [which USMLE defines to include cheating and abusive conduct] is not the only basis upon which scores may be invalidated or reported with a qualification." *Id*. at 2. Instead, any examinee within the "subset" about whom NBME believes itself to have a "good faith basis for questioning the validity of the outcome at issue" has her score invalidated immediately. *Id*. at 5–6.

NBME gave examinees until February 16, 2024, to choose one of three options. First, they can request that NBME reconsider its decision. "It may take up to ten (10) weeks," NBME wrote, "for your reconsideration request to be evaluated, and perhaps longer." Ex. 1 at 3. Second, they can agree to retake the test. NBME wrote that it "anticipate[d] [that] retake exams will be offered beginning in mid to late 2024." *Id*. Finally, examinees can do nothing, in which case their "invalidated outcome(s) will remain unavailable on [their] USMLE transcript and [their] access to USMLE will

be suspended for three (3) years." *Id*.

The retake option is particularly troubling. Nepali test-takers have been told that they will be required to retake the exam under scrutinized conditions, taking each step in separate years and at test centers specifically chosen by the board. *Id*. It would likely take at least three years to complete this process, at which point graduates would be considered "old graduates" for matching purposes, and anyway their prior invalid scores will remain on their transcripts, threatening their applications.

If examinees choose options one or two—the only options for them to practice medicine any time in the next three years—they are required to specifically waive their right to sue NBME.

Under the special procedures established for the "subset" of examinees described in the letter, "[i]f the [committee] concludes that the information submitted by or on behalf of an examinee does not provide an adequate basis for overturning the decision to invalidate the score(s) at issue, the Committee will so notify the Examinee." Ex. 2 at 6. In other words, the burden—unlike in every other investigation the NBME conducts—is on every test-taker in the "subset" to *disprove* suspicion of "irregular behavior."

**B.   NCBE Reveals That it Invalidated Scores Explicitly on the Basis of Nepali Ethnicity or National Origin**

On January 31, 2024, the day before graduates become eligible to rank and be ranked on the Match, and the same day NBME emailed test-takers individually, NBME released the following statement to the general public:

The USMLE program regularly monitors and analyzes examinees' test performances for unusual score patterns or variations, and other information that could raise questions about the validity of an examinee's results. As part of an ongoing investigation, the USMLE program has identified a pattern of anomalous exam performance associated with Nepal, which challenges the validity of test results for a group of examinees. Highly irregular patterns can be indicative of prior unauthorized access to secure exam content. Examinees with results in question are being notified by the USMLE Secretariat's Office that their previous Step scores have been invalidated and that they will be required to take a validation exam(s). The USMLE program is working to notify examinees who need to schedule validation exam(s) and to support score users and other stakeholders impacted by the validation exam requirements.

That same day, ECFMG released a statement reading:

- Invalidated test scores no longer meet the requirements for ECFMG Certification.
- ECFMG Certificates issued to those whose test scores have been invalidated are also invalidated and those individuals are no longer considered to be ECFMG Certified.
- Applicants with invalidated test scores who were previously verified to the National Resident Matching Program® (NRMP®) as meeting the examination requirements for ECFMG Certification will now be verified to the NRMP as not meeting the examination requirements for ECFMG Certification.
- Status Reports on ECFMG Certification previously sent to residency programs, employers, U.S. state medical boards, and/or other organizations will be resent with the updated information, i.e., that an impacted individual is not ECFMG Certified and does not meet the examination requirements for ECFMG Certification.
- Invalidation of USMLE Step 3 scores does not impact ECFMG Certification.
- There may be implications to those who are being sponsored by ECFMG on a J-1 visa.

ECFMG also sent a letter, attached as an exhibit, to impacted individuals such as Dr. Giri notifying them that their "previously issued ECFMG Certificate also has

been invalidated" and that they "must destroy" their ECFMG certificate. Ex. 3 at 1.

On information and belief, scores "associated with Nepal" are either the scores of Nepali people, the scores of people who went to medical school in Nepal, or the scores of people who took Step One or Two in Nepal. The overwhelming majority of these people—if not all of them—are Nepali by citizenship, origin, ethnicity or all three. At least some of these people are Nepali by ethnicity but not national origin.

Not all people "associated with Nepal" under NBME's definition took the exams in Nepal. All or almost all took Step Three in the U.S., and many took Steps One and Two in countries other than Nepal, often India and Bangladesh, but elsewhere too.

On information and belief, NBME treated scores "associated with" any country other than Nepal under its ordinary procedures. No one else's scores were immediately invalidated—they all have an opportunity to be heard first. No one else was publicly accused of cheating—they get a full investigation first. No one else gets their final invalidation disclosed to the world in a press release—they all get to go on with their lives privately if they want. Only Nepali people immediately and publicly lost their scores with no opportunity to be heard first and no individual investigation.

None of them were presented with any individual evidence of any irregular score, let alone of actual cheating. All they get is a form email with, at most, one line explaining what about their scores lead NBME to invalidate their scores.

And these explanations appear to ignore obvious context. Nepal is a relatively small, developing country with only two university medical schools and two other

medical institutions that educate a small population of doctors. Unlike in the U.S. and other large countries, those schools share faculty members, curricula, and exams. Similarly, Nepali medical students all prepare for the same Nepali national exams generally using the same methods and materials. Nepali students would, therefore, be expected to have quite similar answers to similar questions in the absence of any irregular behavior whatever.

At the same time, the USMLE does not take points off for incorrect answers, and it is a strictly timed exam. Because most questions on the exam are quite lengthy and there is no harm in randomly guessing, some test-takers (including Dr. Giri) guess immediately as soon as they see that a question involves a given topic on which they have less knowledge than others. Accordingly, Dr. Giri—and many other students who, like her, honestly studied for the exam—sometimes answer questions correctly much faster than they possibly could have read those questions. That's not cheating; that's effective exam strategy.

Similarly, Dr. Giri experienced one or two technical problems during her exam, particularly with the portal used for clinical case simulations, with which she was technologically unfamiliar. This resulted in her prematurely ending that portion of the exam and scoring poorly, and perhaps this is part of why NBME became suspicious of Dr. Giri's answer timing.

NBME would have learned all of this before irrevocably harming Plaintiffs (as explained below) had it applied to them the same policies it would have applied to people from or tracing ancestry to any other place on earth.

C.     The Irreparable Harm to Plaintiffs

The immediate invalidation of their USMLE scores has caused Plaintiffs severe harm and it will cause them irreparable harm if it is not enjoined before February 21, 2024, to give time for Plaintiffs to participate in the Resident Match.

As of January 31, 2024, Plaintiffs who are applying to medical residencies are all ineligible for the Match, the deadline for which is February 28, 2024. Thus, unless this Court asks before that deadline, under the NBME's framework for appeals or re-tests, all Plaintiffs will miss this year's match no matter what they do. And NBME has offered no explanation for why it waited until the day before the Match opened to abruptly suspended Plaintiffs' scores: Dr. Giri and many others took some of the invalidated exams more than a year ago.

Nepali doctors who are currently in their residencies risk losing their visa status and being forced to leave the country immediately. On information and belief, many have already lost their jobs. This Court's emergency action to restore score validity pending individualized, non-discriminatory investigations is thus required.

**ARGUMENT**

I.     **Plaintiff Meets The Standard for Obtaining a Temporary Restraining Order or Preliminary Injunction**

Emergency relief, in the form of a TRO or preliminary injunction, is warranted here. Courts apply the same four factors when considering an application for a temporary restraining order as they do when weighing whether to enter a preliminary injunction. *E.g.*, *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022). To get a TRO or a preliminary injunction, movants must

establish four factors: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *E.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). At the end of the day, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Rufer v. Fed. Election Comm'n*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).

As explained in detail below, those four factors weigh in favor of Plaintiff here: she is likely to succeed on the merits, because there is strong  evidence that she was treated differently than others on the basis of her national origin or ethnicity; it is indisputable that the harm she and those similarly situated have and will suffer is irreparable absent action from this Court; and the balance of equities and public interest tip strongly in favor of preserving the status quo rather than permitting the USMLE to invalidate the scores of possibly hundreds of people, thereby totally upending their  lives, professionally and otherwise.[2]

---

[2] One threshold matter regarding Plaintiffs' entitlement to relief: shortly before filing a Complaint in this Court, Plaintiffs filed a charge of discrimination with the EEOC. They may seek preliminary relief in this Court as the EEOC conducts its investigation. *See Wagner v. Taylor*, 836 F.2d 566, 570 (D.C. Cir. 1987) ("[W]e agree with the District Court that federal courts have authority to enjoin, when appropriate, retaliatory transfers and other acts of reprisal while the administrative or the judicial-review process is advancing. . . . Congress did not intend to foreclose federal courts from providing injunctive relief in favor of worthy claimants."); *Jordan*

**A.      Plaintiffs Are Likely to Succeed on the Merits Because NBME Explicitly Discriminated on the Basis of Ethnicity and National Origin Without Any, Let Alone a Compelling, Justification.**

*First*, Plaintiffs are likely to succeed on the merits. To state a claim under Title VII, Plaintiffs must show that they (a) suffered an adverse employment action (b) because of their race, color, religion, sex, or national origin. *E.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Usually employers deny that they take adverse employment actions on the basis of a protected characteristic, contending instead that some other reason motivated the action, thereby triggering the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). But NBME said the quiet part out loud: There is no question that it acted on the basis of national origin or ethnicity because it explicitly said it was invaliding scores from test-takers "associated with Nepal."

Relatedly, to state a claim under Section 1981, "a plaintiff must [show] . . . that they, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Plaintiffs meet that standard here too.

### 1.      NBME Is Liable Under the D.C. Circuit's "Interference" Cases Interpreting Title VII

First, the suspension of Plaintiffs' scores is an "adverse employment action"

---

*v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) ("[O]ur Circuit held in Wagner that Congress did not intend to foreclose courts from providing injunctive relief to plaintiffs facing irreparable harm while pursuing their administrative remedies."). And Title VII's administrative-exhaustion requirement poses no barrier to relief under Section 1981.

and NBME is a responsible party under D.C. Circuit law. In *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), the D.C. Circuit "extend[ed] Title VII liability beyond a direct employment relationship to 'employers' who are in a position to interfere with the employment relationship between the Title VII plaintiff and some third party." *Morrison v. Am. Bd. Of Psychiatry & Neurology, Inc.*, 908 F. Supp. 582, 584 (N.D. Ill. 1996) (discussing *Sibley*); *Taylor v. Pompeo*, No. 19-cv-2987, 2021 WL 7904001, at *4 (D.D.C. Jan. 6, 2021) (Under *Sibley*, "a plaintiff may bring a discrimination claim against defendants who are neither actual nor potential direct employers of particular complainants, but who control access to such employment and who deny such access by reference to invidious criteria." (citation omitted)). Courts have specifically applied *Sibley*'s interference theory to cases against companies and employers that administer exams for the purpose of employment. *Id.*; *Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 577 (9th Cir. 2000) ("[W]e hold that Title VII applies to the [California Basic Education Skills Test].")); *and compare Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 375 (2d Cir. 2006) (inapplicable, out-of-Circuit case explicitly rejecting *Sibley* to conclude that Title VII does not apply to people without an employee–employer relationship with the plaintiff).

Here, under binding law, NBME is a potentially liable "employer" under the *Sibley* rule: it administers an exam whose only purpose is securing employment. *Morrison*, 908 F. Supp. At 584 (applying *Sibley* to medical board exam). And NBME's action is here is adverse: Due to NBME's departure from its normal procedures when

it comes to individuals "associated with Nepal," Plaintiffs are immediately unable to work or apply for work. Thus, if Plaintiffs show that NBME engaged in discrimination, Plaintiffs are very likely—indeed nearly certain—to prevail on the merits.

2.     *NBME Explicitly Discriminated on The Basis of Ethnicity, National Origin, Or Both, in Clear Violation of Title VII and Section 1981*

As explained in the Complaint, under ordinary NBME procedures, test-takers suspected of cheating are entitled to a full investigation before their scores are invalidated. But NBME decided to apply a new, harsh procedure to approximately 800 test-takers in a "subset of examinees" that it described as "associated with Nepal." The only scores "associated with Nepal" are either the scores of Nepali people, the scores of people who went to medical school in Nepal, or the scores of people who took Step One or Two in Nepal. The overwhelming majority of these people, and perhaps all of them, are Nepali by citizenship, origin, ethnicity or all three. The evidence that NBME acted on the basis of ethnicity or national origin, which comes entirely from NBME's *own* words, is overwhelming.

To justify its facially discriminatory actions, NBME's public communications claim that it has observed some as-yet-unexplained pattern of scores that indicates prior unauthorized access to questions. Its theory is apparently that some test-takers sit for the exam to memorize questions and then sell those questions to future test-takers *on the internet*. The problem with this theory is that the internet is available worldwide. NBME thus has not attempted to justify, nor can it, how it could be the case that this pattern of online-enabled unauthorized access would apply uniquely to

test-takers "associated with Nepal" (regardless of whether that could justify the explicit discrimination NBME's decision worked, which of course it cannot). If NBME thought that recent administrations of the test exhibited suspicious patterns, it could have simply applied its new procedures to *all* test-takers whose scores fit those patterns. Indeed even assuming that NBME has a secret tip regarding Nepali test-takers (and there is no evidence of this whatever), applying one standard to test-takers "associated with Nepal" and another standard to test-takers "associated with all other countries" would remain obviously illegal discrimination: employers are not allowed to translate their suspicions of some members of an ethnic group into negative consequences for the group as a whole; that is, after all, the essence of prejudice. There is, in short, no possible explanation for NBME's conduct—let alone one supported by any publicly available evidence—other than illegal discrimination.

Plaintiffs easily state discrimination claims under Section 1981 as well. NBME discriminated against them in the performance of the contract it entered, which required it to administer USMLE and certify scores in exchange for (a rather significant amount) of money. And it did so on the basis of ethnicity. *Covington v. FMC & Assocs., LLC*, No. 1:22-CV-01441-RDM, 2023 WL 5133184, at *7 (D.D.C. Aug. 10, 2023) ("[T]he racial discrimination [section 1981] is understood to protect against includes intentional discrimination based on ancestry or ethnic characteristics." (citations and internal quotation marks omitted)).

### B.   Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief From This Court

*Second*, Dr. Giri and the proposed class satisfy the irreparable harm

requirement. To satisfy this element, "[t]he moving party must show the injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation and internal quotation marks omitted). There is more than imminence here: NBME has already invalidated the scores of the approximately 800 members of the proposed class, and unless their scores are restored and NBME is ordered to adhere to its normal process, the proposed class will suffer inevitable harm to their employment opportunities, residency, and immigration status—classic forms of irreparable harm. *E.g.*, *Nio v. United States Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 62 (D.D.C. 2017) (finding irreparable harm where plaintiffs' "ability to travel and pursue professional and personal opportunities has been curtailed"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 99 (D.D.C. 2021) (finding irreparable harm where the plaintiffs "clients have confirmed they refuse to do business with them because of the designation" and one plaintiff was "at risk of losing his visa").

Plaintiffs have also satisfied their burden to "show the alleged harm will directly result from the action which the plaintiff seeks to enjoin." *Strait Shipbrokers*, 560 F. Supp. 3d at 98 (citation and internal quotations omitted). At base, Plaintiffs ask that the Court direct NBME to treat Nepali test-takers the same as it has treated all others suspected of cheating. Had NBME done that in the first instance, Dr. Giri's score (and those of other proposed class members) would remain valid while any investigation and/or appeal took place, and she would be allowed to participate in the

Match.  Absent the relief requested herein, these doctors' careers will be derailed due solely to NBME's decision to treat test-takers "associated with Nepal" differently from all other test-takers.

### C.   The Balance of The Equities Favors Relief Because All Plaintiffs Ask For Is to be Treated As NBME Would Treat Any Test-Taker Who Is Not Nepali.

*Third*, this Court and the D.C. Circuit have long recognized that, where plaintiffs face the threat of serious harm and it would cost the defendant little to maintain the status quo, the balance of the equities tips in favor of granting preliminary injunctive relief. *See, e.g.*, *Dist. Title v. Warren*, 181 F. Supp. 3d 16, 29 (D.D.C. 2014) ("The Court finds that an order enjoining defendants from further dissipating funds to which they are not entitled will not harm defendants, but rather, will maintain the status quo.") *aff'd sub nom. Title v. Warren*, 612 F. App'x 5 (D.C. Cir. 2015) (same); *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012).

The balance of the equities thus weighs heavily in favor of an immediate injunction requiring NBME to treat test-takers "associated with Nepal" the same as it treats all other test-takers. Specifically, the equities weigh in favor of granting both forms of immediate relief Plaintiffs request: (a) a pause of NBME's unilaterally imposed 16-day deadline for affected doctors to decide whether to waive their right to sue NBME, and (b) the reinstatement of the affected doctors' test scores pending individualized investigations. Granting the former relief will preserve the immediate status quo, by allowing the Court to weigh the parties' claims without forcing all Plaintiffs to choose between accepting NBME's cancellation or waiving their right to

sue NBME for discrimination. NBME has arbitrarily set that deadline for February 16, so immediate action from this Court is required simply to give the Court time to decide consider the serious claims of discrimination against individuals "associated with Nepali" and the validity of NBME's departure from its normal process.

Granting the second form of requested relief—requiring NBME to adhere to that normal process, during which test-takers' scores remain valid pending appeal and individualized consideration—would return the parties to the status quo that existed until January 31, 2024. Before that date, Dr. Giri and other members of the proposed class were preparing their residency applications; other members of the proposed class who are already residents went to work every day to continue training and attend to patients. And prior to January 31, if any of them were to be suspected by NBME of cheating, they would have been notified privately and permitted to maintain their score while seeking an appeal. NBME upended the lives of these approximately 800 individuals with its actions on January 31.

Where "the requested relief will in no way impinge upon the [defendants] financially" and would restore plaintiffs to their position before the alleged Title VII violation, the "balance-of-harm prong strongly militates in favor of granting requested relief." *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 34 (D.D.C. 2001). That is the case here. Moreover, given that this third factor is inherently comparative, it is highly significant that *not* granting Plaintiff and the proposed class the relief they request would have devastating consequences—for their livelihood, their immigration status, and their reputation. *Id.* ("Whereas the potential harm to

third parties and to the [defendant] of plaintiffs' requested relief is minimal at best, the harm to the plaintiffs by denying them injunctive relief would be severe."); *Daly v. Runyon*, No. 95-cv-5954, 1996 WL 754112, at *5 (N.D. Ill. Dec. 31, 1996) ("[A] court may award injunctive relief in Title VII cases if the decision is consistent with fundamental concepts of fairness. (citation omitted).

### D.     The Public Interest Supports Granting The Emergency Relief.

*Fourth*, This Court has long recognized the "strong public policy" against race discrimination, and that the public interest weighs in favor of an injunction particularly where allegations of discrimination *"prima facie* have a likelihood of being meritorious." *Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1119 (D.D.C. 1987) ("Congress has made eradication of discrimination in all facets of public life . . . a priority to which many otherwise private interests must give way."); *E.E.O.C. v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991) (affirming grant of Title VII preliminary injunction and noting "compelling governmental and public interest in eradicating unlawful employment discrimination"); *cf. Bilingual Bicultural Coal. on Mass Media, Inc. v. F.C.C.*, No. 75-1855, 1977 WL 5712, at *1 (D.C. Cir. Apr. 20, 1977), *on reh'g en banc*, 595 F.2d 621 (D.C. Cir. 1978) ("Race discrimination is not in the public interest.").

Moreover, the "public has an interest in assuring that private institutions comport with general notions of procedural fair play." *Heineke v. Santa Clara Univ.*, No. 17-cv-05285, 2018 WL 3368455, at *17 (N.D. Cal. July 10, 2018), *aff'd*, 965 F.3d 1009 (9th Cir. 2020), *and aff'd in part, rev'd in part on other grounds*, 812 F. App'x 644 (9th Cir. 2020); *Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983, 988 (D.

Minn. 1994) (same). And here, that interest is not counterweighed by any interest NBME may have in deference to its normal procedures, because the entire problem in this case is NBME departed from those procedures only for individuals "associated with Nepal." The public interest would thus be served by an order directing NBME to treat all test-takers in the same manner, regardless of race or ethnicity.

## CONCLUSION

The Court should immediately grant the proposed emergency relief to preserve the status quo. A proposed order is attached.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Emily Gerrick
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
*/s/ Kritika Tara Deb*
James Crooks
Kritika Tara Deb
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
(619) 547-4182