**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DR. LATIKA GIRI,

                Plaintiff,

v.                                    Case No. 1:24-cv-00410

THE NATIONAL BOARD OF
MEDICAL EXAMINERS,

                Defendant.

_____/

**NBME'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

It is an unfortunate reality that some individuals attempt to achieve higher scores on high-stakes examinations through improper means. The adverse consequences are troubling in all instances but particularly so when the examination is a medical licensing examination that every jurisdiction in the United States relies upon to help ensure that prospective licensees have the minimum competencies needed to provide safe and effective health care.

The United States Medical Licensing Examination ("USMLE") program, which is co-sponsored by defendant National Board of Medical Examiners ("NBME"), invalidated the passing level results that 832 individuals achieved on one or more of the three Step examinations that make up the USMLE. It did so based upon concerns that the exam results reflected prior access to secure exam content rather than knowledge and understanding of the medical principles and skills that the exams are intended to assess. The USMLE program did not invalidate the scores because the examinees are Nepali, as Plaintiff unfairly and inaccurately asserts, but because USMLE program staff concluded that there is a good faith basis for questioning the validity of their scores.

As explained further below, the USMLE program received tips that prospective examinees in various countries were exchanging secure USMLE test content and using that content to prepare for their exams, in an orchestrated and clandestine manner. The USMLE program also located information on the internet that was consistent with the tips. When NBME psychometricians did a preliminary evaluation of how examinees were performing in various of the countries that had been mentioned, they learned that the country with the largest number of examinees achieving statistically anomalous USMLE results was Nepal. The USMLE program therefore prioritized its investigation efforts on those examinees, while continuing to evaluate information relating to examinees in other countries. And when it realized that a large number of the individuals who it had identified with questionable USMLE results would soon be applying to residency programs and providing health care services to the public, the USMLE program decided that it had to act.

The USMLE program took reasonable and appropriate actions to prevent the significant harm and disruption that would result from allowing potentially unqualified individuals to participate in the 2024 residency Match, while giving the affected examinees an opportunity to provide information in support of reinstating the invalidated scores or to take a free retest to demonstrate their competencies. Its actions did not reflect an extreme departure from the program's policies relating to score validity concerns; they were consistent with rights that the USMLE program reserves in its testing agreement with examinees, they were consistent with actions other testing entities have taken after learning that exam content had been improperly disclosed to an unknown number of prospective examinees, and they were not discriminatory.  If the USMLE program identified the identical performance anomalies among a large group of USMLE examinees from, say, Maryland, it would take the identical actions with respect to those examinees that it has taken with respect to the 832 individuals whom Plaintiff purports to represent here.

2

Against this background, and based upon allegations that, for the most part, are not supported with any documentation relating to Dr. Giri much less to the other 831 affected examinees, Dr. Giri is asking the Court to issue a preliminary injunction that would require NBME to immediately reinstate the invalidated USMLE scores of 832 individuals so that they can participate in the 2024 residency Match and begin to provide medical services in the United States as resident physicians or continue to practice medicine here if they are resident physicians. The Court should deny this request.

According to Dr. Giri, she is simply trying to preserve the status quo, and her requested relief would cause no harm to NBME or any third-parties. Motion for Temporary Restraining Order or Preliminary Injunction and Memorandum of Points and Authorities in Support (Dkt. 3) ("Pl. Br.") at 1, 24-27.  Nothing could be further from the truth, however. She wants the Court to *alter* the status quo, not preserve it, by ordering NBME to *reinstate* 832 USMLE scores that NBME has already invalidated because of significant concerns about their validity. And, if granted, the requested injunction would cause enormous harm not only to NBME, which has an obligation to protect the integrity of the USMLE program and the reliability of reported USMLE results, but also to state licensing authorities, which rely upon USMLE results to help ensure that physicians have the minimum competencies needed to provide safe and effective health care, and which issue training and permanent licenses on the strength of passing USMLE results; to members of the general public who receive health care services from individuals whose USMLE results have been invalidated and may not have the qualifications that their those results suggest; to the hospitals and other health care facilities that employ any such individuals as residents, only to later be told that the residents should not have been given positions and were not qualified to practice because their USMLE scores were invalid; to the residency programs, which devote significant resources to

recruiting and training resident physicians and do not want to lose a resident because USMLE scores are later invalidated; and to individuals who are not selected for residency positions that instead go to one of the 832 individuals whose USMLE scores have been determined to be invalid.

Preliminary injunctions are extraordinary remedies that should be granted only if a plaintiff makes a clear showing that all required factors support the requested relief. Dr. Giri has fallen well short of making that showing here.

## **BACKGROUND**

### I.    **NBME and the USMLE**

NBME is a private, not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality assessments of the knowledge and skills of health professionals. Decl. of Alex J. Mechaber, M.D., MACP ¶ 4 ("Dr. Mechaber Decl."). NBME is a co-sponsor of the USMLE program. *Id.* ¶ 4.

The USMLE is a standardized examination used to evaluate applicants' knowledge and their competence for medical licensure in the United States and its territories. *Id.* ¶ 5. It is designed to assess an examinee's ability to apply the knowledge and demonstrate the fundamental skills that constitute the basis of safe and effective patient care. *Id.* Medical licensing authorities across the U.S. rely upon the USMLE in evaluating the qualifications of individuals seeking an initial license to practice medicine. *Id.* ¶ 5.

Three "Step" exams make up the USMLE: Step 1, Step 2 Clinical Knowledge ("Step 2 CK"), and Step 3. *Id.* ¶¶ 6-9. Step 1 assesses whether candidates can apply basic science concepts that are important to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. It ensures knowledge of not only the sciences that provide a foundation for the safe and competent practice of medicine in the present, but also

the scientific principles required for maintenance of competence through lifelong learning. *Id*. ¶ 7. Step 2 CK assesses an examinee's ability to apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision and includes emphasis on initial clinical management, health promotion and disease prevention. *Id.* ¶ 8. Step 3 assesses whether the examinee can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings. *Id.* ¶ 9. The test items and cases reflect the clinical situations that a general, as-yet undifferentiated, physician might encounter within the context of a specific setting. It is the final examination in the USMLE sequence leading to a license to practice medicine without supervision. As such, it provides a final assessment of physicians assuming independent responsibility for delivering general medical care. *Id.*

The USMLE is administered on computers at testing centers located around the world. *Id.* ¶ 10. The testing centers are operated by a third-party vendor, Prometric, or its franchisees. *Id.* Step 3 is administered only in the U.S., but Steps 1 and 2 CK are administered worldwide. Id.

The USMLE is a "secure" exam, which means that the exam items are kept confidential before and after an exam is administered. *Id.* ¶ 12. Strict security measures are in place in NBME's offices that limit who can access USMLE items. NBME also holds examinees to strict confidentiality obligations. As a condition of taking any Step examination, examinees must agree not to duplicate or disclose any examination materials before, during or after taking the examination, by any means or in any format whatsoever. *Id.* This includes not disclosing or discussing any questions or answers that they see when taking a Step exam, in whole or in part, through in-person discussions or on any internet-based platforms, and not accessing content that has been improperly disclosed. Exam rules of conduct and prohibited behavior are set forth in the USMLE Bulletin of

Information (*see* ECF Dkt. 3-3 at 11-13), and examinees must certify that they have read and agree to abide by the Bulletin of Information and the policies and procedures described therein as a condition of taking the exam. *Id.*; *see also* Declaration of Colleen Ward ("Ward Decl.") ¶ 16.

NBME goes to great lengths to maintain the confidentiality of its USMLE items because, as is common with standardized tests, NBME reuses items from prior exams to "equate" scores (that is, to adjust for variation in the difficulty of exam forms so that the reported scaled scores reflect the same level of performance exam-to-exam). Dr. Mechaber Decl. ¶ 13.

When live USMLE items are disclosed outside of the secure testing environment, it jeopardizes the validity of future exam results. *Id.* ¶ 14. The risk is that questions will be answered correctly not because a given examinee knows the applicable content but because of prior access to the questions and answers. *Id.* That harms not only other examinees and the USMLE program, but also the licensing boards and members of the general public that rely on USMLE outcomes to help ensure that only those with the skill and knowledge needed to practice medicine unsupervised are licensed as doctors.  It also harms the medical residency programs that rely on USMLE scores when evaluating and selecting applicants. *Id.;* Decl. of Christopher Feddock ¶¶ 33, 35 ("Dr. Feddock Decl.").

## II.    The USMLE program's investigation of reported unauthorized collection and sharing of secure exam content

The performance of USMLE examinees is monitored regularly and may be analyzed to detect aberrancies or other variations that raise questions about the validity of their exam results. Dr. Mechaber Decl. ¶ 15.

The USMLE program also encourages examinees to help maintain the integrity of the USMLE by reporting suspected test security violations. *See* Ward Decl. ¶ 4. Individuals can submit anonymous tips via phone or email. The USMLE program also has an app (the "STOPit app")

where individuals can share anonymous tips and the USMLE program can communicate with the tipsters through the app. *Id.* Tipsters may describe, for example, activities related to a specific individual or individuals, a certain school, or a particular test center. *Id.* at ¶ 5. They may point to postings on social media, in messaging apps, or in online social networks such as Reddit. Tips are reviewed and investigated, typically by a USMLE program officer in the first instance. *Id.*

The USMLE program has received a number of tips tied to activities in specific countries, claiming that groups of examinees were collecting and disseminating secure USMLE exam content so that examinees would see and discuss the questions in advance of testing. *Id.* at ¶ 6. One tip received in January 2023, for example, claimed that there were question banks of live USMLE items circulating and that individuals were relying on these question banks to achieve very high scores. The tipster indicated this was happening in India and in Nepal. *Id.* Another tip received in January 2023 suggested that "in India and in Nepal USMLE aspirants are purchasing [the] last six months question papers". *Id.* The USMLE program also became aware of posts on social media and in online chat rooms suggesting that groups of individuals in Nepal were collecting and sharing large amounts of secure exam material in private groups and using this unauthorized access to obtain extremely high USMLE scores. *Id.* ¶ 7.

In response to the anonymous tips received by the USMLE program office and other information, in early 2023, the USMLE program asked the NBME Psychometrics and Data Analysis ("PADA") unit to analyze examinee performance data for test centers in Jordan, Nepal, and Pakistan. *See* Decl. of Daniel Jurich, Ph.D. ("Dr. Jurich Decl.") ¶ 6. Within this initial data analysis, the data involving the test center in Nepal (there was only one test center in Nepal) was the most extreme. *Id.* ¶ 7. First, out of more than 400 test centers across the world (including more than 315 test centers in the U.S. or Canada), the Nepal test center produced the highest test scores (on

average across all examinees) in the world for Step 1 in 2021 and 2022 and the highest test scores in the world for Step 2 CK in 2022. *Id.*[1] For the 2022 Step 1 exam, the average score of examinees testing in the Nepal test center was 240. No other test center in the world had an average examinee score above 227. *Id.* Second, the median item response time for examinees who tested at the Nepal test center in 2022 was also among the fastest 5% and 10% of all international test centers for Step 1 and Step 2 CK, respectively.[2] Third, the volume of examinees taking the USMLE Step 1 and Step 2 CK at the test center in Nepal had increased unusually quickly. Step 1 volume had more than doubled in the Nepal test center in 2022 (662 examinees) compared to 2019 (281). *Id.* The rapid increase continued in 2023, where examinee volume was approximately 3.5 times higher (981 examinees) than the 2019 volume. *Id.* This data was consistent with anonymous tips and other information received by the USMLE program office suggesting there may be wide-scale collection and sharing of live USMLE exam content within Nepal. *Id.*

Continuing its investigation, in or around April 2023, PADA ran "agreement analyses" to see if it could identify examinees who might have shared or otherwise had access to confidential USMLE content prior to testing. *Id.* ¶ 8. Agreement analysis, a common and well-studied data forensic method, identifies examinees who have selected a statistically improbable number of the same incorrect response options to the same questions (from among the typically 4-6 answer choices that exist for a given multiple-choice question) as another examinee. *Id.* In other words, an agreement analysis does not just look to see if multiple examinees missed the same question; it looks to see whether multiple examinees selected the same *incorrect* answers to the same question.

---

[1]  When a year is referenced in relation to a Step exam, the reference is to a USMLE testing year, not a calendar year. *See* Dr. Jurich Decl. ¶ 2 n.1.

[2]  "Median response time" refers to the average amount of time an examinee displayed each exam item on their computer screen during a test session, as defined by the 50th percentile. *Id.*

PADA first ran an agreement analysis for all examinees who tested at centers in Jordan, Nepal, and Pakistan, as well as two centers in India. *Id.* ¶ 9. This analysis showed that, for the 2022 Step 1 exam and the 2021 and 2022 Step 2 CK exam, there was a substantially higher percentage of examinees with a statistically significant level of agreement matches in the group of examinees who tested at centers in Jordan, Nepal, Pakistan, and India (the "reviewed group"), compared to the baseline group. *Id.*[3] The data also showed that the vast majority of examinees with a statistically significant number of matching incorrect answers tested at the Nepal test center. *Id.*

Data analyzed by PADA further showed that examinee volumes increased considerably at the Nepal test center in the months prior to the USMLE program releasing new test items, suggesting that candidates who had prior access to disclosed exam questions wanted to test before new questions came into the item pool. *Id.* ¶ 10.

In or around July 2023, PADA re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 CK exams, this time focused on examinees who tested at the Nepal test center and/or were citizens of Nepal (based on information self-disclosed in their application to test). *Id.* ¶ 11. These analyses showed that a significantly higher percentage of examinees in this reviewed group had a substantially higher number of statistically significant agreement matches (*i.e.*, the same incorrect responses to the same questions) with one or more other examinees in that group, for both exams, as compared to the initial reviewed group that included examinees not only from the Nepal test center but also test centers in other countries. *Id.* ¶ 12. This analysis confirmed that the Nepal test center was a priority concern for the USMLE program. *Id.*

---

[3] For all of the agreement analyses discussed in this declaration, NBME ran an analysis of a "baseline group" comprising the first 500 first-time examinees from accredited U.S. and Canadian medical schools who tested on the exam form, and those numbers were used as a comparison to the reviewed group.

PADA also expanded its analysis to the Step 3 exam. *Id.* ¶ 13. The reviewed group in this case was adjusted to include individuals who attended medical school in Nepal or self-reported as a citizen of Nepal. *Id.* The Step 3 exam is only offered in the United States, so PADA could not look to data from the Nepal test center. *Id.* This analysis showed no statistically significant agreement matches for the 2021 Step 3 exam but considerably higher percentages of incorrect-response agreement in 2022 and 2023 (based on data available at that time). *Id.*

While the PADA analyses were ongoing, the USMLE program continued to receive anonymous tips tied to Nepal. *See* Ward Decl. ¶ 8. In May 2023, for example, one tipster reported:

> *Hello, I am concerned that USMLE graduates from Nepal have been scoring really high scores (270s and 280s since past 3-4 years). There is a real reason behind this which is that almost all questions are out and the examinee gets all repeated question in their exam which is really unfair given this used to be a competitive exam. ... These are preparation libraries/ reading rooms in Nepal where students gather and go through these volumes of question pool, that is illegal. ... Mero reading room, HOPE reading room, subham reading room, Paradise reading room, closer study Hub. (.all are kathmandu based)*

*Id.* Another tip received in June 2023 reported:

> *I would like to report that some of closed group nepalese candidate are discussing and sharing Past questions written by past exam takers. These are groups according to the medical schools. One of the friend sent me this set, which have all the questions and he was pretty much sure that if the candidate get this set, 280+ score is confirm....Incident occurring in Telegram group owned by Nepalese usmle aspirant ....*

*Id.* ¶ 9.

An individual acting on behalf of the USMLE program was also able to gain access to an exclusive online Telegram Messenger group in which USMLE exams are discussed, with approximately 1,300 members. *Id.* ¶ 10.[4] This individual had to provide documentation showing a nexus

---

[4] Telegram is a cloud-based mobile and desktop messaging app that enables large numbers of individuals to participate anonymously and confidentially in an online messaging group. Ward Decl. ¶ 11. According to the Telegram website (https://telegram.org/faq#q-what-is-telegram-what-do-i-do-here): "With Telegram, you can send messages, photos, videos and files of any type (doc, zip,

to Nepal and a USMLE testing permit to be admitted to the group, which has been referred to at times in online group postings as "Arahmba." *Id.*

After gaining admission to this USMLE Telegram group, the individual downloaded hundreds of files from the Telegram group site, including "re-calls" from examinees of secure USMLE exam content. *Id.* ¶ 12 and Ex. A. Screenshots shared by this individual showed participants in the group chats claiming that many of the questions that they saw when they took their USMLE Step exams came from "PQs" ("Past Questions") that had been shared within the group. Some even claimed that 90% or more of their exam questions came from "PQs." *Id.* ¶ 13. One poster wrote:

> *Hello everyone, I had my exam on 16th October. I had around 75% pqs even though most of our friends had around 90-95%. (May be it' depends on ones LUCK too) But exam is doable. New question takes our time but PQs are our real SAVIOUR. I hope my small contribution will help all of you somehow. Thank you ARAMBHA family specially amazing authors, hosts and admins. See you guys on other side. Hopefully!*

Another poster wrote:

> *Dear all, I had my exam today, Most of the questions were PQ or around PQ. I request all to go through 1000 pages (saviour). No words can describe how grateful I am for this group. See you all on the other side. Complete set loading soon….*

*Id.* ¶ 13 and Ex. B.

There are also posts in the group chats advising examinees to use the full examination time when they take the USMLE to avoid raising suspicion about having had prior access to secure exam materials, and not to talk publicly about having seen "PQs" when they took their test. *Id.* ¶ 14. One poster wrote:

---

mp3, etc), as well as create groups for up to 200,000 people or channels for broadcasting to unlimited audiences. You can write to your phone contacts and find people by their usernames. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. In addition to this, we support end-to-end encrypted voice and video calls, as well as voice chats in groups for thousands of participants." *Id.*

> *Hello everyone!*
> *As you all know what might be the consequences of talking about pq at exam center,*
> *leaving exam center less than half of allotted time.*
> *No one is with that type of super power to finish that exam this much early.*
> *Really guys! are you that much dumb or what??*
> *It's okay if you are blessed with that super power. Let's close this group n it will be*
> *easy for you to stay at exam center for allotted time.*
> *N congratulations !! You guys are going a step ahead to end this center n the jour-*
> *ney*

*Id.* ¶ 14 and Ex. C. Another poster wrote:

> *Hello everybody, i have been told that people giving step 1 are finishing their exams*
> *2-3 hours early and are coming out of the prometric centre talking about the pq. If*
> *you have friends or know the admin of step 1 please forward a message requesting*
> *them to take their time during exams.*

*Id.*

Given the highly unusual and concerning data shown in the PADA analyses and other information learned during the course of the USMLE program's investigation into possible unauthorized access to live exam content within Nepal, in or around September 2023, the USMLE program began working on establishing a set of criteria for identifying exam scores with questionable validity associated with Nepal. Dr. Jurich Decl. ¶ 14.

PADA consulted with private test security consultants and worked with USMLE program leadership and other USMLE program staff to establish the criteria. *Id.* ¶ 15. The overarching concern was that passing level results—often with scores that were among the highest in the world—may reflect prior access to secure exam questions and answers rather than knowledge and understanding of the medical subjects assessed on the exam. *Id.*

The purpose of this analysis by USMLE program staff was to identify score validity concerns, not to identify irregular behavior or prove that any given examinee cheated on the USMLE. *Id.* ¶ 16. It is often very difficult, if not impossible, to obtain direct evidence of cheating, particularly when content is shared on anonymous and restricted social media sites such as Telegram. *Id.*

Thus, to protect the integrity of the test, in cases of suspected security breaches, it is a psychometrically sound practice to analyze relevant test performance data to identify scores of questionable validity and to cancel or withdraw those scores if the testing entity does not have confidence that the scores are an accurate measure of the examinee's knowledge or competence as assessed by the exam. *Id.* This is a common and accepted practice within the standardized testing industry. *Id.*

In evaluating exam performance for purposes of identifying scores of questioned validity, USMLE program staff considered, among other information, the results of the incorrect-response agreement analysis for each examinee, the examinee's median response time, the examinee's numerical scores, whether the examinee had considerable performance differences on different Step exams, whether the examinee had considerable differences in performance on multiple attempts at the same exam, and whether the examinee had already been identified for irregular behavior. *Id.* ¶ 17. The analysis was individualized for each examinee, based on their individual exam data. *Id.* For the incorrect-response agreement part of the analysis, statistically significant agreement matches were required with at least two other individuals in the reviewed group, and under the thresholds used by PADA, the probability of an examinee showing statistically significant agreement matches with at least two individuals would be expected to occur by chance alone in only 1 in 100 million cases. *Id.* Matching with more than two individuals based on chance alone would be even more improbable. *Id.* This analysis was run with respect to (a) individuals who took the Step 1 and/or Step 2 CK exam in 2021, 2022, or 2023 (based on then-available data) at the Nepal test center or who self-reported as a citizen of Nepal and (b) individuals who took the Step 3 exam in 2021, 2022, or 2023 (based on then-available data) and attended medical school in Nepal or self-reported as a citizen of Nepal. *Id.* ¶ 18.

The USMLE program's score analysis described above identified 832 examinees who had passing level exam results whose validity the USMLE program had a significant and good faith basis for questioning. *Id.* ¶ 19. Of this number, 618 examinees had one Step score flagged as being of questioned validity; 202 examinees had two Step exam scores flagged; and 12 examinees had scores flagged on all three Step exams. *Id.* The analysis flagged approximately 25% of all the individual exam administrations meeting the criteria discussed above. *Id.* The analysis flagged approximately 40% of the examinees meeting the criteria for at least one exam. *Id.*

The USMLE program's investigation into possible test security issues and score invalidity is not limited to Nepal, and its investigation is ongoing. *Id.* ¶ 23; Dr. Mechaber Decl. ¶ 23.

## III.     Invalidation of Plaintiff's USMLE scores

### A.      USMLE program policy

The USMLE program expressly reserves the right to cancel exam results that are at or above the passing level if the USMLE program has a good faith basis for questioning whether the exam result(s) represent a valid measure of knowledge or competence as assessed by the examination.  Bulletin of Information 19 (ECF Dkt. 3-3). Questions about score validity may result from irregular behavior, improper access to exam questions, or other factors. Dr. Mechaber Decl. ¶ 16.

The USMLE program has different policies and procedures in place to address instances of suspected irregular behavior versus instances of questioned score validity, although certain types of conduct might fall under more than policy. *Id.* ¶ 17. Those policies and procedures include the *United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores* the *United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding Irregular Behavior. Id.* ¶ 17 and Exs. A-B.

As recognized in the *Policies and Procedures Regarding the Validity of Passing Level Scores*, special procedures may also be appropriate in some circumstances in which the validity of a passing USMLE score is questioned, particularly in circumstances involving multiple examinees. *Id.* ¶ 18 and Ex. A. In accordance with the *Policies and Procedures Regarding the Validity of Passing Level Scores*, the USMLE program is expressly authorized to take any actions it deems appropriate in response to concerns regarding score validity if the USMLE Committee for Individualized Review ("CIR") or the USMLE Composite Committee concludes that alternative or supplemental procedures are warranted in response to a given set of facts or circumstances. *Id.*

Following the months-long investigation and analysis by the USMLE program described above that resulted in the USMLE program identifying 832 examinees who had passing level performance results on one or more Step exams as to which the USMLE program had significant concerns about the validity of the passing results, the USMLE program concluded that alternative procedures were warranted to address the score invalidity concerns identified through the investigation and analysis, in the interest of providing a process that is timely, efficient, effective, and fair, and given the large number of examinees involved in the investigation. *Id.* ¶¶ 19-20. Those alternative procedures are set out in a document entitled the *United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees*. *Id.* ¶ 20 and Ex. C. Under both the *Policies and Procedures Regarding the Validity of Passing Level Scores* and the *United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees*, when questions about score validity arise after a score has been released, USMLE program staff will suspend further distribution of the questioned

score, inform the examinee about the question, and request a response. *Compare* Dr. Mechaber Decl. Ex. A ¶ B.4 (p. 3) and Ex. C ¶ B.5.

As set out in the *United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees*, the 832 examinees were provided three options in response to the USMLE program's findings, and they were required to choose how they wished to proceed within fifteen calendar days of receiving notice. *Id.* ¶ 21 and Ex. C at 4-5. In setting this deadline, the USMLE program was mindful of providing sufficient time for examinees to respond, while also allowing the process to move forward expeditiously and to facilitate exam retake planning and scheduling. *Id.* ¶ 21.

The USMLE program was also aware that hundreds of the examinees identified through the USMLE program's investigation and analysis with passing-level scores of questionable validity were registered to participate in the 2024 National Resident Matching Program ("NRMP"). USMLE program leadership (which includes academic medical center faculty who are intimately familiar with the medical residency training process as well as representatives of state medical licensing boards) was deeply concerned about the risks of allowing this group of individuals to move forward in the Match and potentially enter into residency programs, where they would be directly involved in providing patient care. *Id.* ¶ 22.

**B.      Plaintiff's score invalidation**

Plaintiff took the Step 1 exam in February 2023, the Step 2 CK exam in May 2023, and the Step 3 exam in September 2023. Ward Decl. ¶¶ 17-19 and Exs. D-F.[5] She received a passing score each exam.

---

[5] Dr. Giri took all three Step exams in one year, within an approximately seven-month period. It is highly unusual for an examinee to take all three Step examinations in such quick succession, given the need to study for different content domains for each of the three exams. Dr. Jurich Decl.

Dr. Giri's passing-level USMLE Step exam results were invalidated based on the USMLE program investigation described above. *See* Jurich Decl. ¶ 24-25 and Ex. C. Dr. Giri's Step 1 result has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times, unusually high performance, and abnormal question response times. *Id.* ¶ 27. Dr. Giri's Step 2 CK score has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times and abnormal question response times. *Id.* Dr. Giri's Step 3 score has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times and abnormal question response times. *Id.*

Dr. Giri may request reconsideration of the USMLE program's decision to invalidate her scores by providing an explanation and supporting documentation evidencing why she believes her Step 1, Step 2 CK and Step 3 exams result should be reinstated as valid. *Id.* ¶ 26 and Ex. C. She may also choose to retake each of the exams at no cost. *Id.*

Dr. Giri has challenged the bases for the USMLE program's invalidation of her and other exam scores. *See* Complaint ¶¶ 49-51. First, she argues that the explanations provided for her score invalidations "ignore obvious context" because, according to her verified complaint:

> Nepal is a relatively small, developing country with only two university medical schools and two other medical institutions that educate a small population of doctors. Unlike in the U.S. and other large countries, those schools share faculty members, curricula, and exams. Similarly, Nepali medical students all prepare for the same Nepali national exams generally using the same methods and materials. Nepali students would, therefore, be expected to have quite similar answers to similar questions in the absence of any irregular behavior whatsoever.

---

¶ 34. Step 1 is generally taken upon completing the pre-clerkship curriculum in medical school; Step 2 CK is generally taken after concluding clinical rotations; and Step 3 is generally taken after the first year of residency. *See* www.ama-assn.org/medical-students/usmle-step-1-2/what-usmle.

*Id.* ¶ 49.[6] Nepal has at least 19 medical schools, however, not two (or four). Dr. Jurich Decl. ¶ 29. And when the USMLE program ran data analyses to examine whether there were statistically significant answer agreements for examinees in Nepal, it performed the same analysis with respect to a baseline comparison group that would have included other individuals who also went to the same medical schools, had the same teachers, and likely studied together. *Id.* Yet this baseline comparison group did not show statistically significant response similarity above the expected and extremely low rates. *Id.*

Dr. Giri also argues that it is not surprising that she was able to answer Step exam questions correctly in less time than it would take her to even read the question, on topics with which she had less familiarity. In her own words, and from her verified complaint:

> Because most questions on the exam are quite lengthy and there is no harm in randomly guessing, some test-takers (including Dr. Giri) guess immediately as soon

---

[6]  Dr. Giri asserts that "she did not cheat on the exams and did not have unauthorized access to exam questions," Pl. Br. 11, but her assertion that she did not have access to improperly disclosed questions appears to conflict with other assertions she makes. As noted above, she asserts that "Nepali medical students all prepare ... using the same methods and materials," and she asserts elsewhere in her brief that "[c]heating is a serious problem for the USMLE all over the world" and has been described "in a recent news article as 'rampant.'" Pl. Br. 7. If she studied for her Step exams using the same materials as all other "Nepali medical students," it is incredibly unlikely she did not have access to improperly disclosed UMSLE questions, whether knowingly or unknowingly. In all events, NBME was not required to find evidence that Dr. Giri cheated in order to invalidate her score. The appropriate question is whether it had a good faith basis for questioning the validity of her scores. *See, e.g., Langston v. ACT*, 890 F.2d 380, 385 n.9 (11th Cir.1989) ("Under the governing law, the outcome of plaintiff's case does not turn on whether or not plaintiff cheated on his exam, but only on whether or not ACT carried out its contractual obligations in good faith."); *San Mateo Union High School Dist. v. Educ. Testing Servs.*, 2013 WL 4711611, *9 (N.D. Cal. 2013) (rejecting argument that argument "that, as a prerequisite to invalidating test scores, Defendants have an implied obligation to establish that students, in fact, actually cheated or gained an unfair advantage" as a result of a non-standardized test administration); *Doe v. Nat'l Bd. of Podiatric Medical Exam'rs*, 2003 WL 21403698, *5 (S.D.N.Y.2003) ("The significant consideration in deciding whether or not to invalidate a test score is thus not whether the individual candidate engaged in misconduct, but whether the candidate's test results are tainted by misconduct. As exemplified in this case, [the testing agency] may have reason to invalidate the candidate's test results even when they are innocent."). NBME clearly had a good faith basis for questioning the validity of Dr. Giri's USMLE scores and the scores of the other affected examinees.

as they see that a question involves a given topic on which they have less knowledge
than others. Accordingly, Dr. Giri—and many other students who, like her, hon-
estly studied for the exam—sometimes answer[ed] questions correctly much faster
than they possibly could have read those questions. That's not cheating; that's ef-
fective exam strategy.

Complaint ¶ 50. Exam timing and score records provide no evidence that Dr. Giri's quickly-an-

swered questions reflected guesses. Dr. Jurich Decl. ¶ 31. The Step exams are designed so that, on

average, examinees have 90 seconds to answer each exam question. Focusing on items that Dr.

Giri responded to in less than 30 seconds, she correctly answered 95%, 91%, and 91% of these

items on Step 1, Step 2 CK, and Step 3, respectively. *Id.* Similarly, for items that Dr. Giri responded

to in less than 20 seconds, she correctly answered 100%, 93%, and 85% of these items on Step 1,

Step 2 CK, and Step 3, respectively. These high correct response rates also do not align with guess-

ing strategies. Instead, because items typically have 4 or more response options, guessing without

reading the question is expected to yield approximately 20—25% correct responses. *Id.*

Finally, Dr. Giri claims:

Dr. Giri experienced one or two technical problems during her exam, particularly
with the portal used for clinical case simulations, with which she was technologi-
cally unfamiliar. This resulted in her prematurely ending that portion of the exam
and scoring poorly, and perhaps this is why NBME became suspicious of Dr. Giri's
answer timing.

Complaint ¶ 51. The USMLE program, however, does not have any record of Dr. Giri reporting

any technical problems to test center staff or to the USMLE program, on her exam day or at any

point after taking the exam. Ward Decl. ¶ 22.  And performance on the computer-based case sim-

ulation portion of the Step 3 exam would not impact Dr. Giri's Step 3 score validity analysis. Dr.

Jurich Decl. ¶ 33. The computer-based case simulations are scored using complex rules in response

to the examinee's orders and actions that limits the item's utility within an answer similarity or

item response time analysis. *Id.* Therefore, this section was not included within those components

of the score validity analysis. *Id.* Indeed, the dynamic nature of this section of the exam along with

its scoring format makes this section of the exam less prone to effects from prior knowledge compared to single-best answer multiple-choice questions. *Id.* Thus, Dr. Giri's relatively lower performance on this section of the Step 3 exam compared to other sections of the Step 3 exam is consistent with the USMLE's finding of questionable score validity. *Id.*

## IV.  Plaintiff's USMLE experience and status in pursuing a medical career

### A.  Plaintiff's allegations

Dr. Giri alleges that she grew up in Nepal, graduated from the Kathmandu University School of Medical Sciences in 2022, is a Nepali citizen, and currently lives in Kathmandu. Complaint ¶ 27. Dr. Giri took all three Step exams in one year, in 2023. She took the Step 1 exam on February 9, 2023, in Kathmandu. She took the Step 2 CK exam on May 8, 2023, in India. She took the Step 3 exam on September 18, 2023, in Connecticut. *Id.* ¶ 28. She received passing scores on all three exams. *Id.*

Dr. Giri testifies through her verified complaint that she "studied hard" for her Step exams and "did not have unauthorized access to exam questions." *Id.* She does not explain, however, how she studied, the study materials she used, or whether she studied alone or in a group. Dr. Giri also explains that she "guessed immediately" when she encountered a topic on the USMLE about which she had "less knowledge than others," and therefore "sometimes answer[ed] questions **correctly** much faster than [she] possibly could have read those questions." *Id.* ¶ 50 (emphasis added).[7] She then proclaims that this evidences effective exam strategy, not cheating. *Id.* But Dr. Giri's contention—that it makes perfect sense that she correctly answered questions on topics that she is not

---

[7] Dr. Giri's reference to how other test-takers approach questions, *see* Complaint ¶ 50, is just one example of proffered testimony that is not within her personal knowledge.

familiar with and without spending enough time to read the entire questions—is a complete non-sequitur.

Dr. Giri alleges that in January 2024, she "was preparing to enter the Match and hoping to enter residency in the summer of 2024." *Id.* ¶ 31. But Dr. Giri does not explain the steps she has taken to "prepare to enter the Match," and she provides no documentation whatsoever to show that she has taken any of the numerous actions needed to participate in the Match and obtain a residency program. *See id.* As explained in the next section, a graduate of a foreign medical school (International Medical Graduate, or "IMG"), must obtain certification through the Educational Commission of Foreign Medical Graduates ("ECFMG") to participate in the Match, and certification requires more than simply passing the USMLE. Dr. Giri does not testify that she meets the other requirements for ECFMG certification. She also does not testify that she has prepared the other documentation and information required for a residency application portfolio. She does not testify or demonstrate that she has submitted applications to any residency programs or that she obtained interviews with any program (a virtual prerequisite for obtaining a residency position through the Match), and she has not identified a single program or school where she expected or hoped to work.  Instead, she is asking the Court to simply accept that – but for the absence of passing US-MLE scores – she and hundreds of others affected examinees would be able to participate in the 2024 Match and would obtain residency positions.  This is extremely unlikely and is speculative in all events (thus providing no basis for preliminary injunctive relief, as discussed below).

Dr. Giri also does not discuss her performance in medical school or her perceived likelihood of obtaining a position in the Match if she were eligible to participate this year. Indeed, Dr. Giri is noticeably silent about her residency plans and aspirations. She does not explain where she is interested in serving as a resident or what medical specialty she wants to pursue. Dr. Giri also

does not explain any options she may have to obtain a residency in the United States through avenues other than the NRMP's Main Residency Match; to practice medicine in Nepal, which is her home country, the country where she attended medical school, and the country where she apparently has lived her entire life, and where passage of the USMLE is not required to become licensed; or to practice medicine in any other country besides the United States.

Dr. Giri generally references the immigration status of foreign medical graduates who are accepted into residency programs and alleges that individuals with J-1 or H-1B visas must "maintain participation in the residency program" to retain their visa eligibility, Complaint ¶ 20, but she does not allege that she herself currently has a visa to work in the United States or provide any documentation to support her assertion that NBME's challenged invalidation of USMLE results "threatens the current employment and immigration status of hundreds of doctors already practicing in the United States," Pl. Br. 1.

### B.   The residency match process for IMGs

To become a licensed physician in the United States, an individual must generally complete four years of medical school and between three and seven years in a medical residency program, achieve passing level scores on the medical licensure examinations that are required and accepted in a given jurisdiction (usually the three Steps of the United States Medical Licensing Examination ("USMLE")), and meet any additional requirements set by the state legislatures and state medical boards.  The process of becoming a licensed physician thus takes many years for all prospective physicians, and it takes longer for some than for others.  It is not uncommon for a given individual to encounter an unanticipated delay in obtaining his or her medical license because of issues encountered in medical school, on a licensing exam, or in  applying to residency programs.

Broadly speaking, there are two pools from which residency programs draw their applicants: graduates of non-U.S. and non-Canadian medical schools, known as International Medical Graduates, or "IMGs"; and graduates of medical schools located in the United States or Canada, who are sometimes referred to as "USMGs".   IMGs are sometimes also referred to as Foreign Medical Graduates, or "FMGs".

The location of the medical school, not the citizenship of the physician, determines whether a medical school graduate is an IMG. This means that U.S. citizens who graduate from medical schools outside the United States and Canada are considered IMGs, while non-U.S. citizens who graduate from medical schools in the U.S. and Canada are not considered IMGs.

The precise type of health care services that residents may provide varies from state to state.  However, in all jurisdictions and at some point during their residencies, all medical residents provide direct care to patients, including diagnosing, managing, and treating health conditions and injuries.  In many states, medical residents may also apply for a DEA license and write prescriptions for controlled substances.

Most residency positions are filled by way of the main National Residency Matching Program, commonly known as the NRMP "Main Residency Match" or simply the "Match."   The NRMP is an independent, non-profit entity. *See generally* https://www.nrmp.org/.

The Main Residency Match provides a mechanism for USMG and IMG applicants to enter residency training and is conducted every year. Therefore, if someone does not participate in the Match in a given year, he or she can do so the following year. Participation in the Match is voluntary, and—as discussed below—the Match is not the only means by which an individual can find a position in a graduate medical education residency program. IMGs and USMGs participate in the Main Residency Match.

The Main Residency Match uses a mathematical algorithm to match residency applicants' and residency programs' preferences. Residency program applicants prepare lists that rank their preferred residency positions at the institutions to which they have applied, and residency programs prepare lists of the applicants to which they prefer to allocate their residency positions. The algorithm then compares lists and identifies which applicants have "matched" with which residency programs. There are set dates each year by which applicants and residency programs must submit their Rank Order Lists to the NRMP.

If a residency applicant who participated in the Main Residency Match does not match when the matching algorithm is processed, the applicant may attempt to obtain an available unfilled position during the Match Week Supplemental Offer and Acceptance Program ("SOAP"). This includes both IMGs and USMGs.

Medical school graduates who did not participate in the NRMP's Main Residency Match may also participate in the SOAP in an effort to obtain a residency position. This also includes both IMGs and USMGs.

The NRMP's website provides far more detailed information on how the Main Match and SOAP operate and the dates on which components of the matching process occur.  *See* https://www.nrmp.org/.

There are also a handful of other match programs through which medical school graduates can obtain a position at a residency program in the United States, involving certain specialties.  For example, there is Urology Residency Match Program that is not operated by the NRMP (see https://www.auanet.org/meetings-and-education/for-residents/urology-and-specialty-matches); and there is a program known as the San Francisco Match ("SF Match") that provides residency and fellowship matching services involving various specialties and subspecialties (*see*

https://www.sfmatch.org/about). A relatively small number of medical school graduates also obtain residency positions each year through direct communications with a residency program, after the Match and SOAP have concluded.

Applying for a residency position is a multi-month process in which applicants must complete several steps, many of which must occur months in advance of submitting a Rank Order List to the NRMP as a participant in the Main Residency Match. The Association of American Medical Colleges ("AAMC") provides detailed information to medical school students on this process, which typically includes the submission of applications to residency programs by way of the Electronic Residency Application Service ("ERAS"), which AAMC operates. *See* https://students-residents.aamc.org/apply-smart-residency/understanding-application-process.

The pre-Match application process consists of at least three separate activities: (1) researching residency programs and identifying programs that appear to be a good fit for the applicant; (2) preparing and submitting an application to the chosen programs; and (3) interviewing at the programs that invite the applicant for interviews.

A fourth application step is required for IMGs.  Before they participate in the Match, IMGs must receive certification from an organization known as the Educational Commission for Foreign Medical Graduates ("ECFMG") that they are eligible to participate in a U.S.-based residency program.  ECFMG's website describes the certification process as follows:

> ECFMG, through its program of certification, assesses whether international medical graduates are ready to enter residency or fellowship programs in the United States that are accredited by the Accreditation Council for Graduate Medical Education (ACGME) . ACGME requires international medical graduates who enter ACGME-accredited programs to be certified by ECFMG.
>
> ECFMG Certification assures directors of ACGME-accredited residency and fellowship programs, and the people of the United States, that international medical graduates have met minimum standards of eligibility to enter such programs. ECFMG Certification does not, however, guarantee that these graduates will be

accepted into programs; the number of applicants each year exceeds the number of available positions.

*See* https://www.ecfmg.org/2024ib/certification.html.

To be eligible for ECFMG Certification, international medical students/graduates must submit an Application for ECFMG Certification, which confirms their intent to pursue ECFMG Certification and their understanding of the purpose of the certification program....

**Examination Requirements**

To meet the medical science examination requirement for ECFMG Certification, applicants must pass Step 1 and Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination (USMLE).

To meet the clinical skills requirement and communication skills requirement for ECFMG Certification, applicants must:

- Complete an ECFMG Pathway, which includes attaining a satisfactory score on the Occupational English Test (OET) Medicine, **OR**

"

- Have a passing performance on the former Step 2 Clinical Skills (CS) component of USMLE that is valid for ECFMG Certification.

ECFMG has established time limits and other rules for completing the examination requirements for ECFMG Certification....

**Medical Education Credential Requirements**

.... International medical graduates must have been awarded credit for at least four credit years (academic years for which credit has been given toward completion of the medical curriculum) by a medical school that is listed in the World Directory with an ECFMG note stating it meets ECFMG eligibility requirements. There are restrictions on credits transferred to the medical school that awards an applicant's medical degree that can be used to meet this requirement. See ECFMG Policy on Transfer Credits in Medical Education Credentials.

Applicants must document the completion of all requirements for, and receipt of, the final medical diploma.... ECFMG verifies every applicant's medical school diploma with the appropriate officials of the medical school that issued the diploma and requests that the medical school provide the final medical school transcript. Verification by ECFMG with the issuing school may also be required for transcripts that are submitted to document transferred credits.... "

*See* https://www.ecfmg.org/2024ib/certification-requirements.html.

If a residency program applicant is not invited to interview with a residency program, it is a virtual certainty that the applicant will not be listed on the program's Rank Order List for the Main Residency Match. By extension, if a given applicant is not invited to interview with any residency programs to which he or she applies, it is a virtual certainty that the individual will not be included on any program Rank Order Lists and will not obtain a residency position through the Main Residency Match.

Residency applications are a compilation of materials which demonstrate an applicant's qualifications and help residency programs assess whether the applicant would be a good fit for the specialty as well as a successful trainee. Application portfolios generally include: (1) an application and curriculum vitae (CV); (2) letters of recommendation; (3) a personal statement; (4) medical school transcripts; (5) a Medical Student Performance Evaluation (MSPE); and (6) a licensing examination transcript. Applicants generally create or assemble the first three components, their medical schools are generally responsible for components 4 and 5, and the examination registration entity is responsible for component 6 (NBME for USMGs and ECFMG for IMGs).

Assuming they are otherwise eligible, medical school graduates who have passed Step 1 and Step 2 CK of the USMLE can participate in the Match and SOAP and obtain residency positions, even if they do not yet have a passing Step 3 score.

Residency program positions in the United States are highly competitive.  For example, the University of Kentucky College of Medicine has roughly 2,500 applicants each year for 24 residency positions in its internal medicine program. Out of those applicants, it would invite roughly 200 – 250 applicants to participate in interviews, and it would end up interviewing roughly 150 of the candidates who were invited to interview. Most but not all of the individuals interviewed would then end up on the program's Rank Order List that was submitted for purposes of the Main

Residency Match. Other programs at the school were also very competitive. *Id.* (internal medicine-pediatric residency program receives more than 500 applications for 6 available residency positions).

A residency program could easily spend hundreds if not thousands of hours screening residency applicants, participating in interviews, and preparing it Rank Order List for the Main Residency Match. To the extent those efforts were directed at individuals who later dropped out of the Match for any reason before they were extended an offer, or who had to withdraw from a residency program after taking a position, the efforts would have been wasted.

Because residency programs are so competitive, residency selection is a "zero sum" proposition. The selection of any given candidate by a program necessarily means, in virtually all cases, that another applicant will lose the opportunity to be a resident in that program.

USMLE scores typically play a significant role when residency programs are screening applicants and deciding who to invite for interviews. Applicants with higher Step exam scores have a better chance of being invited for an interview and thus of being included on a program's Rank Order List for the Main Residency Match.

In the face of large numbers of applicants who attended medical school outside of the United States and have varying educational and experiential backgrounds, USMLE exam results provide an important and objective piece of information to residency program directors and a degree of assurance that applicants have the minimum knowledge and skills needed to become competent health care providers. It is therefore vitally important that the results that appear on an applicant's USMLE transcript are a valid and reliable indication of the applicant's knowledge and abilities in the areas that are assessed on the USMLE exams.

## ARGUMENT

"A preliminary injunction is an 'extraordinary remedy.'" *Archdiocese of Washington v. Washington Metropolitan Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The moving party must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest.'" *Id.* (citation omitted); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).[8]

"The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted); *see also, e.g., Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 81, 93 (D.D.C. 2021) ("[A]s a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations and citations omitted).

Plaintiff has not made a clear showing in her favor on *any* of the preliminary injunction factors, and her motion should be denied. Plaintiff fails to show a likelihood of success on the merits. Neither Title VII nor Section 1981 apply extraterritorially to Plaintiff, and her claims fail as a matter of law. Even if she could assert such a claim, her speculative assertions that NBME

---

[8] The D.C. Circuit "has not yet decided whether [*Winter*] is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned …." *Archdiocese of Washington*, 897 F.3d at 334; *see also, e.g., Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) ("In the past, this Court has applied a 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another.' … This approach is arguably in tension with intervening Supreme Court decisions stating without qualification that 'a party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'"… In the past, we have noted this tension but reserved the question whether the sliding-scale approach remains valid…. We follow the same approach here because, even under the sliding-scale approach, the movant must raise at least a 'serious legal question on the merits.'") (citations omitted).

discriminatorily targeted examinees in Nepal is simply incorrect. The USMLE program investigated and responded to score validity concerns related to Nepal because of multiple points of information and data pointing to widespread dissemination of secure test content in groups associated with Nepal. The USMLE program did not arbitrarily or invidiously target Nepal; it is where the information and data led. Plaintiff also cannot show irreparable harm based on her vague and conclusory allegations about possibly participating in the 2024 Match. There is no *evidence* that Plaintiff or any putative class member will actually experience irreparable harm in the absence of preliminary injunctive relief.

And while the preliminary injunction analysis often focuses on the likelihood of success and irreparable harm factors, in this case, the final two factors—the balance of harms and public interest—merit particularly close attention. The mandatory preliminary injunctive relief that Plaintiff seeks on her own behalf and on behalf of a putative class of 800+ individuals would order NBME to reinstitute passing-level scores on a medical licensure exam and thereby allow hundreds of individuals to participate in the residency match program and, if successful, begin providing patient care as early as June of 2024, even though their medical knowledge and competence as assessed by the exam have now been questioned following a lengthy investigation.  The risk of harm to NBME, other entities and individuals, and the general public if an injunction were mistakenly issued in this situation is dramatically greater than the risk of harm vaguely identified by Plaintiff,  as summarized by one long-time residency program director:

> As a residency program director, I would have significant concerns about including an applicant on our Rank Order List, or extending a residency position offer to an applicant, for whom there were concerns about the legitimacy of their credentials. This includes but would not be limited to concerns about the validity of the examination results shown on their USMLE transcripts.  The concerns fall into at least five categories:

a.      First and foremost, I would have concerns about the health and safety of individuals to whom that resident would be providing health care services.  Individuals who do not have the qualifications they purport to have should not be providing health care services, and – in my view – any doubts in that regard should be resolved in favor of protecting the public's safety.

b.      Second, and relatedly, I would be concerned about the repercussions of allowing someone to participate in the Match and obtain a residency position, only to later learn that their USMLE results or other credentials were invalid, thereby requiring removal of the resident.  If this happened in our program, I would anticipate that the hospital where the resident worked would want to review every patient encounter that the resident had prior to removal, to ensure that there were not patient-safety issues that need to be addressed and to identify possible legal risk exposure from having allowed a non-qualified individual to participate in delivering health care services.

c.      Third, I would be concerned that a residency position might be going to Candidate A instead of to Candidate B, when Candidate B was in fact the better qualified applicant.  This is essentially a fairness issue.

d.      Fourth, I would be concerned that the program would be misallocating scarce resources.  It takes a significant amount of time and other resources to supervise and train residents.  Programs devote these resources in large part because they rely upon residents to help deliver health care services to their patient populations, but they also do so because this is a critical part of the graduate medical education process in the United States, and because the programs hope that qualified and well-trained residents might later become valued licensed professionals within the community.

e.      Finally, I would be concerned about the impact on other staff members if a resident had to be removed from his or her position because of an invalid credential.  This would alter the work schedules for other residents and could easily create both staffing issues and morale problems within the facility where that resident was working.

Feddock Decl. ¶ 35.

Plaintiff's motion for preliminary injunction, individually and on behalf of a putative class, should be denied.

## I.      Plaintiff fails to show a likelihood of success on the merits.

Plaintiff's emergency preliminary injunction motion fails at the outset because she has not satisfied her burden of showing a likelihood of success on the merits, the "first and most important

31

factor" in the preliminary injunction analysis. *Id.*; *see also Greater New Orleans Fair Housing Action Ctr. v. U.S. Dep't of Housing & Urban Development*, 639 F.3d 1078, 1084 (D.C. Cir. 2011) ("In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits.") (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008)). Neither Title VII nor Section 1981 extend extraterritorially to Plaintiff, an alleged citizen and resident of Nepal. And even if either statute applied, there has been no discrimination against Plaintiff or any putative class members, and Plaintiff has not established a prima facie case that cany such discrimination occurred.

A.    **Neither Title VII nor Section 1981 extend extraterritorially to Plaintiff.**

Plaintiff alleges that she is a citizen and resident of Nepal who allegedly was planning to apply for employment in the United States. *See* Complaint ¶ 27.  Title VII and Section 1981 do not apply in this context.[9]

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *E.E.O.C. v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991) (citation omitted), *abrogated by statute on other grounds* in 42 U.S.C. § 2000e-1(f). The premise of Plaintiff's Title VII and Section 1981 claims is that she, a non-citizen of the United States who currently resides in Nepal, has been blocked in her attempt to obtain employment as a medical resident in the United

---

[9] NBME also notes that it is not Plaintiff's employer or the employer of any member of the putative class, and Plaintiff does not allege otherwise. Title VII prohibits employment discrimination by various specified entities, including employers, employment agencies, labor organizations, and training programs, and on its face has no applicability to entities that administer licensing examinations. NBME will reserve its arguments regarding any application of the D.C. Circuit's analysis in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) in this context for another day (*see* Pl. Br. 20-21), because even if it is assumed—solely for the purposes of this expedited preliminary injunction motion—that Title VII is applicable in this context, Plaintiff has not otherwise shown a likelihood of success on her Title VII claim.

States based on the USMLE program's decision to invalidate her Step exam results.  "Nothing on the face of Title VII suggests that its substantive provisions and remedial scheme reach a noncitizen, nonresident applicant for domestic employment." *Nakhid v. American Univ.*, No. 19-3268-APM, 2021 WL 4169355 (D.D.C. Sept. 14, 2021), *aff'd on other grounds*, 2022 WL 2678742 (D.C. Cir. July 12, 2022). "[T]he statute's private right of action seeks to protect only the interests of U.S. citizens and U.S. residents. Its 'focus' does not include the interests of a noncitizen, nonresident who submits his application from abroad." *Id.* at *6.

The same conclusion applies with respect to Plaintiff's Section 1981 claim. "The plain text of Section 1981 manifests Congress's intent to confer on 'persons *within* the jurisdiction of the United States … the same [enumerated] right[s] in every *State* and *Territory*." *Ofori-Tenkorang v. American Int'l Grp., Inc.*, 460 F.3d 296, 301 (2d Cir. 2006) (citing 42 U.S.C. § 1981(a) (emphasis added)); *id.* at 303-06 (affirming district court dismissal of Section 1981 claims involving alleged discrimination that occurred while plaintiff was living and working in South Africa).

Plaintiff thus cannot assert a claim under Title VII or Section 1981.  The same is true for any other member of her purported class who is a non-citizen and resides outside the United States, which is likely to be the vast majority of the putative class members.

**B**.     **Even if Title VII or Section 1981 applied, NBME has not discriminated against Plaintiff.**

Assuming she could get past the extraterritoriality hurdle discussed above, Dr. Giri's Title VII and Section 1981 claims would still fail.  And, more immediately, her motion for a preliminary injunction must be denied because she has not made a clear showing that she is likely to succeed on the merits of either of her claims.

To state a claim under Title VII, a plaintiff must show that she (a) suffered an adverse employment action, (b) because of her race, color, religion, sex, or national origin. *Brady v. Office*

*of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  To state a claim under Section 1981, "a

plaintiff must [show] . . . that, but for race, [she] would not have suffered the loss of a legally

protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct.

1009, 1019 (2020).

     Plaintiff offers only a facile argument in support of her assertion that she is likely to prevail

on the merits. According to Plaintiff, "[t]here is no question that [NBME] acted on the basis of

national origin or ethnicity because it explicitly said it was invaliding scores from test-takers 'as-

sociated with Nepal.'" Pl. Br. 19.  This is the sum-total of what Plaintiff characterizes as "over-

whelming" evidence that "NBME acted on the basis of ethnicity or national origin."  *See id.* at 21.

The Court should reject Plaintiff's argument.

     The statement that Plaintiff relies upon is found in an announcement that NBME posted on

the USMLE website relating to the score invalidations.  In relevant part, it reads as follows:

> The USMLE program regularly monitors and analyzes examinees' test perfor-
> mances for unusual score patterns or variations, and other information that
> could raise questions about the validity of an examinee's results. As part of an
> ongoing investigation, the USMLE program has identified a pattern of anoma-
> lous exam performance associated with Nepal, which challenges the validity
> of test results for a group of examinees. Highly irregular patterns can be indic-
> ative of prior unauthorized access to secure exam content. Examinees with
> results in question are being notified by the USMLE Secretariat's Office that
> their previous Step scores have been invalidated and that they will be required
> to take a validation exam(s). The USMLE program is working to notify exam-
> inees who need to schedule validation exam(s) and to support score users and
> other stakeholders impacted by the validation exam requirements.

*See* Dr. Mechaber Decl. Ex. C.

     Any fair reading of this statement makes clear that scores were invalidated because the

USMLE program identified a pattern of highly irregular and anomalous performance infor-

mation that raised questions about the validity of the test results that have been invalidated.

The fact that the announcement also included the accurate statement that the pattern of

anomalous performance leading to the score invalidations in question was "associated with Nepal" cannot reasonably be read as saying that anyone's score was invalidated because they are a Nepali citizen or of Nepali ethnicity.  And Plaintiff's contrary assertion is categorically untrue.  *See* Dr. Machaber Decl. ¶ 24.

Plaintiff is also wrong in suggesting that she and the other Nepali examinees have been treated differently than any other individuals with questioned Step results, because their scores were invalidated before they had an opportunity to provide any information in support of the scores' validity.  *See* Pl. Br. 22.  This is not accurate.  Under the USMLE program's standard policies relating to score validity, the USMLE program routinely suspends the reporting of scores that the program has a good faith basis for questioning.  *See* Dr. Mechaber Decl. Ex. A p. 3 ¶ B.4. It is true that the USMLE program adopted policies and procedures specifically to address the extraordinary facts that it encountered in this instance, but its standard score validity policies expressly authorize the adoption of such supplemental policies and procedures when deemed warranted by program management, noting as one example situations score validity concerns involving "multiple examinees."  *See id.* p. 2 ¶ A.5.

Finally, NBME notes that other testing programs have also invalidated the scores of multiple examinees based upon a concern that some or all of those examinees had prior access to secure test content or otherwise tested in a manner that did not reflect a proper, standardized administration of an exam.[10]  This is entirely reasonable and reflects an appropriate balancing

---

[10]    *See, e.g.*, *Doe #1 v. College Board*, 440 F.Supp.3d 349, 352-53 (S.D.N.Y. 2020) (discussing the College Board's cancellation of the SAT scores achieved by a large number of examinees: "Defendant's analysis of testing data for the May 2019 SAT identified indicia of suspect behavior in a geographically proximate cluster of several hundred test takers in the Middle East, including Plaintiffs, with statistically unlikely overlapping answer patterns.");  *San Mateo Union High School Dist. v. Educ. Testing Servs.*, 2013 WL 4711611, ** 2-5, 9 (N.D. Cal. 2013) (cancelling the scores of all examinees who took AP exams at a test center at which exam protocols were not

of the multiple interests that are at stake with regard to the reporting of high-stakes exam scores whose validity has been questions.

## II.    Plaintiff has failed to demonstrate irreparable harm in the absence of preliminary injunctive relief.

The alleged irreparable harm needed to support injunctive relief must be "both certain and great; ... actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  The harm must also be harm that cannot be compensated monetarily.  *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The possibility that adequate compensatory … relief will be available at a later date … weighs heavily against a claim of irreparable harm.").

Plaintiff has failed to establish that she or any of the 831 other individuals whose USMLE scores have been cancelled will suffer irreparable harm in the absence of a preliminary injunction. Indeed, her argument consists only of speculative and conclusory assertions, unsupported by any documentation relating to her or to any other affected examinee:  "[U]nless their scores are restored and NBME is ordered to adhere to its normal process, the proposed class will suffer inevitable harm to their employment opportunities, residency, and immigration status—classic forms of irreparable harm."  Pl. Br. 23.  With respect to either herself or anyone else, she has not provided any evidence (1) that anyone has lost a residency position, (2) that anyone has been deported or lost their visa status, (3) that anyone has submitted applications to any residency programs, (4) that anyone has been interviewed by any residency programs, (5) that anyone would be included on

---

followed, regardless of whether any of the affected examinees did or did not participate in or benefit from the improper actions at issue in that case); *see also* https://www.pharmacy.ca.gov/applicants/statement_cpje.shtml  (discussing the cancellation of scores achieved by a large number of prospective pharmacy licensees because of the advance disclosure of test content, followed by opportunities to take a free retest).

any residency program's Rank Order List for the 2024 Main  Residency Match if their USMLE scores were reinstated, or (6) that the only way any of the 832 individuals whose scores have been invalidated can obtain a residency position in the United States is by participating in the 2024 Main Residency Match.  Nor she addressed whether she and the other affected individuals have applied or could apply for licensure in Nepal or in another country other than the United States.

Irreparable harm cannot be shown by way of "unsubstantiated and conclusory assertions." *John Doe Co. v. Consumer Finan. Protection Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017).  Dr. Giri has failed to establish that she or anyone else would suffer irreparable harm.  *See Qui v. Univ. of Cincinnati*, 2018 WL 4496304, *8 (S.D. Ohio 2018) (denying preliminary injunction in a case asserting disability discrimination claims where plaintiff failed to present "evidence showing that removal proceedings and deportation are imminent or that enrollment in the University of Cincinnati's CCM program is the only way he can maintain his valid nonimmigrant status [and avoid deportation]," or "any evidence that he has explored alternative options to maintain valid nonimmigrant status beyond seeking reenrollment as the University"); *Doe v. Ohio State Univ.*, 2016 WL 692547, *10-11 (S.D. Ohio 2016) (denying medical student's motion for a preliminary injunction reinstating him as a student in good standing, where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing" based upon his understanding of "the 'match' and 'scramble' procedures by which medical students are offered residencies," and it was not clear whether plaintiff would be able to obtain a residency even if he was not "reinstated prior to March 14, 2016":  "Certainly, Mr. Doe's medical education pathway has been disrupted by his dismissal from Ohio State. But it is far from clear that, absent an injunction at this point, he will be unable to complete his education or to pursue his chosen profession."), *objections overruled, report aff'd*, 2016 WL 1578750 (S.D. Ohio 2016); *see*

*also Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 U.S. Dist. LEXIS 86837, *14-15 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives. For example, she does not discuss whether her school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools.") (denying preliminary injunction).

### III.   Plaintiff fails to show that the balance of harm favors her.

Plaintiff's argument regarding the balance-of-harm factor also fails.  She asserts that she and other members of the putative class would suffer "devastating consequences" absent her requested injunction," to "their livelihood, their immigration status, and their reputation;" and that those alleged harms outweigh any harm to NBME because the requested relief would not "'impinge upon [NBME] financially'" and would simply preserve the status quo.  Pl. Br. 24-25.  However, she offers no supporting evidence for the harm that she and other affected examinees would purportedly suffer absent an injunction, and she totally and inaccurately trivializes the harm that the requested injunction would cause NBME.

NBME has a strong and legitimate interest in ensuring that the USMLE program is fair to all examinees, and that the scores that are reported to licensing authorities, residency programs and other third-parties are valid and reliable.  *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. ); *see also Murray v. Educ. Testing Serv.*, 170 F.3d 514, 517 (5th Cir.1999) ("Several courts, including this one, have recognized the importance of allowing ETS to assure itself of the validity of students' scores through internal review procedures. ETS provides a valuable service to colleges and universities by providing a standardized measure of students' ability. Accordingly, ETS has an obligation to provide, or use its best efforts to provide, only valid scores to the colleges and universities that rely on ETS's services. Moreover, ETS has the right to protect

its own reputation by assuring the reliability of the information it provides. Finally, '[t]he other test-takers are entitled to assurance that no examinee enjoys an unfair advantage in scoring.'") (citations omitted); *San Mateo Union High School Dist. v. Educ. Testing Servs.*, 2013 WL 4711611, *9 (N.D. Cal. 2013) (denying preliminary injunction that would have required ETS to score and report the AP scores of dozens of examinees, which had been cancelled because of testing irregularities and concerns about the scores' validity); *Doe v. Nat'l Bd. of Podiatric Medical Exam'rs,* 2003 WL 21403698, **5-6 (S.D.N.Y. 2003) (denying motion for a preliminary injunction that would have required the defendant to release the scores that had been achieved on a licensure exam, where the testing entity had invalidated the scores because of "advance leakage of questions"). These are the NBME interests at issue here, not the financial cost to NBME if the injunction were granted.

Moreover, the harm to NBME cannot be undone if scores are released, relied upon by third parties, and then later invalidated. *Cf. Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) ("[W]hile Rothberg may eventually find a solution for the difficulty she faces if denied a preliminary injunction, the LSAC cannot hope for relief once the injunction issues.") (overturning preliminary injunction that required LSAT to release plaintiff's LSAT score). This further tips the balance-of-harm factor in favor of NBME.

Finally, Plaintiff is also being less than forthcoming by suggesting that no harm would come to NBME because the requested injunction will simply preserve the status quo. That is clearly not accurate. Under the current status quo, the passing level results of the 832 examines have already been invalidated, and third parties have been notified that the results are no longer in place. The relief that Plaintiff is requesting would alter that status quo, not maintain it. She is asking the Court to order NBME to "restore the validity of all scores" that were invalidated; to

maintain those scores as valid during the "pendency of this litigation and during the pendency of any investigation that NBME chooses to conduct pursuant to its ordinary procedures;" and to immediately "notify all impacted parties, including any affected test-takers, medical schools, hospitals, and other relevant organizations or people that the scores have been restored and that affected test-takers should not be treated any differently than other test-takers not impacted by NBME's recent action."  See Proposed Order (ECF Dkt. 3-5).

## IV.     Plaintiff fails to show that her requested injunctive relief is in the public interest.

Although it is the last factor discussed in this brief, the public interest factor provides the most obvious and compelling reason to deny Dr. Giri's requested injunction.

Dr. Giri is asking the Court to reinstate the passing level scores of 832 USMLE examinees, despite significant concerns about the validity of those scores, so that they can (1) participate in the 2024 Main Residency Match and otherwise attempt to immediately find residency positions in U.S.-based residency programs; (2) accept positions as resident physicians and began providing health care services as soon as June 2024; or (3) continue to provide health care services to patients if they already have a residency position.  *See* Pl. Br. 25.  That would have enormous adverse consequences for numerous entities and individuals and would clearly be contrary to the public interest.  *See generally* Dr. Feddock Decl. ¶¶ 33- 35; Johnson Decl. ¶¶ 10 – 17.

### A.   Risk of Harm to the General Public

Resident physicians provide medical care and prescribe drugs. *See* Dr. Feddock Decl. ¶¶ 12, 13; Johnson Decl. ¶ 15.  Allowing potentially unqualified individuals to be serve as residents by way of the requested preliminary injunction would therefore endanger members of the general public.  *See* Dr Feddock Decl. ¶ 35.a ("Individuals who do not have the qualifications they purport to have should not be providing health care services, and – in my view – any doubts in that regard

should be resolved in favor of protecting the public's safety."); Johnson Decl. ¶ 17 ("As the Chief Assessment Officer of the [Federation of State Medical Boards], I believe that an individual who achieves a passing level result on a USMLE exam because he or she had prior access to secure exam questions should not be permitted to retain that score or to receive a temporary or limited license to practice as a resident physician on the basis of that score, and that this is true regardless of whether the individual knew that they were accessing confidential exam content. Allowing an individual to become a resident physician on the strength of USMLE scores whose validity has been questioned following a good faith evaluation of available performance data and other available information would jeopardize the public welfare, create legal exposure for the hospitals and other facilities at which the individual is permitted to work as a resident physician, and undermine the public's confidence in the state's licensure system.

## B.  Risk of Harm to Residency Programs

Residency programs invest heavily in recruiting and training residents, in terms of both staff time and other resources. *See* Dr. Feddock Decl. ¶ 34. They would be harmed in various ways if they allocated a residency spot to someone whose passing level Step score was later invalidated, thereby requiring removal of that resident and creating staffing and potential morale issues for the program. *Id.* at ¶¶ 35.d, 35.e.

## C.  Harm to Hospitals and Other Health Care Facilities

Any hospital or other health care facility where Dr. Giri or another affected examinee worked because they had passing level USMLE scores that were later invalidated would be harmed by the requested injunction. As Dr. Feddock explains, the facility and its lawyers would almost certainly "want to review every patient encounter that the resident had prior to removal, to ensure that there were not patient-safety issues that need to be addressed and to identify possible legal

risk exposure from having allowed a non-qualified individual to participate in delivering health care services."  Dr. Feddock Decl. ¶ 35.b.

### D.  Risk of Harm to Other Residency Candidates

Residency positions are highly competitive.  Therefore, any residency position that goes to Plaintiff or any other member of her putative class would come at the expense of someone else, who would not get that position.  *See* Dr. Feddock Decl. ¶¶ 29-33, 35.c.

****

Remarkably, Dr. Giri ignores all of these interests in her discussion of the public interest. *See* Pl. Br. 26-27. She asserts instead that the public has an interest in eradicating discrimination. *Id*. at 26. That is true, of course, but of no relevance here. NBME has not engaged in unlawful discrimination. She also asserts that the public has an interest in ensuring that private institutions comport with general notions of procedural fair play. *Id*. Again true, at least as an abstract proposition, but irrelevant here. The actions taken by NBME have been consistent with the terms of the parties' testing agreement and with NBME's score validity policies. In addition, NBME has offered examinees an opportunity to provide information that might result in reinstatement of the invalidated scores, as well as an opportunity to take a free re-test. Weighed against the other interests that are implicated when issues arise regarding the validity of USMLE scores, any so-called "general notions of fair play" have been met here.

## <u>CONCLUSION</u>

The Court should deny Dr. Giri's preliminary injunction motion.

Dated:  February 18, 2024

Respectfully submitted,

/s/ Robert A. Burgoyne
Robert A. Burgoyne (D.C. Bar No. 366757)
Caroline M. Mew (D.C. Bar No. 467354)
Perkins Coie LLP
700 13th St., NW, Suite 800
Washington, DC 20005
T: 202 654 6200
F:  202 654-6211
RBurgoyne@perkinscoie.com
CMew@perkinscoie.com

Counsel for NBME