**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DR. LATIKA GIRI,

        Plaintiff,

v.                                  Case No. 1:24-cv-00410-CRC

THE NATIONAL BOARD OF
MEDICAL EXAMINERS,

        Defendant.

_____/

**NBME'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff seeks provisional certification of a putative class of 823 individuals whose passing-level scores on the United States Medical Licensing Examination ("USMLE") were recently invalidated by the USMLE program based on questioned score validity. In other words, the USMLE program invalidated the scores because it has a good faith basis to question whether the examinees actually have the knowledge and competence required to pass one or more Steps of the USMLE, a medical licensing exam that is designed to assess an examinee's ability to apply the knowledge and demonstrate the fundamental skills that constitute the basis of safe and effective patient care. Plaintiff seeks mandatory preliminary injunctive relief on a class-wide basis that would require NBME to immediately reverse its score invalidation so that eligible members of the putative class can participate in the upcoming medical residency Match, obtain a medical residency, and receive licenses granted by state medical boards that would permit them to participate in providing patient care in a clinical setting as soon as July 1, 2024.

Plaintiff should not be allowed to pursue this relief on a class-wide basis because (at a minimum) she fails to show that the requirements of commonality and adequacy of representation are met. Plaintiff's motion for class certification should be denied.

## BACKGROUND

A complete factual background is set forth in NBME's Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction, filed contemporaneously with this brief. For ease of reference, NBME will summarize key background points here.

## I.     NBME and the USMLE

NBME is a private, not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality assessments of the knowledge and skills of health professionals. Decl. of Alex J. Mechaber, M.D., MACP ¶ 4 ("Dr. Mechaber Decl."). NBME is a co-sponsor of the United States Medical Licensing Examination ("USMLE") with the Federation of State Medical Boards. *Id.* ¶ 4.

The USMLE is a standardized examination used to evaluate applicants' knowledge and their competence for medical licensure in the United States and its territories. *Id.* ¶ 5. It is designed to assess an examinee's ability to apply the knowledge and demonstrate the fundamental skills that constitute the basis of safe and effective patient care. *Id.* Medical licensing authorities across the U.S. rely upon the USMLE in evaluating the qualifications of individuals seeking an initial license to practice medicine. *Id.* ¶ 6. Three "Step" exams make up the USMLE,: Step 1, Step 2 Clinical Knowledge ("Step 2 CK"), and Step 3. *Id.* ¶¶ 8-10.

The USMLE is a "secure" exam, which means that the exam items are kept confidential before and after an exam is administered. *Id.* ¶ 13. NBME goes to great lengths to maintain the

confidentiality of its USMLE items because, as is common with standardized tests, NBME reuses items from prior exams to "equate" scores (to adjust for variation in the difficulty of exam forms so that the reported scaled scores reflect the same level of performance exam-to-exam). *Id.* ¶ 14.

## II.   The USMLE program's investigation of reported unauthorized collection and sharing of secure exam content.

The USMLE program regularly monitors the performance of USMLE examinees and examinee performance may be analyzed to detect aberrancies or other variations that raise questions about the validity of their exam results. *Id.* ¶ 16. The USMLE program also encourages examinees to help maintain the integrity of the USMLE by reporting suspected test security violations by submitting anonymous tips to the USMLE program office. *See* Declaration of Colleen Ward ("Ward Decl.) ¶ 4.

The USMLE program has received a number of tips tied to activities in specific countries, claiming that groups of examinees were collecting and disseminating secure USMLE exam content so that examinees would see and could study confidential USMLE questions in advance of testing. *Id.* at ¶ 6. Some of the tips refer to examinee activity in specific geographic regions. In response to such tips, in early 2023, the USMLE program asked NBME's Psychometrics and Data Analysis ("PADA") unit to analyze examinee performance data for test centers in Jordan, Nepal, and Pakistan. *See* Declaration of Daniel Jurich, Ph.D. ("Dr. Jurich Decl.") ¶ 6. Within this initial data analysis, the data involving the test center in Nepal was the most extreme. *Id.* ¶ 7.

Continuing its investigation, in or around April 2023, PADA ran "agreement analyses" to see if it could identify examinees who might have shared or otherwise had access to unauthorized USMLE content prior to testing. *Id.* ¶ 8. Agreement analysis, a common and well-studied data forensic method, identifies examinees who have selected a statistically improbable number of the same incorrect response options to the same questions (from among the typically 4-6 answer

choices that exist for a given Step exam multiple-choice question) as another examinee. *Id.* In other words, an agreement analysis does not just look to see if multiple examinees missed the same question; it looks to see whether multiple examinees selected the same *incorrect* answers to the same question. *Id.*

PADA first ran an agreement analysis for all examinees who tested at centers in Jordan, Nepal, Pakistan, as well as two centers in India. *Id.* ¶ 9. This data also showed that the vast majority of examinees with a statistically significant number of matching incorrect answers tested at the Nepal test center. *Id.* Data pulled by PADA further showed that test volumes increased at the Nepal test center in the months prior to the USMLE program releasing new test items, suggesting that candidates who had prior access to disclosed exam questions wanted to test before new questions appeared on the exam. *Id.* ¶ 10.

In or around July 2023, PADA re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 CK exams, this time focused on examinees who tested at the Nepal test center and/or were citizens of Nepal (based on information self-disclosed in their application to test). *Id.* ¶ 11. The results of these analyses confirmed that the Nepal test center was a priority concern for the USMLE program. *Id.* ¶ 12.

PADA also expanded its analysis to the Step 3 exam. *Id.* ¶ 13. The reviewed group in this case was changed to include individuals who attended medical school in Nepal or self-reported as a citizen of Nepal. *Id.* The Step 3 exam is only offered in the United States, so PADA could not look to data from the Nepal test center. *Id.* This analysis showed no statistically significant agreement matches for the 2021 Step 3 exam but considerably higher percentages of incorrect-response agreement for the 2022 and 2023 Step 3 exam (based on available data). *Id.*

While the PADA analyses were ongoing, the USMLE program continued to receive anonymous tips tied to Nepal during 2023. *See* Ward Decl. ¶ 8. An individual acting on behalf of the USMLE program was also able to gain access to an exclusive online Telegram Messenger group in which USMLE exams are discussed, with approximately 1,300 members. *Id.* ¶ 10. This individual had to provide documentation showing a nexus to Nepal and a USMLE testing permit to be admitted to the group. *Id.* Hundreds of files of exam "recalls" were retrieved from the site. *Id.* ¶ 12 and Ex. A. Other posts in the group chats showed examinees claiming that many of the questions that they saw when they took their USMLE Step exams came from "PQs" ("Past Questions") that had been shared within the group. Some even claimed that 90% or more of their Step exam questions came from "PQs." *Id.* ¶ 13 and Ex. B. Still other posts in the group chats advised examinees to use the full examination time when they take the USMLE to avoid raising suspicion about having had prior access to secure exam materials, and not to talk publicly about having seen "PQs" when they took their test. *Id.* ¶ 14 and Ex. C.

Given the highly unusual and concerning data shown in the PADA analyses and other information learned during the course of the USMLE program's investigation into possible unauthorized access to live exam content within Nepal, in or around September 2023, the USMLE program began working on establishing a set of criteria for identifying exam scores with questionable validity associated with Nepal. Dr. Jurich Decl. ¶ 14.

PADA consulted with private test security consultants and worked with USMLE program leadership and other USMLE program staff to establish criteria for identifying scores with questionable validity. *Id.* ¶ 15. The overarching concern was that passing level results—often with scores that were among the highest in the world—may reflect prior access to secure exam questions

and answers rather than knowledge and understanding of the medical subjects assessed on the exam. *Id.*

In evaluating exam performance for purposes of identifying scores of questioned validity, USMLE program staff considered, among other information, the results of the incorrect-response agreement analysis for each examinee, the examinee's median response time, the examinee's numerical scores, whether the examinee had considerable performance differences on different Step exams, whether the examinee had considerable differences in performance on multiple attempts at the same exam, and whether the examinee had already been identified for irregular behavior. *Id.* ¶ 17. The analysis was individualized for each examinee, based on their individual exam data. *Id.* For the incorrect-response agreement part of the analysis, statistically significant agreement matches were required with at least two other individuals in the reviewed group. *Id.* This analysis was run with respect to (a) individuals who took the Step 1 and/or Step 2 CK exam in 2021, 2022, or 2023 (based on then-available 2023 data) at the Nepal test center or who self-reported as a citizen of Nepal and (b) individuals who took the Step 3 exam in 2021, 2022, or 2023 (based on then-available 2023 data) and attended medical school in Nepal or self-reported as a citizen of Nepal. *Id.* ¶ 18.

The USMLE program's score analysis described above identified 832 examinees who had passing level exam results whose validity the USMLE program had a good faith basis for questioning. *Id.* ¶ 19. Of this number, 618 examinees had one Step score flagged as being of questioned validity; 202 examinees had two Step exam scores flagged; and 12 examinees had scores flagged on all three Step exams. *Id.*

### III.     Current invalidation of Plaintiff's USMLE scores

Plaintiff took the Step 1 exam in February 2023, the Step 2 CK exam in May 2023, and the Step 3 exam in September 2023. Ward Decl. ¶¶ 17-19 and Exs. D-F. She received a passing score each exam.

Plaintiff's passing-level USMLE Step exam results were invalidated based on the USMLE program investigation described above. *See* Jurich Decl. ¶ 24-25 and Ex. C.  Her Step 1 result has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times, unusually high performance, and abnormal question response times. *Id.* ¶ 27. Her Step 2 CK score has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times and abnormal question response times. *Id.* Her Step 3 score has been invalidated due to extremely improbable answer similarities with other examinees testing on the same form at similar times and abnormal question response times. *Id.*

### IV.     Plaintiff's USMLE experience and status in pursuing a medical career

#### A.     Plaintiff's allegations

Plaintiff alleges that she grew up in Nepal, graduated from the Kathmandu University School of Medical Sciences in 2022, is a Nepali citizen, and currently lives in Kathmandu. Complaint ¶ 27. She took all three Step exams in one year, in 2023. She took the Step 1 exam on February 9, 2023, in Nepal. She took the Step 2 CK exam on May 8, 2023, in India. She took the Step 3 exam on September 18, 2023, in the United States (Connecticut). *Id.* ¶ 28. She received passing scores on all three exams. *Id.*

Plaintiff testifies through her verified complaint that she "studied hard" for her Step exams and "did not have unauthorized access to exam questions." *Id.* She does not explain how she

studied, the study materials she used, or whether she studied alone or in a group. Plaintiff also explains that she "guessed immediately" when she encountered a topic on the USMLE about which she had "less knowledge than others," and therefore "sometimes answer[ed] questions ***correctly*** much faster than [she] possibly could have read those questions." *Id.* ¶ 50 (emphasis added).

Plaintiff alleges that in January 2024, she "was preparing to enter the Match and hoping to enter residency in the summer of 2024." *Id.* ¶ 31. She does not explain the steps she has taken to "prepare to enter the Match." *Id.* She also does not discuss her performance in medical school or her perceived likelihood of obtaining a position in the Match if she were eligible to participate this year. Indeed, Plaintiff is noticeably silent about her residency plans and aspirations. She does not explain where she is interested in serving as a resident or what medical specialty she wants to pursue. Plaintiff also does not explain any options she may have to obtain a residency or practice medicine in Nepal—which is her home country, the country where she attended medical school, and the country where she apparently has lived her entire life—or in any other country besides the United States.

Plaintiff generally references the immigration status of foreign medical graduates who are accepted into residency programs and alleges that individuals with J1 or H1B visas must "maintain participation in the residency program" to retain their visa eligibility, Complaint ¶ 20, but she does not allege that she herself currently has a visa to work in the United States.

### LEGAL STANDARD

To certify a class, a putative class action plaintiff must satisfy Federal Rule of Civil Procedure 23, which "imposes stringent requirements for certification that in practice exclude most claims" from class proceedings. *American Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

Under Rule 23(a), the putative class action plaintiff must demonstrate that:

1.  the class is so numerous that joinder of all members is impracticable;

2.  there are questions of law or fact common to the class;

3.  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4.  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiff must also satisfy at least one of the requirements of Rule 23(b). Here, the Plaintiff has elected to proceed under Rule 23(b)(2), which requires her to show that NBME "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

A putative class action plaintiff bears the burden of satisfying Rule 23, which "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The plaintiff must "affirmatively demonstrate" compliance with the rule. *Id*. In order to achieve class certification, a plaintiff must "'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis in original).

## ARGUMENT

Plaintiff fails to demonstrate that class certification is appropriate based on the commonality and adequacy of representation requirements of Rule 23(a), and her motion for class certification should be denied.

## I.       Plaintiff fails to satisfy Rule 23(a)'s commonality requirements

The Court should deny Plaintiff's motion for class certification because Plaintiff cannot satisfy Rule 23(a)'s commonality requirement. Factual inquiries regarding each individual member of the putative class would be required to provide the answers to the purportedly common questions at issue identified by Plaintiff.

Rule 23(a)(2) requires a showing of "questions of law or fact common to the class." But this "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'"" *Wal-Mart*, 564 U.S. at 349 (citation omitted). To satisfy the commonality standard, the Plaintiff must do more than raise a laundry list of such questions; the Plaintiff must demonstrate that the members of the putative class have claims that "depend on a common contention" that must be capable of "classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Ultimately, "[w]hat matters to class certification … is … the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* "In other words, . . . the class must show that its 'theory can be proved on a classwide basis.'" *Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (quoting *Wal-Mart*, 564 U.S. at 349).

Plaintiff describes the common factual issues across the putative class as (a) "whether NBME had any statistical evidence of irregular behavior that could justify disparate treatment on the basis of ethnicity and national origin" and (b) "whether, if NBME had such evidence, NBME treated individuals 'associated with Nepal' differently from other individuals for whom it had similar statistical evidence." Pl. Br. at 6. These purported "common questions" are not common at all. The USMLE program conducted individualized analyses of the exam performance of each

individual who was the subject of its performance review, as well as each separate exam each examinee took. *See* Jurich Decl. ¶ 17. The statistical data and USMLE program analysis will vary from examinee to examinee. Even if the class were limited to examinees of Nepalese ethnicity or national origin, as Plaintiff presumes, the "crux of the inquiry" into the discrimination claims here as posited by Plaintiff would be "the reason for a particular" invalidation decision. *Wal-Mart*, 564 U.S. at 352. Due to the individualized nature of the USMLE score review, that question would necessarily require individualized proof about the reasons NBME concluded that each putative class member's score(s) were determined to be of questionable validity. These are matters of individual, not common, proof.

Plaintiff's legal claims under Title VII and Section 1981 and her description of "questions of law common to the members of the class," *id.*, are based on the assumption that all members of the putative class share a common national origin or ethnicity tied to Nepal. Putative class members may have only tested in Nepal, however, rather than claiming national origin or ethnicity related to Nepal.

Plaintiff's current class certification motion is focused solely on her request for injunctive relief and is relevant to Plaintiff's pending motion for preliminary injunctive relief. One of the key factors going to whether Plaintiff or any putative class member is entitled to such relief, there has been no showing of commonality and every indication is that facts going to the question of irreparable harm are not common across the class. Plaintiff claims that "[i]n January 2024, [she] was preparing to enter the Match and hoping to enter residency in the summer of 2024." Complaint ¶ 31. Not all putative class members will be in the same position. Indeed, Plaintiff also alleges that "Nepali doctors who are currently in their residencies risk losing their visa status and being forced to leave the country immediately" and that "[o]n information and belief, many have already lost

their jobs." *Id.* ¶ 55. Plaintiff also points to putative class members with potential visa problems, *see* Complaint ¶¶ 20, 55. Plaintiff is not in the same position as these individuals, and her allegations simply reinforce that putative class members may be in different stages of the medical education and training, again pointing to a predominance of individual factual issues.

Plaintiff has not shown that she satisfies Rule 23(a)(2)'s commonality requirements, and the Court should deny class certification.

## II.      Plaintiff is not an adequate class representative.

Plaintiff is not an adequate class representative because of the potential for conflict between Plaintiff and other members of the class. "A representative is adequate if '(1) his interests do not conflict with those of other class members, and (2) he will vigorously prosecute the interests of the class through qualified counsel." *Moore v. Napolitano*, 269 F.R.D. 21, 33-34 (D.D.C. 2010) (citations omitted) (denying class certification); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.") (citations omitted).

Plaintiff's interests conflict with other class members for a number of reasons. Most immediately, and as set out in NBME's opposition to Plaintiff's motion for preliminary injunction, Plaintiff cannot successfully pursue the two claims she raises in this lawsuit—a claim under Title VII and a claim under 42 U.S.C. § 1981—because those statutes do not apply extraterritorially. Other putative class members likely share a similar problem, but there may also be other class members who have sufficient presence in the United States relative to those claims that they would not be barred from pursuing them. Plaintiff's inability to successfully move forward with her claims as a matter of law is an obvious conflict with potentially some class members.

Looking forward, Plaintiff also has a likely conflict with some class members because Plaintiff insists that she did not cheat on the USMLE or have unauthorized access to secure exam

questions, but this may not be the case for all putative class members. As explained to Plaintiff and other members of the putative class, "[t]he fact that a question arises concerning the validity of a score does not necessarily imply that an Examinee engaged in irregular behavior, or that an Examinee was aware that he or she was engaging in irregular behavior. Irregular behavior is not the only basis upon which scores may be invalidated or reported with a qualification." Declaration of Alex J. Mechaber, MD, MACP ("Dr. Mechaber Decl.") Ex. D at 2 ¶ B.3. It is also possible that information learned through the USMLE program's ongoing investigation or the course of this litigation could give rise to a charge of suspected irregular behavior against one or more putative class members. *See id.* ("Examinees will be notified separately if they are being investigated for suspected irregular behavior under the *USMLE Policies and Procedures Regarding Irregular Behavior*."). This would then conflict with Plaintiff, who has verified under penalty of perjury that she did not cheat on the USMLE and did not have unauthorized access to exam questions. Complaint ¶ 30. A putative class member who engaged in, or is suspected of engaging in, irregular behavior may have different interests in litigation involving the score invalidation, and a class representative may not have the same incentive to litigate on behalf of such individuals. Plaintiff has not accounted for any such conflicts. *See* Complaint ¶ 66 ("she has no known conflicts of interest with any other class member").

**CONCLUSION**

The Court should deny Plaintiff's Motion for Class Certification.


Dated:  February 18, 2024

Respectfully submitted,


/s/ Caroline M. Mew
Robert A. Burgoyne (D.C. Bar No. 366757)
Caroline M. Mew (D.C. Bar No. 467354)
Perkins Coie LLP
700 13th St., NW, Suite 800
Washington, DC 20005
T: 202 654 6200
F:  202 654-6211
RBurgoyne@perkinscoie.com
CMew@perkinscoie.com

Counsel for the National Board of Medical
Examiners