**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DR. LATIKA GIRI, on behalf of herself and all others similarly situated, | ) ) ) |  |
| Plaintiffs, | ) ) | Case No. 24-cv-410 |
| v. | ) ) | CLASS ACTION |
| THE NATIONAL BOARD OF MEDICAL EXAMINERS, c/o CT Corporation System, 1015 15th Street NW, Suite 1000, Washington, DC 20005 | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) |  |

**COMBINED REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION AND FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................. i

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT .................................................................................................. 3

I.   THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION TO
     PREVENT NEPALI TEST-TAKERS FROM BEING TREATED
     DIFFERENTLY THAN ALL OTHERS ............................................... 3

     A.   Plaintiff Is Likely To Succeed On The Merits. ....................... 4

          1.   The Civil Rights Acts apply to Dr. Giri's claims. .......... 4

          2.   Defendant's evidence reveals a clear violation of the Civil
               Rights Acts. ..................................................................... 9

               a.   Even assuming NBME's version of the facts, there
                    is no justification for singling out Nepali test-takers
                    for additional scrutiny, which NBME concededly
                    did. ............................................................................. 9

               b.   The NBME's targeting is harmful and without a
                    reasonable justification. ......................................... 13

     B.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary
          Relief. ...................................................................................... 16

     C.   The Balance of The Equities Supports Granting the Proposed
          Class the Requested Relief. .................................................... 20

     D.   The Public Interest Supports Entry of a Preliminary Injunction. ....... 22

II.  THIS COURT SHOULD CERTIFY A CLASS FOR INJUNCTIVE
     RELIEF OR GRANT A CLASS-WIDE PRELIMINARY INJUNCTION. ....... 23

CONCLUSION ............................................................................................ 25

## PRELIMINARY STATEMENT

Defendant NBME has revealed that it has a substantial worldwide problem with test-takers having unauthorized access to past test questions. But the NBME *admits* that it singled out Nepali test-takers for scrutiny while ignoring "similar conduct by large numbers of examinees in other countries." Mechaber Decl. ¶ 23. NBME temporarily removed test-takers from Nepal with suspect scores from the medical profession and left those from India or Pakistan or Jordan (or the U.S. or Canada, for that matter) free to Match and continue their medical careers in the United States. Its only justification for this clear, explicit disparate treatment is that a data analysis led it to believe that suspect scores are more common among Nepali test-takers than they are among others. Courts have rejected materially identical arguments, *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663–64 (S.D.N.Y. 2013) (holding racial profiling illegal), and this Court must as well.

Although Defendant admits treating Nepali examinees different from all others, it claims that it somehow did not "invidiously target Nepal." ECF 14 at 30 ("Opp."). Defendant's attempt to absolve itself confuses data with decision-making. Data, of course, is nationless and colorless. But NBME decided to carve out groups of people by their ethnicity and national origin, analyze their scores separately, and take unprecedented, preemptive actions against *only* Nepali test-takers, Jurich Decl. ¶¶ 14, 18–19, despite NBME admitting that it found "statistically significant" evidence of cheating in Jordan, Pakistan, and India as well, *id.* ¶ 9. The NBME's attempt to blame the data—when the problem was created by humans using data in a dangerous and unlawful way—is what explains Dr. Machaber's candid

1

acknowledgement that those from Nepal have been treated differently than everyone else who engaged in "similar conduct," Mechaber Decl. ¶ 23, while, in the next breath, claiming that the NBME "acted on the basis of the basis of examinee performance data," Mechaber Decl. ¶ 24. When an organization "establish[es] a set of criteria for identifying exam scores with questionable validity *associated with Nepal*," Jurich Decl. ¶ 14 (emphasis added), it will surely find questionable scores from Nepal only.

Imagine if NBME decided to carve out suspect scores from Jewish test-takers to be the first ones to receive extra scrutiny and preemptive action, or scores from Black or Latino medical students. Defendant could not excuse this conduct by pointing to a pattern of anomalous results from some members of those communities. Defendant has no answer to this point. Instead, Defendant leans in: it admits that it would take an "identical action[]" for "performance anomalies among a large group of USMLE examinees from, say, Maryland." Opp. at 2. That presents no legal problem, though, because Congress has not outlawed discrimination based on birth state. Far from answering Plaintiff's charge, then, Defendant's statement proves Plaintiff's case: substitute any protected class for "Marylander" in Defendant's hypothetical, and Defendant's action would be self-evidently unlawful.

With success on the merits very likely given Defendant's admissions, and because this would not be an extraterritorial application of federal civil rights law for several reasons, a preliminary injunction should issue because Plaintiff and the proposed class meet all the other factors. Those whose scores were cancelled would clearly be irreparably harmed absent an injunction here: they will feel the effects of

being subjected to intentional discrimination, and also have their careers derailed. And Defendant's admissions again reveal that the balance of equities and public interest favor entry of a preliminary injunction: Defendant's own evidence reveals that a very large number of test-takers with suspect scores will be participating in the Match, and yet no Declarant expresses any concern for patient safety or harm to the medical profession from these test-takers entering the Match. This makes sense given where resident applicants are in their careers, and the protections in place during a medical residency. But this is as true for Nepalis as non-Nepalis. Thus, this Court should enter a preliminary injunction that would reinstate the invalidated scores of the proposed class of 832 Nepali test-takers (which this Court should, but need not, preliminarily certify) and require that the NBME treat all test-takers, of any national origin, alike.

## ARGUMENT

### I.  THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION TO PREVENT NEPALI TEST-TAKERS FROM BEING TREATED DIFFERENTLY THAN ALL OTHERS

There is no dispute that Defendant intentionally and explicitly treated Nepali test-takers—including those who took a test in Nepal and those who did not but were identified as Nepali citizens—differently from those of other nationalities. This is what anti-discrimination laws exist to prevent. Because those laws apply in this case, and because the other equitable factors tip in favor of granting preliminary relief, this Court should enter the proposed injunction that would restore the invalidated scores and require test-takers of all nationalities be subject to the same procedures.

3

### A.    Plaintiff Is Likely To Succeed On The Merits.

#### 1.    *The Civil Rights Acts apply to Dr. Giri's claims.*

Defendant first argues that applying Title VII and § 1981 here constitutes an impermissible extraterritorial application of federal civil rights laws because Dr. Giri is "a non-citizen of the United States who currently resides in Nepal." Opp. at 3. But Defendant ignores the extensive U.S. contacts of Dr. Giri and the proposed class. Dr. Giri took Step Three of the *USMLE in the United States*, with a valid visa, as Defendant requires of all doctors taking that Step. Compl. ¶¶ 15, 28, 55; Opp. at 5. This is thus a *domestic* application of the statute as to Dr. Giri and the vast majority of prospective class members, who either took Step Three in the United States or are currently in residency (in both senses of the word) in the United States.[1] Defendant points to no case where application of Title VII was even in question where a plaintiff was located physically and legally in the United States for a key employment-related action, where the employer was in the United States, and where the action interfered with U.S. employment. There is no such case, because such a case would involve conduct that is "within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991); *see also Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 306 (2d Cir. 2006) (applying "territorial jurisdiction" standard to section 1981 claim and reversing dismissal due to "[c]onduct that occurred while Plaintiff was within the United States").

---

[1] Dr. Giri took her Step 3 examination in the U.S. on September 18, 2023, Compl. ¶ 29, after Defendant began its targeting of Nepali examinees, Jurach Decl. ¶ 11.

Still, even considering Dr. Giri's ties to Nepal and her return to Nepal after Step Three was completed, Title VII still applies. To "determine whether the case involves a domestic application of the statute," a court looks to whether the statute's focus applies to conduct in the United States. *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). Several courts, including this Court, have previously held that Title VII's focus on eradicating discrimination from domestic employment permits claims by nonresident aliens who apply from abroad and would be eligible to work in the United States. *See Hartman v. Wick*, 678 F. Supp. 312, 325 (D.D.C. 1988) (holding that "[i]n light of the plain language of the statute, the silent legislative history, and accepted rules of statutory construction, the Court must find that Title VII applies to non-resident aliens who apply for employment within the United States"); *Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184, 187 (4th Cir. 1998) (holding that a foreign national who applies for a job in the United States is protected by Title VII). And the case for Title VII's application here is even stronger than those cases, not only because of the substantial U.S. contact by Plaintiffs but also because this is not actually a "job application" case. Rather, Plaintiffs go through an entire testing process with a United States organization, which necessarily involves travelling to the United States to complete, and which serves as a gateway to employment in the entire medical profession *anywhere* in the United States, not just at one company. Tolerating industry-wide discrimination *within the United States* is not what

Congress intended with Title VII, and it is not what its text permits.[2] Indeed, Defendant *requires* that applicants come to the United States to take Step 3, but now it protests that it need not follow U.S. anti-discrimination law for those test-takers whom it invites into the country. Defendant does not address this perverse impact of its narrow reading.

Instead, Defendant relies on *Nakhid v. Am. Univ.*, No. 19-CV-3268 (APM), 2021 WL 4169355 (D.D.C. 2021) (cited at Opp. 33), but the reasoning in that non-binding district court opinion does not apply here, and its validity is in question anyway. In *Nakhid*, the court rejected the application of Title VII to a discrimination claim by a nonresident, non-citizen who applied online from Lebanon to be soccer coach at American University. *Id.* at *2. The applicant applied but "was not selected for an initial screening interview or any subsequent interview," so never set foot in the United States as part of the process. *Id.* at *2. The *Nakhid* court found that the case involved an insufficient connection to the United States to be covered by Title VII. *Id.* at *6.

---

[2] If the Court concludes that actually having visited the United States to take Step Three or become a resident is a prerequisite to Title VII's coverage for any absent class member, then, while immediate relief for Dr. Giri and most of the proposed class would still be available, Dr. Giri would propose to amend the complaint to add a claim under the District of Columbia's Human Rights laws for that small group of proposed class members who have not yet been to the United States as part of the process. That law would apply here because a corporation at home in D.C. (by its own choosing, of course) took the discriminatory actions. *See, e.g.*, *Kambala v. Checchi & Co. Consulting, Inc.*, 280 F. Supp. 3d 131, 138 (D.D.C. 2017) ("A discrimination claim can arise under the DCHRA when either the discriminatory employment decision was made in the District of Columbia or the effects of that discriminatory decision were felt in the in the District.").

But the connection between the plaintiff and the United States here is far stronger than in *Nakhid*, so even applying *Nakhid*'s analysis, this Court should reach the opposite conclusion. As another district court found, for a nonresident, non-citizen job applicant with "extensive contacts with the United States at all stages of the recruitment, hiring and employment process, it is not clear that the extension of Title VII protection to plaintiff would amount to extra-territorial application of that law." *Olvera-Morales v. Sterling Onions, Inc.*, 322 F. Supp. 2d 211, 221 (N.D.N.Y. 2004). Extensive domestic contacts allay the *Nakhid* court's concern that allowing foreign job applicants who apply for U.S. jobs online and never set foot in the United States to claim discrimination "would effect a massive expansion of Title VII's protections," 2021 WL 4169355 at *6 (citing *Reyes-Gaona v. N. Carolina Growers Ass'n*, 250 F.3d 861, 866 (4th Cir. 2001)), because Plaintiffs here studied U.S. medical practices and took three exams designed exclusively for U.S. employment, including one administered only physically within the United States.

Plaintiffs' eventual domestic employment here is also not purely speculative, as in *Nakhid*, but likely. Defendant's statistics show that a majority of putative class members will undeniably be working in the United States if it were not for Defendant's discriminatory actions. Feddock Decl. at ¶ 38. Title VII protects rights in *employment*, and a defendant who fires someone because of that person's race of course cannot be heard to say it has avoided the statute merely because the victim no longer works for the defendant. *See, e.g.*, *Sodipo v. Caymas Sys., Inc.*, No. C 06-05794 CRB, 2006 WL 8441939, at *4 (N.D. Cal. Dec. 5, 2006) (rejecting argument that Title

VII does not apply because "Plaintiff only lost his authorization to work when, after Defendant notified the authorities that it had fired him, the government revoked his visa"). Here, the key point is that the reason the class-members who have not yet entered the United States did not do so *is Defendant's discrimination* within the U.S. That is exactly what Title VII was meant to combat.

Finally, although *Nakhid* is both non-binding and distinguishable from the facts of this case, it is also not clear if it is good law. In the appeal of *Nakhid*, the D.C. Circuit affirmed the court's ruling for the defendant on the alternative ground that summary judgment on the merits was appropriate, and it expressly declined to consider "whether Title VII or § 1981 apply to job candidates who are not U.S. citizens and who apply to U.S.-based jobs while physically located outside the United States." *Nakhid v. Am. Univ.*, No. 21-7107, 2022 WL 2678742, at *2 (D.C. Cir. July 12, 2022). And, as mentioned, *Nakhid* itself failed to cite an earlier D.D.C. decision that went the other way on that question. Like the D.C. Circuit, however, this Court can avoid that question, because it can find that Plaintiff and the proposed class here have more extensive domestic contacts than mere foreign job applicants, because their domestic employment is not merely speculative, and because job interference is different than job application. Those extensive connections to the United States, including necessarily taking one of the invalidated exams on U.S. soil, render this a domestic application of Title VII (and § 1981).

2.    *Defendant's evidence reveals a clear violation of the Civil Rights Acts.*

a.    **Even assuming NBME's version of the facts, there is no justification for singling out Nepali test-takers for additional scrutiny, which NBME concededly did.**

At this early stage, without having the benefits of the full adversary process, Plaintiff and the proposed class are forced to take the NBME at its word that it has a substantial problem with test-takers worldwide having unauthorized, advance access to questions that are reused across test administrations. NBME officials detail the various test information that can be found by those looking for it on online fora and groups like "social media, in messaging apps [like Telegram] or in online social networks such as Reddit" as well as "online chat rooms" Ward Decl. ¶¶ 5, 7; *see also id.* ¶ 8–14. Officials have seen a "substantially higher percentage of examinees with a statistically significant level of agreement" in, at least, Jordan, Nepal, Pakistan, and India. Jurich Decl. ¶ 9. Defendant even created an app called "STOPit" to collect tips and other information from anyone around the world to reports suspected test security violations. Ward Decl. ¶ 4. For purposes of this motion, Plaintiff takes the evidence as valid, though there could be other explanations for both the group-level and individualized data that the declarants proffer.[3]

---

[3] For instance, some of the data raises questions that demand probing by experts (what is the impact of group studying on answer correlation?). And some of the data is incomplete and would be subject to further discovery (what is the raw data behind some of the numbers given at both a general level and for Dr. Giri's score analysis in particular?). But Plaintiff recognizes that this Motion is not the venue to probe those issues, and so accepts for now that Defendant has detected score anomalies across wide swaths of test-takers from multiple countries that indicate unauthorized access to test material.

Armed with data indicating an abundance of test-takers had unauthorized access to the data, NBME took an action that was illegal and unprecedented: it carved the data up by national origin and then, despite strong evidence of cheating everywhere in the world (and particularly in Jordan, Nepal, Pakistan, and India, Jurich Decl. ¶ 9), decided to take adverse action against only *Nepalis* suspected of having access to past questions. The data didn't make that decision; the people inside NBME did. As Plaintiff explained in her opening brief, NBME's actions violated Title VII and § 1981 because they resulted in an "adverse employment action" based on national origin or race. *See* ECF 3 at 19–22 ("Opening Br.").

Defendant does not dispute the adverse action component, and it devotes just over two pages of its 42-page response brief to arguing that its extraordinary action was non-discriminatory, but as not discriminatory on the merits, but these few pages are inconsistent with its own factual submissions. Opp. at 33–36. Defendant claims that there is no evidence that "anyone's score was invalidated because they are a Nepali citizen or of Nepali ethnicity" and even cites Dr. Mechaber's Declaration (at ¶ 24) for the proposition that the "contrary assertion is categorically untrue." Opp. at 35. But Dr. Mechaber's Declaration says the opposite of what NBME claims it does. Dr. Mechaber states that "[t]o the extent that issues have been or are identified reflecting similar conduct by large numbers of examinees in other countries"—and, as stated elsewhere, such issues have been identified—she "expect[s]" those other test-takers will face sanction at some unspecified future time. Mechaber Decl. ¶ 23. In other words: Nepali test-takers were the first and only test-takers to have adverse

action, while those of a different national origin may (or may not) be scrutinized next. Left out of the declaration and Defendant's brief is how anyone thought that letting "similar conduct by large numbers of examinees" slide, so long as those test-takers were not from Nepal, is anything other than discrimination based on national origin.

Defendant's only other point on the merits of Title VII defends itself against a due process claim that is not at issue. The NBME argues that its institution of a novel policy in January 2024 that permits blanket score invalidation, and its application of that policy exclusively to Nepalis, is acceptable because the NBME reserved the right to institute such a novel policy in its posted policies and procedures. Opp. at 35. The NBME may be right about its ability to craft a new policy, but it is wrong about its ability to apply that policy only to Nepalis (or to Nepalis before anybody else). Plaintiff thus has no issue with the holdings of the two cases cited by Defendant on this point. *See* Opp. at 35 n.10 (citing *Doe #1 v. College Board*, 440 F. Supp. 3d 349, 351 (S.D.N.Y. 2020) (no equal protection or discrimination claim made; in any event, court did not reach the merits and compelled arbitration); *San Mateo Union High School Dist. v. Educ. Testing Servs.*, 2013 WL 4711611, at *8–14 (request for relief denied on claims of due process, breach of contract, and related violations upon score cancellation)). What Plaintiff does object to, and what the cases NBME cites did not involve, is NBME's decision to apply its sui generis, and very punitive, new policy *to one ethnic group only*.

Defendant has no answer for this point. The NBME contends that the "USMLE program routinely suspends the reporting of scores that the program has a good faith

basis for questioning," Opp. at 35, but that proposition is misleading because, before last month, scores were considered valid until an investigation was complete. Indeed, in the very next sentence, the NBME admits that it adopted new policies and procedures for the "facts that it encountered in this instance." Opp. at 35; *see also* Mechaber Decl. ¶ 20, Ex. D (new procedures, dated January 2024). And it has applied those new policies exactly once, to hundreds of Nepalis and nobody else. Jurich Decl. at ¶¶ 18–19.").

Troublingly, although Defendant admits that access to unauthorized material is widespread and not limited merely to the Nepali community, it provides no explanation for its failure to apply this same policy to anyone else of any other nationality. NBME notes that it received anonymous tips regarding cheating in Jordan, Nepal, and Pakistan. Jurich Decl. ¶ 6. It considered this evidence serious enough to warrant a statistical analysis of these countries' (plus some of India's) results, *id.* ¶ 9. And that statistical investigation confirmed anomalies consistent with cheating in *all four countries. Id.* Yet then, with little explanation, program officials chose to begin "establishing a set of criteria for identifying exam scores with questionable validity associated with Nepal." Jurich Decl. ¶ 14. That process culminated in the *en masse* invalidation of the scores of only one country's test-takers. Jurich Decl. ¶¶ 18–19.

And while there are hints that Defendant has in fact identified other test-takers of other nationalities who appear very likely to have had unauthorized access to questions, it has so far failed to cancel any other scores despite the acknowledged

"similar conduct" of many test-takers, per Dr. Mechaber (at Decl. ¶ 23). Defendant gives no information about the extent to which it found evidence of cheating in those countries; apparently, approximately 25% of Nepali scores were found to be compromised, but the NBME says nothing about the percentage of compromised tests in the other three countries or anywhere else in the world. Jurich Decl. ¶ 19. Nor does the NBME provide any information about the status of the ongoing investigation into non-Nepalis, how widespread the problem is, or when or if it will apply these new, preemptive procedures to any other test-taker of any other national origin. This silence speaks volumes.

### b. The NBME's targeting is harmful and without a reasonable justification.

NBME maligned the entire Nepali medical community and branded them as cheaters, in a public release that got the attention of the entire medical profession, *see* Mechaber Decl. ¶ 19, Ex. C, when it *knew* the problem was not confined to Nepal. It knew there was substantial access to unauthorized test materials floating around online. Ward Decl. ¶¶ 4–15. It knew there were statistically significant score anomalies in international testing centers in other locales around the world. Jurich Decl. Jurich Decl. ¶¶ 7–10. (And, when it eventually looks, it will surely find problems elsewhere.) It knew the problem was years in the making, due to its frequent reuse of test questions; that is why it created a reporting app to try to curb the problem. Ward Decl. ¶ 4. Although Dr. Mechaber "expect[s]" other examinees to, at some unspecified future time, be subject to the "same policies and procedures," there is no

actual evidence of further investigation of future action and no basis given for that expectation. Mechaber Decl. ¶ 23.

There is a name for singling out one group for scrutiny based on a (supposedly) data-driven likelihood that individuals of one group have committed more violations than individuals of another: it is called profiling, and it is illegal under the Constitution and, as applicable here, under Title VII and § 1981. That was the court's conclusion in a landmark 2013 decision involving the NYPD's use of race to disproportionately stop and frisk Black and Latino people. There, as here, there was no question that impacted plaintiffs were being singled out based on a protected characteristic: there, race. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663–64 (S.D.N.Y. 2013). There, as here, the defendant contended that the "data" permitted them to take the discriminatory action: the defendant argued that "because these groups are heavily represented in criminal suspect data . . . in those areas where the NYPD carries out most of its stops," it was permissible for the City to consider race in making preemptive stops. *Id.* at 662. The court rejected this argument as illegal discrimination. After all, "[j]ust as it would be impermissible for a public housing agency to adopt a facially race-neutral policy of disfavoring applications from any group that is disproportionately subject to tenant complaints, and then apply this policy to disfavor applications from a racially defined group, so it is impermissible for a police department to target its general enforcement practices against racially defined groups based on crime suspect data." *Id.*

So too here. The NBME has told the Court it has the equivalent of a neutral policy that involves acting against "any group that is disproportionately subject to . . . complaints." *Id.* Here, apparently Nepali test-takers had a disproportionate number of scores that suggest unauthorized access. (Even this is unclear at this stage because Defendant applied its most intense scrutiny to Nepalis only, and it has not informed Plaintiff or the Court how many suspected cheaters from other jurisdictions it is aware of.) But under the uncontroversial principle of equal treatment articulated well in *Floyd*, it is illegal to "disfavor . . . a racially defined group" no matter if the data (supposedly) supports defining a group through racial criteria. The bottom-line is that there are some cuts of the data that statisticians may wish to make that the law prevents. Race is one. National origin is another.

Defendant does not attempt to engage in a burden shifting analysis and so does not attempt to justify the national origin discrimination based on a business necessity, and that seems wise. The record reveals that there are so very many other things that the NBME could have done, and still can do, if it genuinely wants to protect the integrity of the exams, without singling out one group of test-takers based on national origin. For instance, the record reveals no reason why the NBME could not have ignored national origin in its analysis and taken action against those people whose scores indicate similar unauthorized access among *all* test-takers at *all* test centers, or, at the very least, all test-takers at all test centers about which it has

received anonymous tips of cheating.[4] After all, NBME's own evidence reveals that past questions are widely available from many different sources and in many different countries. *See* Ward Decl. ¶¶ 5–14 (describing sources available to any internet user). NBME's data analysis is supposedly so accurate that it can reveal statistical anomalies whose odds of random occurrence are less than 1 in 100,000,000. Jurich Decl. ¶ 25 Ex. C (citing odds of random occurrence in email to test-taker). Yet it is left mysterious why the NBME could not create a model that would attempt to detect all test-takers who had unauthorized access and treat them all the same.[5]

Regardless of what the NBME might do in the future, though, it has unlawfully discriminated in the past. Plaintiffs are likely to succeed on this claim.

## B.     Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

As Plaintiff explained in the Opening Brief, the concrete harm that Plaintiff and the proposed class will suffer absent a preliminary injunction is an inability "to

---

[4] Plaintiff has an idea why NBME did not do the analysis for all test-takers: Data analysis of everyone worldwide would probably confirm that cheating is, indeed, "rampant," as public sources put it. Opening Br. 7. This would be embarrassing to the NBME, which runs USMLE as a business lucrative enough to justify $1,370,248 in total compensation for its CEO. *See* IRS Form 990 for Fiscal Year Ending Dec. 2022, filed Nov. 13, 2023 (available at https://perma.cc/73CG-UR8E). Rather than suffering its *own* embarrassment from cancelling many thousands of scores across the world and facing up to a problem of its own creation, NBME may have decided to target one ethnicity and national origin for group-wide condemnation.

[5] In the long run, one would think that the rampant unauthorized access that the NBME's declarants describe would make the NBME alter the format of the exam, change administration procedures, add more proctoring, create more novel question content, or do other things to combat the apparently very widespread problem of unauthorized test question access. But given the current format, all the law requires is that no single nationality be singled out for special targeting.

participate in the Resident Match," the relevant deadline for which is February 28, 2024. Opening Br. at 17. In her verified Complaint, Dr. Giri states that "[i]n January 2024, Dr. Giri was preparing to enter the Match and hoping to enter residency in the summer of 2024." Compl. ¶ 17. And it is undisputed that many hundreds of those additional members of the proposed class would likewise be participating in the Match; indeed, that is Defendant's main justification for taking the actions it did. Opp. at 2; Mechaber Decl. ¶ 22 (noting "hundreds [with scores Defendant found questionable] were registered to participate" in this year's Match). The inability to participate in the Match, and the accompanying complete derailment of an ability to practice medicine in the United States, is exactly the kind of imminent, concrete harm that justifies entry of a preliminary injunction. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Defendant contends that the evidence of harm is not concrete enough, Opp. at 37, but it mistakes the precise harm alleged and ignores its own evidence regarding the Match. Dr. Giri and the proposed class are not requesting that they be matched to a U.S. residency program. Rather, they simply want their scores restored so that they can compete in the match on a level playing field with other test-takers worldwide. The Supreme Court has stated that the loss of "specific job *opportunities* and the training and competitive advantages that would come with those opportunities," can be "irreparable harm." *Carson v. American Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981) (emphasis added); *see also Serco, Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008) (The "lost opportunity to compete on a level playing field . . . has been

17

found sufficient to prove irreparable harm."); *McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004) ("[P]laintiffs have demonstrated that the inability to play in the fall season, which deprives them the chance for . . . competition, constitutes irreparable harm."). That is the harm here.

Moreover, as this Court has previously found, "being subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (quotation marks omitted, and citing *Smith v. City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring) (noting, in the context of the Age Discrimination in Employment Act, that "discriminating against" an individual is "inherently harmful to the targeted individual"). That is particularly true here, where the stigma of being the only nationality singled out when Defendant admits there are many others whose scores indicate unauthorized access is enormously damaging and irreparable absent immediate action by this Court. These two factors differentiate this case from the cases cited by Defendant, where medical students were dismissed or suspended based on *individualized* conduct. Opp. at 37–38 (citing *Doe v. Ohio State Univ.*, 2016 WL 692547, *10–11 (S.D. Ohio 2016) and *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 U.S. Dist. LEXIS 86837, *14–15 (E.D. Pa. 2012). The irreparable harm here is being discriminated against by not being permitted to participate in the Match on the same terms as other test-takers of all other nationalities, not the mere loss of any particular job or school position. That harm is concrete and non-speculative; indeed, it is certainly impending absent action from this Court.

This also answers Defendant's insulting contention that there is no irreparable harm because Plaintiffs could just participate in a later Match or even just "apply for licensure in Nepal or in another country." Opp. at 37. Plaintiffs took the USMLE test because they wish to work in the United States—the "US" stands for "United States"—and are irreparably harmed from not being able to participate in the Match on the same terms as all other test-takers. Defendant's argument would have all victims of national origin discrimination in the United States just avoid the harm by seeking employment in their country of origin. Defendant's suggestion that Plaintiffs can go work where they came from without being harmed starkly reveals its prejudice, and thankfully that is not the law.

Finally, even assuming the harm is not successfully matching, Defendant's own statistics and actions belie its argument that this harm is too speculative or conclusory. Dr. Feddock states that last year's match rate was 59.4% for non-U.S. citizen student graduates of international medical schools. Feddock Decl. at ¶ 38. Assuming that many of the proposed class were to fall into that category, it is wildly implausible that *no one* of the 832 people in the proposed class "would be included on any residency program's Rank Order List for the 2024 Main Residency Match," as Defendant implies. Opp. at 36–37. There is effectively a 0% chance that all 832 applicants would fail to match, so that harm is certain.[6] Accordingly, Plaintiffs have shown irreparable harm absent injunctive relief.

---

[6] In particular, the probability of this would be approximately $.4^{832}$, which is less than $10^{-378}$, a number so incomprehensibly small to be indistinguishable from 0.

**C.      The Balance of The Equities Supports Granting the Proposed Class the Requested Relief.**

As explained in the previous section and in the opening brief (at 24–26), Plaintiffs will certainly suffer serious harm if they do not obtain the injunctive relief they request, which strongly tips the balance of the equities in their favor. For its part, Defendant claims it has a "strong and legitimate interest in ensuring that the USMLE program is fair to all examinees" and that the scores it reports are "valid and reliable." Opp. at 38. While these are valid interests, they are not furthered by Defendant's disparate treatment of Nepalis. If fairness and Defendant's reputation for reliability were paramount, Defendant would treat like test-takers alike, not based on their national origin but based on the evidence before it. Yet Defendant concedes that it has anonymous tips and statistical evidence suggesting highly similar behavior in other countries, but it continues to report those scores as valid.

The case law Defendant relies on for this prong provides it no help. In none of Defendant's cases was the testing entity alleged to have discriminated against an entire group. Instead, most of Defendant's cases involved a single claim of mistreatment after an individualized process determined a specific score should not be released. *E.g.*, *Powell v. NBME*, 364 F.3d 79 (2d Cir. 2004); *Murray v. Educ. Testing Servs.*, 170 F.3d 514 (5th Cir. 1999). That is exactly the process Plaintiffs seek here, which all non-Nepali test-takers receive. Defendant cannot be harmed by denying this procedure only to Plaintiffs. In none of Defendant's cases did the plaintiff point to any similarly situated individuals who were treated better than they were, let alone any treated better based on ethnicity. The equities involved in group-based discrimination

are very different than those at issue in the testing cases Defendant relies on most heavily.

Defendant next argues that "the harm to NBME cannot be undone if scores are released, relied upon by third parties, and then later invalidated." Opp. 39. But the Court should not credit this as a "harm" at all, because that is *exactly* what Defendant continues to do with every non-Nepali suspected of cheating. *See* Mechaber Decl., Ex. A (generally applicable policies and procedures). Defendant concedes that at this moment there are a substantial number of Jordanian, Pakistani, and Indian examinees (and surely others from elsewhere too) whose scores Defendant has reason to question, based on the same kinds of tips and statistical evidence that it has marshaled against Nepalis. Jurach Decl. ¶ 9. The NBME even "expects" that at some future time they will be sanctioned. Mechaber Decl. ¶ 23. Yet Defendant is content to allow those non-Nepalis to apply for residency, match with a program, and treat patients until it completes its investigation. Defendant cannot claim that permitting the Nepali group to match is irreversibly harmful when it acknowledges that the NBME "expects" to take some action against other similarly situated test-takers even after the Match. *Cf. Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017) (rejecting, while assessing balance of the equities, "a post hoc, secondary justification for an . . . action rooted in . . . animus"), *vacated on other grounds*, 583 U.S. 912 (2017).

**D.    The Public Interest Supports Entry of a Preliminary Injunction.**

As the final injunction factor, Defendant's argument regarding the public interest does not do the work Defendant needs, for similar reasons as above. All acknowledge there is a public interest in ensuring doctors treating patients are well-trained, and that residency programs and resident applicants are not disadvantaged by cheaters. Opp. 40–43. But that interest is not served by canceling the scores of suspected Nepali test-takers but not test-takers about whom Defendant has the same suspicions based on the same evidence. Every constituency Defendant argues would be served by canceling the proposed class's score would be equally well served by non-Nepali test-takers receiving the same treatment or, as requested here, by giving Nepalis the individualized treatment afforded to other individuals. *Cf. Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 162 (D. Me. 2019) (finding public interest favored grant of injunction where "Defendants will be free, going forward, to make exactly the kind of individualized assessments of inmates' medical needs for MAT that they have failed to make here").

By Defendant's logic, the public interest would always justify discrimination so long as the increased scrutiny on a suspect class caught some bad actors. *But see Floyd*, 959 F. Supp. 2d at 556 ("Many police practices may be useful for fighting crime—preventive detention or coerced confessions, for example—but because they are unconstitutional they cannot be used, no matter how effective."). Yet it is well settled the public interest is never served by such disparate treatment; to the contrary, it is better served by treating like individuals alike. *See, e.g., California*

*Hous. Rights Ctr. v. Krug*, 564 F.Supp.2d 1138, 1145 (C.D. Cal. 2007) ("[T]he public interest in abolishing discrimination dictates that the defendants be held to a continuing standard of fair dealing"); *U.S. v. Commonwealth of Puerto Rico*, 764 F. Supp. 220, 225 (D.P.R. 1991) (emphasizing "the public interest that all citizens have in seeing vigorous enforcement of civil rights legislation").

This all makes sense because residents are likely supervised in practice and there will be many opportunities to prevent incompetent practitioners from harming patients. We can be confident in this fact because NBME admits it through its actions: Today, NBME is happy to allow many test-takers with suspect scores to use those scores to apply to residency programs, and it has long tolerated that problem, all without a single identified harm that it could present to this Court. It should not be permitted to complain about it now to prohibit 832 Nepali test-takers out of close to 46,000 test-takers from pursuing careers in medicine.

## II.   THIS COURT SHOULD CERTIFY A CLASS FOR INJUNCTIVE RELIEF OR GRANT A CLASS-WIDE PRELIMINARY INJUNCTION.

"[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion or in conjunction with it." 2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed.); *see also Rodriguez v. Providence Community Corrections, Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) (same). Thus, to craft relief, the Court need not formally rule on the motion to certify the class at this stage. Still, in reply to Plaintiff's motion to certify a class, Defendant makes two points.

First, Defendant contends that its "individualized" evidence of statistical anomalies precludes common treatment, and so the class fails commonality. ECF 15 at 10 ("Class Cert. Opp."). This argument ignores the substance of Plaintiff's claims. Unlike in citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), where plaintiffs attempted to use statistical evidence to support an inference of discrimination, Defendant here *explicitly discriminated* and is trying to use statistics to *excuse* that discrimination. Defendant is thus right that the "'crux of the inquiry' into the discrimination claims here as posited by Plaintiff would be 'the reason for a particular' invalidation decision," Class Cert. Opp. at 11, but that dooms Defendant's argument: The "reason for" *every* score invalidation decision here is Nepali ethnicity or national origin. Because no statistic could possibly justify looking for statistics only among one ethnic group, that theory can be proven identically as to every member of the class. Defendant's *Dukes* argument is a red herring. Similarly, the mere fact that some class-members are harmed more severely than others does not change the fact that they are all harmed in exactly the same way and that a class-wide remedy would cure that exact harm in one fell swoop. *Contra* Class Cert. Opp. at 9.

Second, Defendant argues that Dr. Giri is an inadequate class representative because she is not a U.S. citizen or resident and because she did not cheat on the exam. Class Cert. Opp. at 11. As to the domesticity claims, as explained above, Plaintiff is an adequate class representative because she indeed took the exam in the United States. To the extent the Court believes that current U.S. residents are differently situated, Counsel currently represents at least once such person and could

add her as a lead plaintiff if need be. And Defendant's protestation that Dr. Giri is an inadequate representative because she did not cheat ignores Defendant's own claims that irregular behavior is not what justified its actions in this case. According to *Defendant*, all 832 class members had their scores invalidated because there was some *common* reason to subject them to close analysis: that is, their association with Nepal. *See* Opp. 18 n.6. Only once that first cut was made was any individualized decision made. Because the case turns on the first cut of the data, Dr. Giri is similarly situated to the class and is adequate class representative.

Finally, since it is uncontested that, as described above, this Court may grant class-wide prospective relief without immediately certifying a class, temporarily granting injunctive relief pending resolution of any questions of precise scope or participation in the class would be appropriate given the severe harms described above.

## CONCLUSION

For the foregoing reasons this Court should grant the relief requested in Plaintiffs' motion for a preliminary injunction on a class-wide basis and preliminarily certify the class defined in Plaintiffs' motion for class certification.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Emily Gerrick
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

/s/ James Crooks
/s/ Kritika Deb
James Crooks (admitted *pro hac vice*)
Kritika Deb (admitted *pro hac vice*)
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
(619) 547-4182

*Attorneys for Plaintiffs*