## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. LATIKA GIRI and DR. SWECHHA SHRESTHA, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 24-CV-410 |
| v. | ) | CLASS ACTION |
| | ) | JURY TRIAL DEMANDED |
| THE NATIONAL BOARD OF MEDICAL EXAMINERS, c/o CT Corporation System, 1015 15th Street NW, Suite 1000, Washington, DC 20005 | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

**Preliminary Statement**

1.      Defendant National Board of Medical Examiners administers the U.S. Medical Licensing Exam (colloquially known as the Boards) to approximately 24,000 graduates of U.S. medical schools and another 22,000 graduates of foreign medical schools each year. In 2023, NBME received tips that groups of examinees in India, Pakistan, Jordan, and Nepal had distributed exam questions over the internet before the exams were administered. NBME then conducted a statistical analysis aimed at determining whether test-takers' incorrect answers were sufficiently correlated with those of other test-takers to suggest prior access to exam materials. That analysis revealed evidence that NBME believed to be suggestive of unauthorized access associated with all four countries, but, according to NBME, the problem was most severe among Nepali test-takers. And so NBME targeted Nepali test-takers, conducting an in-depth statistical analysis of the scores of any test-taker who (a) sat for the exam in Nepal, (b) went to medical school in Nepal, or (c) *was a citizen of Nepal*. That investigation lead NBME to summarily invalidate the scores of 832 test-takers whom it described as "associated with Nepal," applying a new set of procedures to these people only. NBME has since taken no public action against test-takers from India, Jordan, Pakistan, or any other country, and has not publicly revealed an investigation into score patterns in any other nations.

2.      The law has a name for this practice: profiling. And profiling is illegal where, as here, it is based on impermissible criteria like ethnicity and national origin. Because NBME's conduct violates Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866, Drs. Latika Giri and Swechha Shrestha bring

1

this Action on their own behalf and on behalf of all Nepali doctors affected by NBME's explicit discrimination, seeking damages for the harm already caused, a permanent injunction preventing further discriminatory treatment, and a declaratory judgment that the treatment was illegal.

## Parties

3.     Plaintiff Dr. Latika Giri is a 2022 graduate of the Kathmandu University School of Medical Sciences. Her Steps One, Two, and Three scores were invalidated by NBME. She is Nepali by ancestry and citizenship and lives in Kathmandu.

4.     Plaintiff Dr. Swechha Shrestha is a medical resident of Nepali citizenship and ancestry and lives in Nevada. Her Step Three exam score was invalidated by NBME.

5.     Defendant National Board of Medical Examiners in a corporation formed under the laws of the District of Columbia. It administers the USMLE.

## Jurisdiction and Venue

6.     This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

7.     This Court has general personal jurisdiction over NBME because it is incorporated under the laws of the District of Columbia.

## Background on the USMLE and The Residency Process for Foreign Medical Graduates

8.     After medical school, doctors in the United States are required to complete a clinical residency during which they learn from, and practice medicine under the supervision of, a licensed doctor.

9.     To legally practice medicine in all fifty states and the District of Columbia, graduates of foreign medical schools must first be preliminarily certified by the Educational Commission for Foreign Medical Graduates ("ECFMG," which verifies that candidates have in fact graduated from a foreign medical school whose degrees are recognized by U.S. authorities and are competent in English), and pass the United States Medical Licensing Exam, known colloquially as "the Boards." After passing the USMLE, graduates earn a final ECFMG certification and are eligible to apply to The Match, which determines which residency program they can pursue.

10.     The USMLE is administered in three steps. Step One is an eight-hour written test designed to measure whether test-takers understand scientific concepts and their application to the practice of medicine. Step One is pass–fail; numerical scores are never released publicly.

11.     Step Two is a nine-hour written test designed to measure whether test-takers can apply medical knowledge, skills, and understanding of clinical science to the provision of patient care under supervision. Step Two is scored from 1 to 300.

12.     Step Three is a 16-hour test designed to measure whether test-takers have the knowledge and skills of physicians assuming independent responsibility for

patient care. It is divided into a written portion and a clinical-simulation portion. Step Three is scored from 1 to 300.

13.     Steps One and Two are administered at testing centers all over the world, and many foreign medical graduates take these exams in their home countries or the countries where they went to medical school. Step Three is administered only in the U.S.

14.     Once graduates have taken the USMLE, they are eligible to apply for residency programs through a process called The Match, which is administered by the National Resident Matching Program. Passing scores on Steps One and Two are required for the Match; Step Three is optional, but most residency programs require a Step Three passing score.

15.     Once foreign medical graduates have completed the USMLE, they are finally certified by ECFMG as eligible to participate in the Match.

16.     The Match cycle begins in September, when applicants may register; they must register no later than January 31 of the following year. Then, starting on February 1, applicants begin ranking the residency programs they prefer in order, and residency programs begin ranking the applicants they prefer in order. This process continues until February 28, when the programs' and applicants' rankings must be final. Then, in the middle of March, applicants learn whether they have initially matched, and a supplemental process opens for unmatched applicants and program spots. Match Day, when the National Resident Matching Program reveals

which applicants will finally go to which residency programs, fell on the ides of March in 2024.

17.    Graduates' USMLE scores are a very important consideration in residency programs' matching decisions.

18.    The USMLE is a so-called secure test and it is administered multiple times during the year. Some questions are recycled from one administration to the next, and the fact that the test is secure means that NBME tries to keep prior questions out of circulation. Test-takers are thus not supposed to discuss any questions or answers they see while taking the test.

19.    There is a known risk with the type of secure test used by the USMLE that examinees may memorize or copy exam questions and disseminate them to future test-takers. The USMLE believes that this is harmful because of its view that those who have unauthorized access to prior questions are not proving subject-matter knowledge in the same way others are.

20.    NBME procedures (attached as Exhibit D to the Declaration of Colleen Ward, attached here as Exhibit A) foresee the possibility that a test-taker's score could be questioned due to unauthorized access or some other irregularity. When the validity of a particular exam result is called into question, NBME generally delays the release of the score if it has not yet been released and suspends further distribution of the score regardless. NBME then gives test-takers the opportunity to respond to the suspicion that their scores are invalid. If test-takers do not take this

opportunity or provide NBME with inadequate explanations, NBME cancels their scores.

### NBME Receives Tips That Exam Questions Are Being Shared in India, Pakistan, Nepal, and Jordan, And Finds Problems That it Considered Statistically Significant in All Countries

21.     In early 2023, NBME received several tips that groups of examinees from India, Nepal, Pakistan, and Jordan were distributing exam questions in advance of the exam. (*See* Exhibit A, Declaration of Colleen Ward; Exhibit B, Declaration of Daniel Jurich.) There may have been tips about other groups, regions, or countries as well, but the tips about tests administered within these four countries have been disclosed.

22.     According to the tipsters, there were question banks of live USMLE items circulating and individuals were relying on these question banks to achieve very high scores. A tip suggested that "in India and in Nepal USMLE aspirants are purchasing last six months question papers." (Ex. B ¶ 6.)

23.     According to information disclosed by the USMLE thus far, none of these tips suggested that the question papers or question banks for sale were available only to purchasers of a certain ethnicity or nationality.

24.     A separate tip indicated that some test-takers were sharing exam information on a private Telegram messenger group and at study centers located in Kathmandu.

25.     In response to the Telegram tip, NBME dispatched an undercover investigator to this Telegram group. The investigator claimed that, to enter the group, he was required to furnish documents showing some nexus to Nepal. He

furnished (presumably inauthentic) documents, entered the group, and found exam material available to the group's 1,300 members. (*Id.* ¶¶ 10, 12.)

26.    Approximately 1,200 people took the USMLE in Nepal in 2023.

27.    In response to these tips, NBME conducted something called "agreement analysis," which is a statistical method aimed at determining whether test-takers' incorrect answers have a statistically significant correlation with each other, which would indicate that those test-takers have had access to exam materials. (*Id.* ¶ 9.)

28.    NBME conducted this analysis on the scores of people who took the USMLE anywhere in Nepal, Pakistan, and Jordan, or at two test-centers in India.

29.    According to NBME, this analysis showed that, for the 2022 Step 1 exam and the 2021 and 2022 Step 2 exam, there was a substantially higher percentage of examinees with a statistically significant level of agreement matches in the group of examinees who tested at centers in Jordan, Nepal, Pakistan, and the two in India compared to a baseline group of test-takers comprising the first 500 first-time examinees from accredited U.S. and Canadian medical schools who tested on the version of the exam reviewed.

30.    According to NBME, the analysis revealed substantially more agreement matches among people who took the exams in Nepal than the other countries.

31.     According to NBME, further separate analyses showed that examinee volumes increased considerably at the Nepal test center in the months prior to the USMLE program releasing new test items.

32.     According to NBME, further analysis showed test-takers from Nepal were scoring higher on the exam than test-takers from other countries by an average of 15 points and were completing the exam faster than test-takers from other countries. (Ex. B, Attachment A; Ex. B ¶ 7.)

33.     NBME has not publicly revealed whether examinee volume increased considerably at any other test centers in the world or whether test-takers from any other country showed significant increases in exam performance or speed in 2023.

### NBME Does Further Investigation Into Nepali Test-Takers Only

34.      Despite discovering what it described as statistically significant levels of agreement matching in India, Pakistan, Jordan, and Nepal, "[i]n or around July 2023, [NBME] re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 [] exams, this time focused on examinees who tested at the Nepal test center. . . ." (Ex. B ¶ 11.)

35.     And despite initially focusing (for reasons that have never been publicly explained) on the place a test-taker took the exam, NBME "re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 [] exams . . . on examinees who . . . were citizens of Nepal (based on information self-disclosed in their application to test)."

36.     Based on the results of its analysis, NBME concluded that "the Nepal test center was a priority concern for the USMLE program." (*Id.* ¶ 13.)

37.    NBME then "expanded its analysis to the Step 3 exam." "The reviewed group in this case was adjusted to include individuals who attended medical school in Nepal or self-reported as a citizen of Nepal." (*Id.* ¶ 14.)

38.    NBME has not publicly revealed any further investigation into any examinees from any other country.

39.    NBME, by its own description, investigates test-takers based not on the characteristics of their individual scores or evidence of their own conduct but rather based on their membership in a national-origin group about which NBME is suspicious. "To the extent that issues have been or are identified reflecting similar conduct by *large numbers of examinees in other countries*," wrote Dr. Alex Mechaber on behalf of NBME, "I expect that those examinees will be subject to the same policies and procedures that have been applied to the examinees at issue in the captioned lawsuit." (Exhibit C, Declaration of Alex Mechaber ¶ 23.)

40.    There has been no additional information revealed about any other action or investigation into any other test-taker who is a citizen of, or took the test in, a country other than Nepal.

### NBME Invalidates Scores of Nepali Test-Takers Only

41.    NBME's agreement analysis identified 832 examinees who had passing level performance results on one or more Step exams as to which NBME had significant concerns about the validity of the passing results. (Ex. C ¶ 13.)

42.    All of these people either took at least one Step at the test center in Nepal, went to medical school in Nepal, or were Nepali citizens.

43.     Of the 832 people whose scores were invalidated, only four are not Nepali citizens. At least two of those four people are Nepali by ancestry, ethnicity, or both.

44.     On January 31, 2024, the day before graduates became eligible to rank and be ranked on the Match, NBME released the following statement:

> The USMLE program regularly monitors and analyzes examinees' test performances for unusual score patterns or variations, and other information that could raise questions about the validity of an examinee's results. As part of an ongoing investigation, the USMLE program has identified a pattern of anomalous exam performance associated with Nepal, which challenges the validity of test results for a group of examinees. Highly irregular patterns can be indicative of prior unauthorized access to secure exam content. Examinees with results in question are being notified by the USMLE Secretariat's Office that their previous Step scores have been invalidated and that they will be required to take a validation exam(s). The USMLE program is working to notify examinees who need to schedule validation exam(s) and to support score users and other stakeholders impacted by the validation exam requirements.

45.     That same day, ECFMG released a statement reading:

- Invalidated test scores no longer meet the requirements for ECFMG Certification.
- ECFMG Certificates issued to those whose test scores have been invalidated are also invalidated and those individuals are no longer considered to be ECFMG Certified.
- Applicants with invalidated test scores who were previously verified to the National Resident Matching Program® (NRMP®) as meeting the examination requirements for ECFMG Certification will now be verified to the NRMP as not meeting the examination requirements for ECFMG Certification.
- Status Reports on ECFMG Certification previously sent to residency programs, employers, U.S. state medical boards, and/or other organizations will be resent with the updated information, i.e., that an impacted individual is not ECFMG Certified and does not meet the examination requirements for ECFMG Certification.

- Invalidation of USMLE Step 3 scores does not impact ECFMG Certification.
- There may be implications to those who are being sponsored by ECFMG on a J-1 visa.

46.     On February 12, 2024, ECFMG emailed the 832 test-takers whose scores had been invalidated to alert them that they must destroy their ECFMG certificates no later than February 15.

47.     In early February 2024, NBME released new procedures, which it called *Policies and Procedures Regarding The Validity of Passing-Level Scores Achieved by a Subset of USMLE Examinees*. (Exhibit D.)

48.     Unlike NBME's ordinary procedures, the "Subset" procedures immediately and publicly invalidate all scores about which NBME has validity concerns prior to any opportunity for examinees to submit explanations or evidence.

49.     Unlike NBME's ordinary procedures, the "Subset" procedures require test-takers to waive their right to sue NBME for, among other things, illegal discrimination in order to re-take the exams.

50.     The "Subset" procedures have never been applied to any subset of test-takers other than those "associated with Nepal" and identified on January 31, 2024.

51.     NBME has not sought a waiver of the right to sue pursuant to the new "Subset" policy from any test-takers other than the 832 whose scores it invalidated on January 31, 2024.

## The Harm to Plaintiffs

52.     The immediate invalidation of their USMLE scores has caused Plaintiffs severe harm.

53.     As of January 31, 2024, Plaintiffs who were applying to medical residencies, Dr. Giri among them, became immediately ineligible for the Match, the deadline for which passed on February 28, 2024. These Plaintiffs will effectively be barred from the practice of medicine in the U.S. for many years and their careers will be derailed permanently.

54.     Many Nepali doctors who are currently in their residencies lost their jobs and visa statuses and were required to uproot their lives and leave the country within as little as 30 days.

55.     Thankfully Dr. Shrestha is not required to leave the country, but she must retake Step 3 of the exam in order to continue her residency program, renewing her preparation while also maintaining a demanding schedule.

56.     Perhaps worst of all, NBME, by loudly and publicly invalidating Nepali doctors' scores, has cast a discriminatory stigma over their whole community.

**<u>Class Action Allegations</u>**

57.     Plaintiffs propose to certify the following class: All USMLE test-takers whose scores were immediately invalidated under the procedures for the "subset" of test-takers described in the document captioned "United States Medical Licensing Examination (USMLE) Policies and Procedures Regarding the Validity of Passing Level Scores Achieved by a Subset of USMLE Examinees."

58.     This class meets Rule 23's requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

*<u>Numerosity</u>*

59.     The class is so large that joinder of all parties would be impracticable.

12

60.     832 people are in the subset of Nepali test-takers targeted by NBME's discriminatory practices.

<u>*Commonality*</u>

61.     There are questions of law and fact common to members of the class.

62.     The questions of fact common to the members of the class include, without limitation, whether NBME had any evidence that could possibly justify disparate treatment on the basis of ethnicity and national origin.

63.     The questions of law common to the members of the classes include, without limitation, whether NBME can possibly show that its discriminatory treatment is justifiable under the law and whether NBME can possibly show that its explicit targeting of test-takers "associated with Nepal" did not constitute discrimination on the basis of ethnicity in violation of Section 1981.

<u>*Typicality*</u>

64.     Drs. Giri and Shrestha took the USMLE and had their scores invalidated on the basis of their ethnicity, national origin, or both. They are within the "subset" defined by NBME's discriminatory policies.

65.     Every other member of the proposed class is within the same "subset." Drs. Giri and Shrestha are thus typical of the class.

<u>*Adequacy*</u>

66.     Dr. Giri's and Shrestha's claims, as explained above, are identical to the claims of other class members and they have no known conflicts of interest with any other class member.

67.     They will adequately protect the interests of absent class members.

68.     They propose Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel. Both firms are experienced in litigating civil-rights class actions.

69.     Class counsel will fairly and adequately represent the interests of the class.

### *Rule 23(b)(2) Factors*

70.     As to its claims for injunctive relief, the Class easily satisfies Rule 23(b)(2)'s requirement that the opposing party acted on grounds that apply generally to the class as a whole so that injunctive relief can apply to the class as a whole. NBME created a special "subset" of people to whom unusually harsh procedures apply, and that whole subset asks that they all be treated just as members of any other ethnic or national origin group would be treated under NBME's ordinary procedures.

### *Predominance and Superiority*

71.     The questions of fact and law common to the class predominate in this action over any questions affecting only individual members of the class.

72.     A class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. Joinder of all members is impracticable, and there will be no difficulty in the management of this case as a class action. NBME maintains records of all test-takers and knows exactly who is in the class, and all class members were severely harmed in the same way.

### **Claims for Relief**

***Count One*: National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

73.     Under the Civil Rights Act of 1964, it is an "unlawful employment practice" to "discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2.

74.     Under D.C. Circuit law, entities are liable for discrimination in violation of Title VII where they interfere with the terms and conditions of people's employment with other people or entities on a discriminatory basis.

75.     The USMLE is necessary to obtain employment as a physician in all 50 states and the District of Columbia.

76.     Defendant NBME interfered with Plaintiffs' employment as physicians explicitly because of Plaintiffs' Nepali national origin, race, or both, by invaliding the scores necessary to pursue employment.

77.     On February 21, 2024, the EEOC issued a right-to-sue letter authorizing this action to Dr. Giri.

78.     On April 9, the EEOC issued a right-to-sue letter authorizing this action to Dr. Shrestha.

***Count Two*: Denial of Equal Rights Under The Law in Violation of Section 1981 of the Civil Rights Act of 1866**

79.     Under Section 1981 of the Civil Rights Act of 1866, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens."

80.     Under Supreme Court law, Section 1981(a) forbids "discrimination in the making, performance, modification, and termination of contracts" on the basis of ancestry or ethnic characteristics.

81.     NBME modified or terminated its contractual agreements with Nepali test-takers on the explicit basis that they were "associated with Nepal." Nepali is both a national origin and a description of ethnicity.

## **Prayer for Relief**

Plaintiff Drs. Latika Giri and Swechha Shrestha respectfully requests:

- An order certifying this Action as a class action, appointing them lead plaintiffs, and appointing Gerstein Harrow and Fairmark Partners class counsel;
- An order permanently enjoining NBME from applying different score invalidation procedures to test-takers associated with Nepal than it does to people associated with every other country;
- A declaratory judgment that NBME's invalidation of scores pursuant to the "Subset" procedures described in the paragraphs above violated Title VII and Section 1981;
- An award of monetary damages to Plaintiffs and the proposed class;
- An award of attorneys' fees and costs under 42 U.S.C. § 1988; and
- All other relief that this Court deems just and proper.


Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Emily Gerrick
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
*/s/ Kritika Debs*
James Crooks
Kritika Debs
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
(619) 547-4182