## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. LATIKA GIRI and DR. SWECHHA SHRESTHA, on behalf of themselves and all others similarly situated, )))))))))))))) | |
| Plaintiffs, | Case No. 24-cv-410 |
| | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| THE NATIONAL BOARD OF MEDICAL EXAMINERS, | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

FACTS ........................................................................................................... 2

ARGUMENT .................................................................................................. 6

I.      NBME DISCRIMINATED IN THE UNITED STATES .................................. 6

        A.      NBME Concedes That Title VII and Section 1981 Protect Dr.
                Shrestha ............................................................................................ 7

        B.      Title VII Protects Dr. Giri ............................................................... 7

        C.      Section 1981 Protects Dr. Giri ...................................................... 13

II.     NBME IS AN "EMPLOYER" UNDER TITLE VII ..................................... 13

III.    NBME ILLEGALLY DISCRIMINATED AGAINST NEPALI TEST-
        TAKERS ........................................................................................... 18

        A.      Profiling on The Basis of Protected Characteristics Constitutes
                Disparate Treatment ..................................................................... 19

        B.      NBME Profiled on The Basis of National Origin ........................... 22

                1.      Because Plaintiffs Allege Direct Evidence of
                        Discrimination, This Motion Should Be Denied Without
                        Reaching McDonnell-Douglas ...................................... 23

                2.      Even Applying McDonnell-Douglas This Motion Must be
                        Denied ....................................................................... 25

                3.      Explicit Discrimination Was Not Bona Fide Essential to
                        NBME's Business ....................................................... 28

        C.      It Is at Least Reasonable to Infer That NBME Profiled on The
                Basis of Ethnicity ....................................................................... 30

IV.     DEFENDANT'S AFFIRMATIVE DEFENSE THAT PLAINTIFFS
        WAIVED THE RIGHT TO SUE IS INVALID BECAUSE THE
        WAIVER IS THE PRODUCT OF DURESS ............................................. 31

CONCLUSION ........................................................................................... 35

# TABLE OF AUTHORITIES

### Cases

*Anzueto v. WMATA*, 357 F. Supp. 2d 27 (D.D.C. 2004). ............................................ 35

*Ass'n of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000) . 15

*Bailey v. Verizon Commc'ns, Inc.*, 544 F. Supp. 2d 33 (D.D.C. 2008) ................. 32, 35

*Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223 (7th Cir. 1995) ............. 31

*Brady v. Off. of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) ........................... 25

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000) .............................................. 30

*Covington v. FMC & Assocs., LLC*, No. 1:22-CV-01441-RDM, 2023 WL 5133184 (D.D.C. Aug. 10, 2023) .................................................................................................. 31

*Davis v. District of Columbia*, 925 F.3d 1240 (D.C. Cir. 2019) ................................. 28

*Dunn v. St. Louis County*, 1989 WL 35541 (E.D. Mo., March 31, 1989) .................. 14

*E.E.O.C. v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244 (1991) ........... 8, 10, 11

*Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184 (4th Cir. 1998) ............................ 10

*Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ................... 20, 22, 25

*George v. New Jersey Bd. of Veterinary Medical Examiners*, 794 F.2d 113 (3d Cir. 1986) ................................................................................................................................. 16

*Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361 (2d. Cir. 2006) ................................. 17

*Hairston v. Vance-Cooks*, 773 F.3d 266 (D.C. Cir. 2014) ..................................... 24, 25

*Hartman v. Wick*, 678 F. Supp. 312 (D.D.C. 1988) ..................................................... 10

*Heim v. State of Utah*, 8 F.3d 1541 (10th Cir. 1993) ................................................... 23

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .................................. 28

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ............................................................ 20

*Keister v. AARP Benefits Comm.*, 410 F. Supp. 3d 244 (D.D.C. 2019) ...................... 32

*Kiprilov v. Nat'l Bd. of Med. Examiners*, No. EDCV160952JGBSPX, 2016 WL 6900723, at *10 (C.D. Cal. Aug. 25, 2016) ................................................................. 15

*Koehler v. Infosys Techs. Ltd. Inc.*, 107 F. Supp. 3d 940 (E.D. Wis. 2015) ............... 28

*Ky. Ret. Sys. v. EEOC*, 544 U.S. 135 (2008) ................................................................ 27

*Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680 (7th Cir. 1970) ........................ 33

*Lalvani v. Cook County*, 269 F.3d 785 (7th Cir. 2001) ............................................... 31

*Latif v. Univ. of Texas Sw. Med. Ctr.*, 834 F. Supp. 2d 518 (N.D. Tex. 2011) .......... 15

*Lopez v. Massachusetts*, 588 F.3d 69 (1st Cir. 2009) .................................................... 17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................ 23

*Mister v. Illinois Cent. Gulf R. Co.*, 832 F.2d 1427 (7th Cir. 1987)............................ 28

*Morrison v. Am. Bd. Of Psychiatry & Neurology, Inc.*, 908 F. Supp. 582 (N.D. Ill. 1996) ................................................................................................... 14, 15, 16, 17

*Nakhid v. Am. Univ.*, No. 19-CV-3268 (APM), 2021 WL 4169355 (D.D.C. 2021).. 8, 9, 12

*Ofori-Tenkorang v. American Int'l Grp., Inc.*, 460 F.3d 296 (2d Cir. 2006).............. 13

*Olvera-Morales v. Sterling Onions, Inc.*, 322 F. Supp. 2d 211 (N.D.N.Y. 2004) ......... 9

*Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006) .................................... 31

*Radon Constr., LLC v. Land Endeavor 0-2, Inc.*, 221 A.3d 654 (Pa. Super. Ct. 2019) ................................................................................................................. 32

*Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998 (D. Del. 1985) ............. 32, 33, 34

*Reyes-Gaona v. N. Carolina Growers Ass'n*, 250 F.3d 861 (4th Cir. 2001).................. 9

*Rice v. Cayetano*, 528 U.S. 495 (2000) ........................................................................ 18

*Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)..................................................... 20

*RJR Nabisco v. European Community*, 579 U.S. 325 (2016) ................................. 7, 10

*Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304 (D.D.C. 2018) ................... 23

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, (1987) ........................................... 31

*Shurtleff v. Giller*, 527 S.W.2d 214 (Tex. Civ. App. 1975)......................................... 33

*Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) ............... 14, 15, 16, 17

*Simko, Inc. v. Graymar Co.*, 55 Md. App. 561 (1983) ................................................. 33

*Sind v. Pollin*, 356 A.2d 653 (D.C. 1976)..................................................................... 32

*Sodipo v. Caymas Sys. Inc.*, No. C 06-05794 CRB, 2006 WL 8441939, at *4 (N.D. Cal. Dec. 5, 2006) ..................................................................................................... 12

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard University*, 600 U.S. 181 (2023) ................................................................................ 19

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)..................................................... 25

*Taylor v. Pompeo*, No. 19-cv-2987, 2021 WL 7904001 (D.D.C. Jan. 6, 2021)............ 14

*Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011) ............................ 17

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) ............................................ 21

*True the Vote, Inc. v. IRS*, 831 F.3d 551 (D.C. Cir. 2016)........................................... 22

*Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245 (D.C. Cir. 2011) ....................................... 24

**Statutes**

42 U.S.C. § 2000e(b) ................................................................. 12, 14

42 U.S.C. § 2000e–1(a) ................................................................ 11

42 U.S.C. § 2000e–1(f) ................................................................ 10

42 U.S.C. § 2000e-2(e)(2) ............................................................ 20

**Other Authorities**

Restatement (Second) of Contracts § 175 ............................................. 32

Restatement (Second) of Contracts § 176 ............................................. 33

**INTRODUCTION**

As this Court is aware from its earlier emergency-injunction ruling in this case, Defendant National Board of Medical Examiners identified what it believed to be anomalous medical licensing exam scores among certain cohorts of international test-takers. It then reasonably and lawfully subjected the examinees who took the test at a suspect test center in Nepal to greater scrutiny. But then NBME switched gears, and this is where it broke the law: NBME classified all *Nepali citizens* as suspicious, even if they took the USMLE in Nevada or North Carolina. That explicit targeting of "citizens of Nepal," unconnected from the suspect test center, violated Title VII and Section 1981.

In its emergency-injunction opinion, this Court reasoned that the targeting of "citizens of Nepal" could have been "tied to a neutral consideration: whether the examinee could have proved nexus with Nepal necessary for gaining admission into [a] Telegram group where secured answers were being distributed." That reasoning cannot prevail at this stage, for two reasons. First, NBME itself disclaims that supposedly neutral consideration: Not a single one of NBME's witnesses contend that the supposedly Nepali-only Telegram group is why they added the criterion of Nepali citizenship, and NBME does not make that argument in its brief. Second, even if NBME had not disclaimed this rationale, Plaintiffs are not required at the motion-to-dismiss stage to disprove all possible nondiscriminatory reasons for the challenged action. NBME will be free to proffer supposedly nondiscriminatory reasons for targeting "citizens of Nepal" at later stages of this case, but at the pleading stage, Plaintiffs need only plead a plausible case of discrimination.

NBME's non-merits arguments fail as well. NBME argues that Dr. Giri seeks an impermissible extraterritorial application of U.S. law but ignores that Dr. Giri was in the United States when she suffered discrimination and ignores that the relevant criterion of domesticity is where employment would have occurred absent discrimination. NBME argues that it is not an "employer" under the D.C. Circuit's interference cases because it does not control medical residency programs, but it misunderstands the relevant standard and ignores its relationship to residency programs anyway. And NBME argues that Plaintiffs waived their right to sue when NBME cynically presented them with the choice of doing so or forfeiting their right to prove their competence—which right NBME took from them on a discriminatory basis—and forgo work in the United States for many years, but this waiver is the product of duress under clear law and so is invalid. NBME's motion should be denied.

## FACTS

NBME administers the USMLE to approximately 24,000 graduates of U.S. medical schools and 22,000 graduates of foreign medical schools each year. Dkt. No. 21, Amended Complaint (AC) ¶ 1. The USMLE is administered in three steps. Step One is an eight-hour written test designed to measure whether test-takers understand scientific concepts and their application to the practice of medicine. Step One is pass–fail; numerical scores are never released publicly. *Id.* ¶ 10. Step Two is a nine-hour written test designed to measure whether test-takers can apply medical knowledge, skills, and understanding of clinical science to the provision of patient care under supervision. Step Two is scored from 1 to 300. *Id.* ¶ 11. Step Three is a 16-hour test designed to measure whether test-takers have the knowledge and skills of

2

physicians assuming independent responsibility for patient care. It is divided into a written portion and a clinical-simulation portion. Step Three is scored from 1 to 300. *Id.* ¶ 12. Steps One and Two are administered at testing centers all over the world. Step Three is administered only in the U.S. *Id.* ¶ 13. Students must pass the USMLE to apply to medical residencies and practice medicine in the U.S. *Id.* ¶ 9.

The USMLE is a so-called secure test and it is administered multiple times during the year. *Id.* ¶ 18. Some questions are recycled from one administration to the next, and the fact that the test is secure means that NBME tries to keep prior questions out of circulation. *Id.* Test-takers are thus not supposed to discuss any questions or answers they see while taking the test. *Id.* There is a known risk with thIS type of secure test that examinees may memorize or copy exam questions and disseminate them to future test-takers. *Id.* ¶ 19. The USMLE believes that this is harmful because of its view that those who have unauthorized access to prior questions are not proving subject-matter knowledge in the same way others are. *Id.* Under NBME's ordinary procedures, if a student's score is called into question, NBME delays its release (but does not recall it if it has already been released) and gives the student an opportunity to explain why the score is valid or try again. *Id.* ¶ 20.

In early 2023, NBME received several tips that groups of examinees from India, Nepal, Pakistan, and Jordan were distributing exam questions in advance of the exam. *Id.* ¶ 21. One tip suggested that "in India and in Nepal USMLE aspirants are purchasing last six months question papers." *Id.* ¶ 22. None of the tips suggested

that the question papers or question banks for sale were available only to purchasers of a certain ethnicity or nationality. *Id.* ¶ 23. A separate tip indicated that some test-takers were sharing exam information on a private Telegram messenger group and at study centers located in Kathmandu. *Id.* ¶ 23. In response to the Telegram tip, NBME dispatched an undercover investigator to this Telegram group who claimed that he was required to furnish evidence of a connection to Nepal to enter. *Id.* ¶ 25.

Faced with this evidence, NBME started by conducting agreement analysis on the exam scores of people who sat for the USMLE anywhere in Nepal, Pakistan, or Jordan, or at two test centers in India. *Id.* ¶ 28. NBME has never explained why it created cohorts based on *test centers* in response to evidence that exam materials were being sold by people from certain countries to the public at large *on the internet*, making them available anywhere in the world and to any*one* in the world. *See generally id.*

According to NBME's own witnesses (and as pleaded in the AC), there was a substantially higher percentage of examinees with a statistically significant level of agreement matches in the group of examinees who tested at centers in Jordan, Nepal, Pakistan, and the two in India compared to a baseline group of test-takers comprising the first 500 first-time examinees from accredited U.S. and Canadian medical schools who tested on the version of the exam reviewed. *Id.* ¶ 29. But the problem, according to NBME, was most severe in Nepal. *Id.* ¶¶ 30–32. And so, according to NBME, in or around July 2023, it re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 exams, this time focused on examinees who tested at the Nepal test center. *Id.*

¶ 34. So far, NBME's criteria for scrutiny were at least ostensibly race- and national-origin-neutral—an Indian student who tested in Nepal would be scrutinized while a Nepali student who tested in France would not. The results of this initial, ostensibly neutral, scrutiny have never been revealed. *See generally id.*

Then NBME switched gears, and this is where it broke the law: despite initially focusing (for reasons that have never been publicly explained) on the place a test-taker took the exam, NBME, according to its own witness, "re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 [] exams . . . on examinees *who . . . were citizens of Nepal.*" *Id.* ¶ 35 (emphasis added). NBME's witnesses (and the AC) reveal no basis on which to add Nepali citizenship as a criterion other than this statement from Daniel Jurich, NBME's head of security and test validity: "The reviewed group in this case was adjusted to include individuals who attended medical school in Nepal or self-reported as a citizen of Nepal. The Step 3 exam is only offered in the United States, so we could not look to data from the Nepal test center." Dkt. 14-2 ¶ 13. In other words, the decisionmakers had formed an opinion that all citizens of Nepal—in contrast to citizens of any other nation—required immediate additional scrutiny. But their initial test-center based criterion would leave out some Nepali people, so, according to plausible allegations, they decided to broaden their search using national origin as an explicit filter.

NBME's national-origin-based analysis led it to conclude that the exam results of 832 people were concerning. *Id.* ¶ 41. Of the 832 people whose scores were

invalidated, only four are not Nepali citizens. *Id.* ¶ 43. At least two of those four people are Nepali by ancestry, ethnicity, or both. *Id.*

In the past, NBME has conducted individualized inquiries of people with potentially invalid scores. But instead of following its ordinary procedures here, NBME created a set of special policies to invalidate the scores of "a subset of USMLE examinees." *Id.* ¶ 47. Unlike NBME's ordinary procedures, the "Subset" procedures require test-takers to waive their right to sue NBME for, among other things, illegal discrimination to re-take the exams. *Id.* ¶ 49. NBME has never subjected any other national-origin or ethnic group to these policies. *Id.* ¶ 50.

## ARGUMENT

NBME argues that this case should be dismissed because it involves an impermissible extraterritorial application of U.S. law, because NBME is not an "employer" under Title VII, because NBME did not discriminate, and because Plaintiffs waived their rights to sue. All these arguments fail.

## I.   NBME DISCRIMINATED IN THE UNITED STATES

NBME argues that Dr. Giri's case, but not Dr. Shrestha's, should be dismissed because allowing Dr. Giri to proceed would violate "the presumption against extraterritorial application of U.S. statutes." Dkt. No. 23 (Motion) at 13. To do this, NBME simply ignores the pleaded fact that Dr. Giri *was in the United States* when she suffered discrimination, AC ¶ 13, which means that both Title VII and Section 1981 apply. Regardless, when determining whether a given application of Title VII is "domestic," the question is where the relevant employment would have taken place without discrimination.

### A.   NBME Concedes That Title VII and Section 1981 Protect Dr. Shrestha

First, NBME concedes that Title VII and Section 1981 protect Dr. Shrestha, who lives in Nevada, from NBME's illegal discrimination. Thus, even if the Court concludes—contrary to clear law—that Dr. Giri's claims involve an extraterritorial application of Title VII and Section 1981, this case may proceed as a putative class action with Dr. Shrestha as lead plaintiff, and the parties can address the issue of class definition later on.

### B.   Title VII Protects Dr. Giri

NBME argues that Dr. Giri's case involves an extraterritorial application of Title VII, but it spends most of its brief on this point fighting a strawman. In particular, NBME claims that Dr. Giri is alleging she is covered by Title VII's "extraterritorial" application to "injuries suffered outside the United States," and that this does not apply to Dr. Giri because she is not U.S. citizen employed by a U.S. employer abroad, which is the supposed limit of Title VII's extraterritorial coverage. *Contra* Mot. at 14–15 (quoting *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016)). But that is not the basis of applying Title VII to Dr. Giri. Instead, the question here is whether Dr. Giri alleges injuries in the United States. She does, for three reasons.

*First,* Dr. Giri was in fact in the United States, in every sense of the word "in," when NBME illegally discriminated against her. (Indeed Dr. Giri explained exactly this in her reply in support of a motion for a preliminary injunction, Dkt. 17 at 4, which NBME ignores.) Dr. Giri took Step Three *in the United States*, with a valid

visa, as Defendant requires of all doctors taking that Step. AC ¶ 13. She did this while NBME was actively discriminating against Nepali people, and indeed her Step Three score—which resulted from a test she took physically in the United States—was invalidated based on NBME's discriminatory conduct. NBME points to no case where application of Title VII was even in question where a plaintiff was located physically and legally in the United States for a key employment-related action, where the employer was in the United States, and where the action interfered with U.S. employment. There is no such case, because such a case would involve conduct that is "within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991). This Court can, and should, deny NBME's motion on this basis alone.

*Second,* even setting aside Dr. Giri's physical presence in the United States when she suffered discrimination—which is dispositive here—the connection between Dr. Giri and the United States is far stronger than in the two cases NBME cites on this issue. NBME relies on *Nakhid v. Am. Univ.*, No. 19-CV-3268 (APM), 2021 WL 4169355 (D.D.C. 2021), where the court rejected the application of Title VII to a discrimination claim by a nonresident, non-citizen who applied online from Lebanon to be soccer coach at American University. *Id.* at *2. The applicant applied but "was not selected for an initial screening interview or any subsequent interview," so never set foot in the United States as part of the process. *Id.* at *2. The Nakhid court found that the case involved an insufficient connection to the United States to be covered by Title VII. *Id.* at *6.

But the connection between Dr. Giri and the United States here is far stronger than in *Nakhid*, so even applying *Nakhid*'s analysis, this Court should reach the opposite conclusion. As another district court found (in a case NBME ignores), for a nonresident, non-citizen job applicant with "extensive contacts with the United States at all stages of the recruitment, hiring and employment process, it is not clear that the extension of Title VII protection to plaintiff would amount to extra-territorial application of that law." *Olvera-Morales v. Sterling Onions, Inc.*, 322 F. Supp. 2d 211, 221 (N.D.N.Y. 2004). Extensive domestic contacts allay the *Nakhid* court's concern that allowing foreign job applicants who apply for U.S. jobs online and never set foot in the United States to claim discrimination "would effect a massive expansion of Title VII's protections," 2021 WL 4169355 at *6 (citing *Reyes-Gaona v. N. Carolina Growers Ass'n*, 250 F.3d 861, 866 (4th Cir. 2001)), because Dr. Giri studied U.S. medical practices and took three exams designed exclusively for U.S. employment, including one administered only physically within the United States. The USMLE is, after all, the *US*MLE.

*Third*, even if Dr. Giri had not been in the United States when she suffered discrimination, foreign applicants for *United States* employment suffer a United States–based injury when that employment is denied on a discriminatory basis, and *Nakhid* is accordingly wrongly decided. To "determine whether the case involves a domestic application of the statute," a court looks to whether the statute's focus applies to conduct in the United States. *RJR Nabisco*, 579 U.S. at 337. Several courts, including this Court, have previously held that Title VII's focus on eradicating

discrimination from domestic employment permits claims by nonresident aliens who apply from abroad and would be eligible to work in the United States. *See Hartman v. Wick*, 678 F. Supp. 312, 325 (D.D.C. 1988) (holding that "[i]n light of the plain language of the statute, the silent legislative history, and accepted rules of statutory construction, the Court must find that Title VII applies to non-resident aliens who apply for employment within the United States"); *Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184, 187 (4th Cir. 1998) (holding that a foreign national who applies for a job in the United States is protected by Title VII).

NBME ignores *Egbuna* and dismisses *Hartman* as outdated, instead focusing on *Reyes-Gaona* and its analysis of Congress's decision to extend employment protections to U.S. citizens employed abroad by U.S. employers but not to foreign nationals *employed abroad* by U.S. employers (or otherwise). Mot. at 16. But following *Reyes-Gaona*'s analysis (which draws negative inferences from Congress's action in response to Supreme Court decisions) takes NBME in the exact opposite direction it wants to go. In 1991, the U.S. Supreme Court held that Title VII did not protect U.S. citizens employed by U.S. employers in foreign countries. *Arabian American Oil Co. (Aramco)*, 499 U.S. at 248. In response, Congress amended Title VII to read: "With respect to employment in a foreign country," the term "employee" "includes an individual who is a citizen of the United States." 42 U.S.C. § 2000e–1(f). Congress left the so-called "alien exclusion" clause, which says that Title VII does not apply "to an employer with respect to the employment of aliens outside any State." *Id.* § 2000e–1(a). The only negative inference that follows here is this one: In *Aramco*, the Court

held that *the place of employment* controls the application of Title VII; Congress responded by displacing that background rule, but *only* as to United States citizens employed by U.S. employers abroad; therefore, the place of employment continues to control in all other circumstances: A U.S. company employing a German abroad is not subject to Title VII, a German company employing a U.S. citizen in Germany is not subject to Title VII, but a U.S. company employing anyone in the U.S. *is*.

Because the place of employment controls application of Title VII (subject only to the exception Congress passed to displace *Aramco*), the place that a job applicant would work should control discrimination in job applications. That is because were the law otherwise it would allow discriminators to straightforwardly benefit from their discrimination. Under NBME's rule, an employer would be free to advertise a vacancy to applicants abroad, review all applications for that vacancy, send out denial letters to Jewish applicants whom it would have otherwise hired reading "your application is denied because you are Jewish," and then turn around and defend its actions by saying "you were not in the United States"—which is true only because NBME *excluded all Jewish applicants*. The law does not permit this, nor should it. In *Sodipo v. Caymas Systems Incorporated*, the plaintiff alleged that the defendant fired him on a discriminatory basis and the employer defended the case by arguing that it was protected from any Title VII action by the Immigration Reform and Control Act of 1986, which makes it illegal for employers to employ an alien without valid authorization, because the plaintiff had lost his authorization to work in the U.S. *when he was fired*. No. C 06-05794 CRB, 2006 WL 8441939, at *4 (N.D. Cal. Dec. 5,

2006). The court rejected this because "Plaintiff here *would* have been eligible to hold a job with the company but for Defendant's allegedly improper retaliation." *Id.* (emphasis in original). So too here.

Finally on this point, applying Title VII to foreign applicants to U.S. jobs would neither result in an "incoherent interpretation of Title VII" nor "effect a massive expansion of Title VII's protections," as the *Nakhid* court worried. 2021 WL 4169355 at \*6. Instead the rule is straightforward—the statute excludes foreign nationals who "are actually employed *by U.S. employers abroad,*" which makes sense because those U.S. companies are governed by foreign employment law in such circumstances, but includes "foreign nationals who merely submit an application for a job in the United States from abroad" because those people by definition allege that they would work in the United States absent the discrimination they allege to have suffered. This is not only a coherent interpretation of Title VII, it is the only one that would avoid a dramatic incoherence: Under NBME's rule and *Nakhid*, Boeing and General Motors are free, in the United States, to publicly advertise job postings to non-U.S. applicants for white, Anglo-Saxon men only, or to publicly exclude all Black people, but Airbus and Peugeot may not privilege Frenchmen over Germans at their U.S. offices. *Compare id.*, *with* 42 U.S.C. § 2000e(b) (including all employers, foreign or domestic, within "employer"). And Dr. Giri's proposed rule would not effect a massive expansion of Title VII for the straightforward reason that it would protect only job applicants who can articulate a bona fide case of discrimination, which may be rare because U.S. employers are not only permitted but *required* to consider an applicant's immigration

status and authorization to work in the United States, something that is presently quite difficult to for most people in the world achieve.

### C.    Section 1981 Protects Dr. Giri

NBME next argues that Dr. Giri's Section 1981 claims must be dismissed because "Section 1981's territorial limitation is defined by the location of the subject discrimination, not by the location of the decisionmaker," Mot. at 18 (quoting *Ofori-Tenkorang v. American Int'l Grp., Inc.*, 460 F.3d 296 (2d Cir. 2006)), and "Dr. Giri was not within the United States at the time of NBME's challenged acts," *id.* at 19. This need not detain the Court long. Dr. Giri, as explained above, was in the United States when she took Step Three, during which time NBME was actively discriminating against her, and she bases her claim on NBME's revocation of her score on Step Three, which came from a test she took "within the United States," *id.* Although Dr. Giri does not contest that Section 1981, unlike Title VII, does not protect a job applicant who never sets foot in the United States, this Court should deny NBME's motion because Dr. Giri very much did.

## II.    NBME IS AN "EMPLOYER" UNDER TITLE VII

NBME next argues that it is not an "employer" under Title VII such that it can be liable for discriminatory administration of the USMLE. Mot. at 20–23. NBME's principal argument appears to be that its relationship to Plaintiffs' eventual employment as doctors in the United States is too attenuated to fall within the D.C. Circuit's well-establish "interference" doctrine, which holds that employers (that is people engaged in commerce employing more than 15 people, *see* 42 U.S.C. 2000e(b)) who discriminate against individuals with respect to their employment with someone

else violate Title VII. *See Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). NBME misunderstands the standard governing this question and misstates its own relationship to medical residencies. And NBME's citation to cases about state licensing regimes are concededly irrelevant.

In *Sibley*, 488 F.2d 1338, the D.C. Circuit "extend[ed] Title VII liability beyond a direct employment relationship to 'employers' who are in a position to interfere with the employment relationship between the Title VII plaintiff and some third party." *Morrison v. Am. Bd. Of Psychiatry & Neurology, Inc.*, 908 F. Supp. 582, 584 (N.D. Ill. 1996) (discussing *Sibley*); *see also Taylor v. Pompeo*, No. 19-cv-2987, 2021 WL 7904001, at *4 (D.D.C. Jan. 6, 2021) ("[Under *Sibley*,] a plaintiff may bring a discrimination claim against defendants who are neither actual nor potential direct employers of particular complainants, but who control access to such employment and who deny such access by reference to invidious criteria." (citation omitted)); *Dunn v. St. Louis County*, 1989 WL 35541 (E.D. Mo., March 31, 1989) (applying *Sibley* to private firefighting school that refused to certify would-be firefighter on discriminatory basis). To state a claim under *Sibley*, plaintiffs must allege (a) that they have a prospective employment relationship (b) with which defendant is "capable of interfering." *Morrison*, 908 F. Supp. at 586 (relying on *Sibley*, 488 F.2d 1338, and *Doe v. St. Joseph's Hosp.*, 788 F.2d 711 (7th Cir. 1986)). NBME does not appear to challenge that Plaintiffs' medical residencies would, absent NBME's discrimination, be employment relationships. *Compare Latif v. Univ. of Texas Sw. Med. Ctr.*, 834 F. Supp. 2d 518, 526 (N.D. Tex. 2011) ("[M]edical residents are

employees for the purpose of suit under Title VII."). Instead, NBME (a) argues that it lacks sufficient capacity to interfere with Plaintiffs' employment and (b) gestures at an argument that it should not be liable because it administers a test that state boards rely on for licensure. Neither argument has merit.

*First*, under *Sibley*, employers are liable whenever they use their "capac[ity] to interfer[e]" with plaintiffs' employment in a discriminatory way, *Morrison*, 908 F. Supp. at 586, not, as NBME would have it, whenever they "make . . . decisions about" employment, Mot. at 22. NBME's reading of *Sibley* both conflicts with clear law and pleaded fact. On the law, the Northern District of Illinois squarely rejected NBME's position in *Morrison*, holding that a board-certification-exam provider was an employer who interfered even though there, unlike here, the certification was *not* required for the employment plaintiff sought. 908 F. Supp. at 586. Similarly, in *Association of Mexican-American Educators v. California*, the Ninth Circuit held that Title VII applies to discrimination in an exam required for employment by another entity. 231 F.3d 572, 577 (9th Cir. 2000). In response, NBME cites *Kiprilov v. Nat'l Bd. of Med. Examiners*, a *pro se* case applying a different standard, called the "means and manner" test, and ignoring both *Sibley* and *Association of Mexican-American Educators*. No. EDCV160952JGBSPX, 2016 WL 6900723, at *10 (C.D. Cal. Aug. 25, 2016). The court in *Morrison* explained *Kiprilov*'s obvious analytical mistake: "[T]he 'means and manner' approach," the court explained, "is one of three that various Circuits use to determine whether an employer–employee relationship exists between the Title VII plaintiff *and a third person*, not to determine whether a Title VII

defendant has enough control to be brought within the *Sibley* theory." 908 F. Supp. at 587 n.14 (emphasis added) (citation omitted). *Kirprilov* does not apply here.

On the facts, NBME ignores that it *does* "make . . . decisions about" plaintiffs' employment. Mot. at 22. "To legally practice medicine in all fifty states and the District of Columbia, graduates of foreign medical schools must . . . pass the United States Medical Licensing Exam." AC ¶ 9. If NBME had a rule that no Jewish people could sit for the USMLE, no Jewish people would participate in the Match and no Jewish people would be employed in medical residencies. *See id.* NBME obviously makes decisions about Plaintiffs' employment. Although states *could* choose to license physicians without the USMLE, none—as a matter of state law and policy, *id.*—has, and that is dispositive. What matters, say the cases, is whether the defendant has the capacity to interfere with plaintiffs' employment. As pleaded, NBME clearly does.

*Second*, the Board appears to concede that because Plaintiffs' "alleged harm related to their participation or planned participation in U.S. medical residency program," cases "declining to recognize Title VII claims in cases involving professional licensure or certification" do not apply. Mt. at 22. This concession is well placed. All of the cases NBME cites are against *state* boards that administer licensing exams, and only one of them, *George v. New Jersey Board of Veterinary Medical Examiners*, addressed *Sibley*. 794 F.2d 113, 114 (3d Cir. 1986). *George* relied on the fact that New Jersey's veterinary medicine board did not have a close relationship with veterinary employers because it was administering state-required tests directly, *id.*, whereas here NBME (as it rightly concedes) is a gatekeeper to Plaintiffs'

employment with residency programs not independent practice. And *George* relied on the fact "the exercise of the police power was not involved in the *Sibley Memorial Hospital* case, whereas in the present case that power was being exercised by the defendants to protect the public from unqualified veterinary service." *Id.* at 114–15. There is no question that NBME does not exercise that power, and regardless the "police power" explanation is "is not at all a convincing" for the reasons explained in *Morrison*, 908 F. Supp. at 585 n.11. "Indeed, it is doubtful whether the licensing exception can survive in intellectual harmony with the *Sibley* theory," which theory concededly governs this case.

*Finally*, NBME preserves its argument for appeal that *Sibley* was wrongly decided. Mot. at 21 n.8 (citing *Lopez v. Massachusetts*, 588 F.3d 69, 83–89 (1st Cir. 2009) and *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 374–76 (2d. Cir. 2006)). Plaintiffs, briefly, preserve their response. Title VII is straightforwardly not limited to claims by "employees" against their own "employers," but rather encompasses claims by any "person claiming to be aggrieved" by the discriminatory actions of an "employer." 42 U.S.C. §§ 2000e(a), 2000e-5(f)(1). In the Supreme Court's only case directly grappling with this language, the Court held that "the term 'aggrieved' in Title VII . . . enabl[es] suit by any plaintiff with an interest arguably [sought] to be protected by the statute." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 178 (2011). Applied here, Plaintiffs are people "claiming to be aggrieved" by the actions of NBME, concededly *an* "employer" (because it is a person employing more than 15 people in commerce), with respect to their conditions of employment, and

those seeking employment as doctors in the U.S. and claiming national original discrimination are within the zone of interest of the employment laws. No "artificial[]" limitation protects NBME from liability under Title VII, and *Sibley*'s decision fits with more recent Supreme Court precedent.

## III.   NBME ILLEGALLY DISCRIMINATED AGAINST NEPALI TEST-TAKERS

At their core, the anti-discrimination laws forbid defendants from taking negative actions against people because of their protected characteristics. "One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his of her own merit and essential qualities." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). NBME, faced with evidence of score irregularities from test centers in many countries, zeroed in on the country where it thought the problem was worst—Nepal. It then targeted *citizens of Nepal* for scrutiny that it applied to no one else. Under the policy that NBME—by the testimony of its own witnesses—applied here, a Nepali American doctor who retains Nepali citizenship but sat for all three steps of the USMLE in Michigan and has lived in Michigan for decades would receive scrutiny that no other American would receive for no reason other than her Nepali national origin. This is called "profiling," and it is illegal where, as here, it is based on protected characteristics like race and national origin.

This case differs slightly from an ordinary discrimination case because here NBME applied ostensibly non-discriminatory criteria to invalidate scores after it applied an illegal criterion to scrutinize them in the first place. But this is a

18

distinction without a difference—the law forbids discrimination in the scrutiny applied to various people. And consider: Every Nepali person whose score showed irregular characteristics had that score suspended, but a Jordanian whose score had those exact same characteristics could use that score to participate in the Match and practice medicine in the United States. The only reason this happened is that NBME concluded that Nepali people were more likely to have invalid scores *because they are Nepali*. That is illegal and NBME's motion must be denied.

### A.    Profiling on The Basis of Protected Characteristics Constitutes Disparate Treatment

The law is extraordinarily hostile to the consideration of race and national origin in employment policies. *See, e.g.*, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard University*, 600 U.S. 181, 257 (2023) (Thomas, J., concurring) (explaining exacting scrutiny applicable in employment-discrimination cases). Policies must instead be facially neutral, and even then are subject to exacting scrutiny when they result in negative outcomes based on race and national origin. *Id.*; *see also id.* at 231 (majority opinion) (explaining that even ostensibly race-neutral policies may be illegal when motivated by race). In the employment context, a policy that in fact discriminates on the basis of race or national origin can be justified in only one of two very narrow ways. First, an employer may show that a protected characteristic is a bona fide occupational qualification (BFOQ), as where a theater must hire an actor of a certain race or gender to play a role. *Compare Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991) (explaining BFOQ test in connection with sex

19

discrimination), *with* 42 U.S.C. § 2000e-2(e)(2) (including national origin with sex in permitted characteristics to consider as bona fide qualifications). Second, an employer may use race explicitly to remedy prior discrimination on the basis of race. *E.g.*, *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490 (1989). Neither applies here.

In support of her motion for a preliminary injunction, Dr. Giri relied on *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663–64 (S.D.N.Y. 2013), arguing that there, as here, the defendant contended that the "data" permitted it to take the discriminatory action: the defendant argued that "because [Black and Latino New Yorkers] are heavily represented in criminal suspect data . . . in those areas where the NYPD carries out most of its stops," it was permissible for the City to consider race in making preemptive stops. *Id.* at 662. The court rejected this argument as illegal discrimination. After all,

> Just as it would be impermissible for a public housing agency to adopt a facially race-neutral policy of disfavoring applications from any group that is disproportionately subject to tenant complaints, and then apply this policy to disfavor applications from a racially defined group, so it is impermissible for a police department to target its general enforcement practices against racially defined groups based on crime suspect data.

*Id.* This Court rejected Dr. Giri's analogy, reasoning that

> That case involved the singling out of members of particular racial groups for deprivation of a constitutionally protected privacy right, through police 'stop and frisks.' The antidiscrimination statutes employed here, by contrast, protect against discriminatory 'adverse employment actions.' As Dr. Giri does not, and could not, claim that the Board took an adverse action when deciding to analyze its own exam data—the point at which it allegedly considered ethnicity and national origin to

> narrow its field of vision—her theory of liability is quite
> distinct from that in *Floyd*.

Dkt. No. 20 at 19 (citations omitted); *id.* at 14 (explaining that Dr. Giri had not shown inference of discrimination because ultimately only 40% of Nepali test-takers had their scores invalidated even though only Nepali test-takers' scores were scrutinized). But now faced with a motion to dismiss in the ordinary course and not an emergency request for an injunction, the Court should consider a different lens that reveals why discriminatory profiling violates Title VII.

Filtering a pool for early potential adverse action to members of a certain race or national origin group and subjecting that group to scrutiny that others are spared violates the law, at least where, as here, that scrutiny eventually results in a concrete adverse action against *only* members of that group.[1] In *Floyd* itself the court explained an analogy (quoted above) to tenant complaints—there, as here, a housing authority that merely reviews its own complaint data to determine which racial groups occasion the most tenant complaints may not violate the law, but that authority does violate the law when it takes action based on those criteria. *Floyd*, 959

---

[1] Title VII and Section 1981 likely forbid employers merely to scrutinize people on the basis of race and national origin, but such cases probably never make it to court. *Cf. Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (discussing housing discrimination claims by people outside the discriminated group and holding that they may bring claims). Consider an employer who has a written policy of auditing the expense reports of all employees of a certain race because the employer suspects people of that race are less honest than others. Would an employee subjected to this scrutiny but whose expense reports were never invalidated have a cause of action? Probably, but this Court need not address this question because here Plaintiffs unquestionably suffered an adverse action when their scores were invalidated.

F. Supp. 2d at 664. So too here. It would be different case if NBME developed a comprehensive framework for analyzing each group of test-takers by citizenship and then took adverse action against *all* takers whose scores may have been the result of unauthorized access to questions. But that is not what happened. Rather, NBME isolated Nepali citizens, took adverse action against Nepalis whose scores it questioned, and then took no action against anyone else. Because the discriminatory filtering lead to adverse action, it is prohibited by Title VII.

Further, cases from the First Amendment context have explained that mere scrutiny based on impermissible characteristics is itself illegal. In *True the Vote, Incorporated v. Internal Revenue Service*, the D.C. Circuit addressed allegations that the IRS had audited the non-profit-status applications of conservative-sounding groups on the basis of their names. 831 F.3d 551, 561 (D.C. Cir. 2016). The court explained that "to process exemption applications pursuant to different standards and at different rates depending upon the viewpoint of the applicants is a blatant violation of the First Amendment." *Id.* Although the court explained that additional scrutiny slowed applications down, which is a concrete harm, the court's opinion did not depend on that alone; merely applying "different standards" to the groups, many of whom were eventually approved, was unconstitutional.

## B.    NBME Profiled on The Basis of National Origin

Because, as explained above, selecting people for additional scrutiny based on race or national origin where that scrutiny eventually results in concrete adverse actions—what Plaintiffs call "profiling"—violates the law, Plaintiffs must next show that they have plausibly alleged that NBME profiled them in this way. Plaintiffs have

done this because, even applying the Court's *McDonnell-Douglas* framework—which Plaintiffs do not need to reach because this is an explicit discrimination case— Plaintiffs make a *prima facie* case, NBME's supposedly neutral justifications are not neutral, and to the extent there's any chance that they are those justifications are flagrantly pretextual. Lastly, NBME cannot justify its discrimination by any form of necessity.

> 1.    *Because Plaintiffs Allege Direct Evidence of Discrimination, This Motion Should Be Denied Without Reaching* McDonnell-Douglas

In *McDonnell Douglas Corporation v. Green*, the Supreme Court held that the plaintiff in a Title VII disparate-treatment case generally must establish a prima facie case of discrimination, after which the burden shifts to the employer to show that neutral criteria justified the adverse action, and only then must the plaintiff show that those criteria are indeed pretextual. 411 U.S. 792, 802 (1973). But, as many courts have explained, this burden-shifting framework is inapplicable in the face of "direct evidence" of discrimination. *E.g.*, *Heim v. State of Utah*, 8 F.3d 1541, 1546 (10th Cir. 1993) ("Statements showing an existing policy which itself constitutes discrimination are direct evidence of discrimination. Such statements make the *McDonnell-Douglas* analysis and shifting of burdens, inapplicable." (citations and quotations omitted)); *see also Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 320 (D.D.C. 2018) ("Direct evidence, 'for example, a statement that itself shows racial or gender bias in the decision,' 'generally entitles a plaintiff to a jury trial.' However, '[i]f a ... plaintiff does not proffer direct evidence of discrimination, [courts] apply the analytical framework adopted by the Supreme Court in *McDonnell-Douglas*.'"

(quoting *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1246–47 (D.C. Cir. 2011), and *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014))).

Here, NBME's explicit, stated policy, offered in the declarations of its own witnesses, is to scrutinize the scores of all people who (a) took Step One or Two in Nepal, (b) went to medical school in Nepal, or (c) self-report as citizens of Nepal. AC ¶¶ 35, 37. This is "direct evidence" of discrimination—no inferences are necessary, and no neutral justifications are possible. And there is more: In a remarkable attempt to defend NBME's explicit discrimination, Dr. Alex Mechaber explained, on behalf of NBME, that future examinees will be subjected to scrutiny based on the countries they come from whenever a "large number of examinees in [those] countries" have "issues . . . identified reflecting similar conduct." AC ¶ 39. NBME's explicit policy is to divide its test-takers by national origin and scrutinize them accordingly. This alone suffices under clear law to deny NBME's motion without reaching *McDonnell-Douglas*.

In denying Dr. Giri's motion for a preliminary injunction, this Court reasoned that NBME's policy was not explicit discrimination because it "differentiated on the basis of test-takers' connection to a geographic region where organized cheating occurred." Dkt. No. 20 at 19. But, on this record, NBME included people whose only connection to Nepal is Nepali citizenship, which criterion shows only one "connection" to the "geographic reason" under scrutiny: national origin, which is illegal. This is accordingly unlike the Court's example citing *Floyd* of circumstances where "police [may] 'deploy their limited resources to high crime areas' where 'the need for policing

is greatest,' so long as race does not enter the picture when officers determine who to stop in those areas.'" *Id.* (quoting *Floyd*, 959 F. Supp. 2d at 562–63). NBME targeted *people*, not places—that is the only conceivable justification for including citizenship as its own criterion.

      2.     *Even Applying McDonnell-Douglas This Motion Must be Denied*

If this Court concludes that Plaintiffs have not shown direct evidence of discrimination despite showing that NBME explicitly singled them out because of their citizenship, this Court should proceed to apply the *McDonnell-Douglas* framework. *See, e.g.*, *Hairston*, 773 F.3d at 272.

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* Applied to a motion to dismiss, "the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002)). And regardless Plaintiffs easily plead one. To show a prima facie case of discrimination, an aggrieved person must show that "the unfavorable action gives rise to an inference of discrimination." *Id.* at 494 n.3. Even if scrutinizing scores "associated with Nepal" is not conclusively discriminatory

(which it is, for the reasons explained above) it is far stronger evidence than usually supports a prima facie case.

Next, NBME's stated reasons for invalidating Plaintiffs' scores are themselves non-neutral, so even if this court concluded that they are NBME's genuine reasons, NBME must still lose this motion. In denying Dr. Giri's motion for a preliminary injunction, this Court reasoned that the "decision [to include] examinees with Nepali citizenship [in the scrutinized group] was . . . tied to a neutral consideration: whether the examinee could have proved nexus with Nepal necessary for gaining admission into the Telegram group where secured answers were being distributed." Dkt. No. 20 at 19. But none of NBME's witnesses contend that this is why they added the criterion of Nepali citizenship, and it is more than plausible to infer that it is not. Dr. Daniel Jurich explained the process in detail: First, NBME received anonymous tips and asked its psychometrics department to analyze exam performance from Jordan, Nepal, and Pakistan. AC Ex. B. ¶ 6. That initial analysis showed that scores from the Nepal test center were suspiciously high and suspiciously fast. *Id.* ¶ 7. And so the psychometrics department ran "agreement analysis" for "all examinees who tested at centers in Jordan, Nepal, Pakistan, as well as two centers in India." *Id.* ¶ 9. "This analysis confirmed that the *Nepal test center* was a priority concern for the USMLE program." *Id.* ¶ 12 (emphasis added). But "[t]he Step 3 exam is only offered in the United States, so we could not look to data from the Nepal test center," Dr. Jurich explained. *Id.* ¶ 13. Instead "The reviewed group in this case was adjusted to include individuals who attended medical school in Nepal or self-reported as a citizen of

26

Nepal." *Id.* NBME did not scrutinize Nepali citizens because it thought only Nepali people had access to certain materials, which is false anyway, AC ¶ 23 (explaining that question papers were available for purchase to anyone with an internet connection); NBME scrutinized Nepali citizens because, after examining data from the Nepali test center, it concluded that Nepali people were more likely to share exam content with other Nepali people—that is, that Nepali *people* were a suspect group. *Contra* Dkt. No. 20 at 14 ("[NBME] analyzed the scores of the group of test-takers who had physical and digital acess to the locations in which "Past Questions" from prior exams were being distributed."); *id.* at 15 ("In other words, location was the crux of [NBME's] investigation."). This process is not neutral on the basis of national origin.

Last, to the extent Nepali citizenship is a mere proxy for potential to access the Telegram group, and therefore that it constitutes a neutral criterion on which to select scores for scrutiny—which it is not, as explained above—that criterion would be plausibly, if not conclusively, pretextual. In denying Dr. Giri's request for a preliminary injunction, this Court reasoned that she had not shown an inference of discrimination because "[c]onspicuously lacking from the[] criteria [for scrutiny] is a *limitation* to those of Nepali ethnicity or national origin." Dkt. No. 20 at 13 (emphasis added). Mere "overlap," this Court concluded, "is not enough, on its own, to confirm that discriminatory animus explains NBME's decision." *Id.* (citing *Ky. Ret. Sys. v. EEOC*, 544 U.S. 135, 142 (2008)). But even assuming NBME's criteria are not *conclusive proof* of discrimination, on this motion it is at least plausible to infer—

27

indeed it is inescapable to infer—that NBME's supposedly neutral criteria were in fact intended to target Nepali people. Of the 832 people who had their scores invalided, at least 830 are "Nepali" by either ethnicity, national origin, or both. AC ¶ 43. In *Kentucky Retirement Systems*, the Court addressed the unique circumstance under which employers are *explicitly permitted* to consider age when determining pension status and, therefore, often end up with policies that result in different outcomes depending on age where those outcomes are dictated by pension status. *Ky. Ret. Sys.*, 544 U.S. at 144 ("These systemic rules involve, not wages, but pensions—a benefit that the ADEA treats somewhat more flexibly and leniently in respect to age.").

In ordinary discrimination cases, "mere overlap" is indeed more than sufficient to allege that other criteria are pretexts. *E.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) (explaining that statistical disparities can prove disparate treatment even when those statistics show that less than 100% of disfavored group members are excluded); *Davis v. District of Columbia*, 925 F.3d 1240, 1255 (D.C. Cir. 2019); *Mister v. Illinois Cent. Gulf R. Co.*, 832 F.2d 1427, 1430 (7th Cir. 1987) (holding that geography was pretext for race despite the fact that not every applicant from disfavored geographic areas was the same race); *Koehler v. Infosys Techs. Ltd. Inc.*, 107 F. Supp. 3d 940, 943 (E.D. Wis. 2015) (holding that plaintiffs had stated disparate-treatment claim even though only 96% of the employers' employees were of the desired race and national origin group).

      3.    *Explicit Discrimination Was Not Bona Fide Essential to NBME's Business*

Finally, NBME does not currently argue that considering Nepali national origin or ethnicity was essential to its business and this Court did not pass on the question when denying Dr. Giri's request for a preliminary injunction. If NBME attempts to raise this argument on reply, this Court should accordingly not consider it, but regardless it is without merit, at least at this stage. The key point is that Plaintiffs allege that the sharing of exam material was *not* strictly limited to people of Nepali national origin. AC ¶¶ 21–23. This means that NBME had many national-origin-neutral ways it could proceed given the evidence it had—indeed NBME's chosen course of action in fact makes little sense in light of those alternatives. At first, NBME was concerned that people who *took the test in Nepal* may have invalid scores. *Id.* ¶ 34. This would make sense if NBME was concerned that, say, test-takers were sharing exam materials in the hallways of test centers, or proctors were letting test-takers cheat in a specific administration of the test, things for which the record reveals no evidence. *See generally id.* But NBME inexplicably "re-ran agreement analyses for the 2021 and 2022 Step 1 and Step 2 [] exams . . . on examinees who . . . *were citizens of Nepal* (based on information self-disclosed in their application to test)," *id.* ¶ 35 (quoting Jurich Dec. ¶ 11). NBME's own theory of the case does not limit those with access to question material to citizens of Nepal: NBME's own witnesses aver that exam materials are available to everyone on earth with an internet connection. *E.g.*, *id.* ¶ 23. And even the supposedly Nepali-only Telegram group obviously was not *limited* to Nepali people: NBME's undercover operative (who is not Nepali, *id.* ¶ 25) gained admission without any difficulty, *id.*

This case is accordingly unlike a much more difficult case where an employer has solid evidence that subjects *only* members of a certain race or national-origin group to suspicion. If, for example, NBME had surveillance footage of an exam site in which only test-takers who appear to be members of a certain race are seen sharing exam material, it may justify scrutinizing only those students' scores on the basis that this race-conscious policy as a bona fide necessity. *E.g.*, *Brown v. City of Oneonta*, 221 F.3d 329, 338 (2d Cir. 2000). The key here is that this is not the state of the alleged facts. NBME instead had evidence that, in its view, made Nepali people more likely to be within the group of test-takers who may have had access to prior exam material. When it target only those people, it discriminated against them illegally.

## C.   It Is at Least Reasonable to Infer That NBME Profiled on The Basis of Ethnicity

As explained above, NBME's policies explicitly target people of Nepali national origin for discrimination and thus violate Title VII. But Section 1981 does not forbid national-origin discrimination; it forbids only discrimination on the basis of race or ethnicity. At this stage of the case, though, it is at least plausible to infer that NBME discriminated on the basis of race or ethnicity and, therefore, its motion to dismiss should be denied.

Section 1981 "defin[es] race broadly to include identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006); *Covington v. FMC & Assocs., LLC*, No. 1:22-CV-01441-RDM, 2023 WL 5133184, at *7 (D.D.C. Aug. 10, 2023) ("[T]he racial discrimination [section 1981] is

understood to protect against includes intentional discrimination based on ancestry or ethnic characteristics." (citations and internal quotation marks omitted)). "Nepali"—like "Indian," "Italian," and "Iranian"—can be a designation of both ethnicity and national origin. *See, e.g.*, *Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001) (applying, without comment, protections of § 1981 to a plaintiff from India); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 230 (7th Cir. 1995) (plaintiff should have been permitted leave to amend complaint to state a claim under § 1981 since Italians may in fact be an identifiable race protected by § 1981); *Pourghoraishi*, 449 F.3d at 756 (applying Section 1981 to claim by plaintiff who identified as "Iranian"). Section 1981 claims are barred where the alleged discrimination is based on "*birthplace alone*," but not where national origin and ethnicity "are identical as a factual matter," as is the case where "one was born in the nation whose primary stock is one's own ethnic group." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (emphasis in original). Here, Plaintiffs are natives and citizens of Nepal. AC ¶¶ 3–4. Discriminating against them for being "Nepali" is, at this stage of the case at least, discrimination on the basis of ethnicity as well as national origin.

## IV.   DEFENDANT'S AFFIRMATIVE DEFENSE THAT PLAINTIFFS WAIVED THE RIGHT TO SUE IS INVALID BECAUSE THE WAIVER IS THE PRODUCT OF DURESS

Finally, NBME argues that this case must be dismissed because it invalidated Plaintiffs' USMLE scores—which are essential to Plaintiffs' employment—then said they could re-take the exam only if they waived their right to sue NBME for discriminating against them. Dkt. No. 23 at 10. NBME concedes that the success or

failure of this argument is governed by normal contract rules, *id.* (citing *Keister v. AARP Benefits Comm.*, 410 F. Supp. 3d 244, 250 (D.D.C. 2019)), and Plaintiffs acknowledge that the release, if enforceable, would bar their claims here. The question is whether, on this record, the release is enforceable. The answer is no.

As NBME's own cases recognize, the doctrine of "economic duress" applies to waivers of rights to sue in employment cases like this one. *See, e.g.*, *Bailey v. Verizon Commc'ns, Inc.*, 544 F. Supp. 2d 33, 37 (D.D.C. 2008).[2] To state a claim of economic duress, parties seeking to invalidate a contract must allege that their "'manifestation of assent is induced by an improper threat by the other party that leaves [them] no reasonable alternative.'" *Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998, 1013 (D. Del. 1985) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 175).

The Restatement explains, in one of its first illustrations of paradigmatic economic duress, that threatening to interfere with a counterparty's future employment is an "improper" threat even where the threatening party was fully within its legal rights to *terminate*, let alone interfere with, the prospective employment.

> A makes a threat to discharge B, his employee, unless B releases a claim that he has against A. The employment agreement is terminable at the will of either party, so that

---

[2] NBME's forced waiver does not contain a choice-of-law clause and NBME does not address which jurisdiction's law governs the enforceability of this contract. The plausible candidates are the District of Columbia, which is where this Court sits and where NBME is incorporated, and Pennsylvania, where NBME is physically headquartered. Both jurisdictions adhere to the Restatement Second approach to economic duress, *e.g.*, *Radon Constr., LLC v. Land Endeavor 0-2, Inc.*, 221 A.3d 654, 661 (Pa. Super. Ct. 2019); *Sind v. Pollin*, 356 A.2d 653, 656 (D.C. 1976), and so this Court need not determine which jurisdiction's law applies here.

> the discharge would not be a breach by A. B, having no reasonable alternative, releases his claim. A's threat is a breach of his duty of good faith and fair dealing, and the release is voidable by B.

RESTATEMENT (SECOND) OF CONTRACTS § 176 comment e, illustration 11.

Many courts have followed suit. *Reiver*, 625 F. Supp. at 1013–14 (citing *Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680 (7th Cir. 1970) (applying Illinois law) (in an action to rescind sale of stock, threats of termination unless employee resold previously acquired company stock to company's officers provided foundation for employee's claim of duress); *Shurtleff v. Giller*, 527 S.W.2d 214 (Tex. Civ. App. 1975) (applying Texas law) (holding that promissory note was unenforceable when employee signed note only after superior's threat of termination); *see also Simko, Inc. v. Graymar Co.*, 55 Md. App. 561 (1983) (applying Maryland law) (holding that restrictive covenant that employee agreed to only after being threatened with termination was enforceable but noting that such threats would constitute duress if used to obtain concessions with respect to already accrued or separate benefits unrelated to the ongoing employment relationship).

So too here, *a fortiori*: Here, unlike in the Restatement's illustration and the ceases (in which at least the employer would stop paying the employee it fired), NBME threatened to forbid Plaintiffs from sitting for NBME's exam, which would do nothing to further NBME's business. *Contra* RESTATEMENT § 176(2)(a) (explaining that a threat is improper if, among other things, "the threatened act would harm the recipient and would not significantly benefit the party making the threat"). NBME is perfectly happy to let Plaintiffs try again on the USMLE and practice medicine if they

33

succeed, of course. It threatened to permanently bar them from doing so, then, for no reason other than to coerce a waiver of their right to sue.

And if that weren't enough to show duress at the pleading stage, which it is under settled law, NBME's threat is improper for an independently sufficient reason: It is itself discriminatory. When NBME invalidates someone's score pursuant to its ordinary procedures, it does *not* require a waiver of the right to sue for that person to retake the test. AC ¶ 49. But it created a special set of procedures and applied them only once—to the "subset" of test-takers against whom it discriminated. AC ¶ 50. This Court should not, at least not on the basis of the pleadings alone, countenance NBME's attempt to benefit from its own discriminatory treatment of test-takers.

NBME's only answer to this point is mere *ipse dixit*. First, NBME asserts, without citation or support, that "either plaintiff could have ignored the Response Form and relied upon her legal claims to challenge NBME's invalidation of her passing USMLE results." Dkt. No. 12. But this is not a "reasonable" alternative as the law requires. In all of the cases cited above, the plaintiffs *could* have simply ignored the defendants' threats and suffered the consequences. *See Reiver*, 625 F. Supp. at 13–14 (collecting cases). Courts, though, hold that such a course of action is unreasonable given the importance of employment to almost every person's life. Here, Plaintiffs *could* have simply forgone the practice of medicine in their chosen country indefinitely, but NBME says nothing—because there is nothing to say—about why that option is reasonable. And NBME's two cases do not help them either. In *Bailey* (a *pro se* district court case), the plaintiff did not allege that the defendant threatened

34

her *future* employment, 544 F. Supp. 2d at 36–37, which courts hold to be clear economic duress, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 176, comment f. illustration 12. Regardless, *Bailey* does not discuss, let alone distinguish, the contract rule that threatened firings, even of at-will employees, generally constitute economic duress. *Id.* illustration 11. In *Anzueto v. WMATA*, the plaintiff did not even argue duress. 357 F. Supp. 2d 27 (D.D.C. 2004).

Based on the record before this Court, it is at the very least plausible to infer that Plaintiffs' waivers were the result of economic duress and, therefore, NBME's motion to dismiss must be denied.

## CONCLUSION

For the foregoing reasons, NBME's motion to dismiss Plaintiffs' first amended complaint should be denied.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Emily Gerrick
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ James Crooks*
*/s/ Kritika Deb*
James Crooks
Kritika Deb
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
(619) 547-4182