**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DR. LATIKA GIRI and DR. SWECHHA
SHRESTHA,

                Plaintiffs,

    v.

THE NATIONAL BOARD OF MEDICAL
EXAMINERS,

                Defendant.

Case No. 1:24-cv-00410-CRC

**REPLY IN SUPPORT OF NBME'S MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I.      Plaintiffs Cannot Avoid Their Binding Releases, and this Action Must Be
        Dismissed With Prejudice Because Plaintiffs Waived Their Claims. ............................ 1

        A.      Plaintiffs Have Not Purported to Void, and Cannot Void, Their
                Release Agreements. ................................................................................... 2

        B.      Plaintiffs Were Not Under "Economic Duress" When They
                Entered Into Their Agreements with NBME Containing the
                Binding Releases. ........................................................................................ 3

II.     Plaintiffs Cannot Pursue Their Title VII and Section 1981 Claims for
        Other Reasons. ..................................................................................................... 8

        A.      Plaintiffs Fail to Show that Dr. Giri Can Pursue Her Extraterritorial
                Claims Under Title VII and Section 1981. .................................................. 8

                1.      Plaintiffs fail to show that Title VII applies extraterritorially
                        to Dr. Giri's claim. ......................................................................... 8

                2.      Plaintiffs fail to show that Section 1981 applies
                        extraterritorially to Dr. Giri's claim. ............................................ 13

        B.      Plaintiffs Fail to State a Claim Under Title VII or Section 1981 ..................... 14

                1.      Plaintiffs fail to state a claim under Title VII because
                        NBME is not their employer or otherwise subject to Title
                        VII with respect to the USMLE. ................................................... 14

                2.      Plaintiffs fail to state a "profiling" claim for discrimination. ................ 20

                3.      Plaintiffs fail to state a claim for discrimination based on
                        ethnicity under Section 1981. ...................................................... 22

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000) ...............................................................................16, 17, 18, 19

*\*Bailey v. Verizon Commc'ns, Inc.*,
544 F. Supp. 2d 33 (D.D.C. 2008) ...............................................................................................4

*Brown v. City of Oneonta, New York*,
235 F.3d 769 (2d Cir. 2000)........................................................................................................21

*Covington v. FMC & Assocs., LLC*,
No. 22-1441-RDM, 2023 WL 513184 (D.D.C. Aug. 10, 2023)..............................................23

*Dunn v. St. Louis Cty.*,
No. 87-1524, 1989 WL 35541 (E.D. Mo. Mar. 31, 1989)......................................................16

*\*EEOC v. Arabian Oil Co.*,
499 U.S. 244 (1991)......................................................................................................................9

*EEOC v. State of Illinois*,
69 F.3d 167 (7th Cir. 1995) .......................................................................................................15

*Egbuna v. Time-Life Libraries, Inc.*,
153 F.3d 184 (4th Cir. 1998) ...............................................................................................10, 11

*Fields v. Hallsville Indep. Sch. Dist.*,
906 F.2d 1017 (5th Cir. 1990) ...................................................................................................19

*Floyd v. City of New York*,
959 F. Supp. 2d 540 (S.D.N.Y. 2013)..................................................................................20, 21

*George v. New Jersey Bd. of Veterinary Med. Exam'rs*,
794 F.2d 113 (3d Cir. 1986)........................................................................................................19

*Haddock v. Board of Dental Exam'rs*,
777 F.2d 462 (9th Cir. 1985) .....................................................................................................18

*Hartman v. Wick*,
678 F. Supp 312 (D.D.C. 1988).................................................................................................10

*Jung v. Ass'n of American Med. Colleges*,
300 F. Supp. 2d 119 (D.D.C. 2004) .............................................................................................6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kerr v. WGN Continental Broadcasting Co.*,
   229 F. Supp. 2d 880 (N.D. Ill. 2002) ...................................................................15

*\*La France v. Georgetown Univ. Hosp.*,
   No. 87-3400-RCL, 1988 WL 135066 (D.D.C. Dec. 9, 1988) ..................................3

*Lalvani v. Cook County, Illinois*,
   269 F.3d 785 (7th Cir. 2001) ...........................................................................23, 24

*Morrison v. American Bd. of Psychiatry & Neurology, Inc.*,
   908 F. Supp. 583 (N.D. Ill. 1996) ..................................................................15, 19

*\*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)........................................................................................11, 12

*\*Nakhid v. American Univ.*,
   No. 19-3268-APM, 2021 WL 4169355 (D.D.C. Sept. 14, 2021) ..........................12

*\*Ndondji v. InterPark*,
   768 F. Supp. 2d 263 (D.D.C. 2011) .....................................................................23

*\*Ofori-Tenkorang v. American Intern. Group, Inc.*,
   460 F.3d 296, 305 (2d Cir. 2006)..........................................................................10

*Olvera-Morales v. Sterling Onions, Inc.*,
   322 F. Supp. 2d 211 (N.D.N.Y. 2004) ..................................................................10

*\*Osborne v. Howard Univ. Phys., Inc.*,
   904 A.2d 335 (D.C. 2006) .............................................................................2, 4, 7

*Reyes-Gaona v. N.C. Growers Ass'n*,
   250 F.3d 861 (4th Cir. 2001) ...............................................................................11

*\*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016)..............................................................................................12

*Rodrigues v. Martin Marietta Corp.*,
   No. 86-3403, 1987 WL 44766 (6th Cir. Sept. 16, 1987) .................................13, 14

*Saint Francis Coll. v. Al-Khazraji*,
   481 U.S. 604 (1987)...............................................................................................23

*\*Schmidt v. Shah*,
   696 F. Supp. 2d 44 (D.D.C. 2010) ......................................................................2, 3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Shekoyan v. Sibley Int'l*,
    409 F.3d 414 (D.C. Cir. 2005)...................................................................11

*Sibley Mem'l Hosp. v. Wilson*,
    488 F.2d 1338 (D.C. Cir. 1973)............................................................14, 19

*Simko, Inc. v. Graymar Co.*,
    55 Md. App. 561 (1983).............................................................................5

*Taylor v. Pompeo*,
    No. 19-cv-2987-CRC, 2021 WL 7904001 (D.D.C. Jan. 6, 2021) ..........16

*U.S. v. Garcia Sota*,
    948 F.3d 356 (D.C. Cir. 2020)...................................................................12

*Wang v. Gen'l Motors, LLC*,
    371 F. Supp. 3d 407 (E.D. Mich. 2019).....................................................13

*Wesley v. Howard Univ.*,
    3 F. Supp. 2d 1 (D.D.C. 1998)..................................................................23

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007)....................................................3, 6, 7

**STATUTES**

42 U.S.C. § 1981(a) ......................................................................................13

**OTHER AUTHORITIES**

EEOC, "Pre-Employment Inquiries and Citizenship," *at*
    https://www.eeoc.gov/pre-employment-inquiries-and-citizenship...........12

Restatement (Second) of Contracts § 175..................................................2

Restatement (Second) of Contracts § 176..............................................4, 5

## **INTRODUCTION**

Plaintiffs' opposition brief is remarkable for the number of things they get wrong. Contrary to what they argue, (a) their release agreements are enforceable; (b) Title VII and Section 1981 do not apply extraterritorially to Dr. Giri's claims; (c) they cannot pursue a Title VII "interference with employment" claim against NBME; and (d) they have not adequately pled claims for discrimination under Title VII and Section 1981. Plaintiffs also notably—but this time, correctly— fail to suggest that the problems with their First Amended Complaint ("FAC") could be cured through amendment.

For the reasons raised in NBME's motion to dismiss and discussed further below, Plaintiffs' FAC should be dismissed with prejudice.

## **ARGUMENT**

**I.    Plaintiffs Cannot Avoid Their Binding Releases, and this Action Must Be Dismissed With Prejudice Because Plaintiffs Waived Their Claims.**

Plaintiffs conspicuously wait until the end of their opposition brief to address the threshold issue of their releases. *See* Mem. of Pts. and Auth. in Opp. to Def.'s Mot. to Dismiss (Dkt. 24) ("Opp. Br.") at 31. They do not dispute that they agreed to the releases and concede that their claims are barred if the releases are enforceable, but they argue that the releases are unenforceable under the doctrine of "economic duress." *Id.* at 32-33.[1] The Court should reject this argument. There was no "economic duress" here, and in any event, Plaintiffs have not—and cannot—void their agreements with NBME, which they have ratified. Plaintiffs validly waived the claims they are attempting to pursue in this case, and their binding releases mandate dismissal of this action with prejudice.

---

[1] Plaintiffs likewise do not dispute that their releases may be considered on this motion to dismiss. They argue only that the releases are unenforceable. *See* Opp. Br. at 32.

### A.    Plaintiffs Have Not Purported to Void, and Cannot Void, Their Release Agreements.

Even if there was some sort of "economic duress" here—and for the reasons explained below, there was not—this would only make Plaintiffs' agreement with NBME *voidable*. *See Schmidt v. Shah*, 696 F. Supp. 2d 44, 63 (D.D.C. 2010) ("'If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is *voidable* by the victim.") (quoting Restatement (Second) of Contracts § 175) (emphasis added; remaining citation omitted); *see also* Opp. Br. at 32-33 (providing illustration from the Restatement stating that a contractual release entered into under duress is "voidable").[2] Plaintiffs' argument simply ignores that "voidable" does not mean "void," and they have not disclaimed or otherwise purported to void the agreements that contain their binding releases.

Moreover, Plaintiffs could not void their agreement now even if they belatedly attempted to do so, because they have each accepted its benefits and thus ratified the agreement. *See Osborne v. Howard Univ. Phys., Inc.*, 904 A.2d 335, 339 n.4 (D.C. 2006) ("[E]ven upon a showing of duress, the contract at issue is not voidable if the victim has accepted benefits under that contract, thereby ratifying it.") (citation omitted). In exchange for their agreement to release the USMLE program and its owners from all claims they might have that relate in any way to the invalidation of their Step exam outcomes, Dr. Giri and Dr. Shrestha each received the opportunity to request reconsideration of the score invalidation decision, to appeal any adverse decision made upon reconsideration, and (if necessary) to retake the Step exam(s) at no cost. *See* Second Ward Decl. (Dkt. 23) Ex. B at 2; Ex. C. at 1; Ex. E at 1. Pursuant to that agreement, each Plaintiff sought

---

[2] NBME agrees with Plaintiffs that a choice-of-law analysis is not necessary to resolve whether Plaintiffs' claims are barred by the releases to which they agreed. *See* Opp. Br. at 32 n.2.

reconsideration of the score invalidation decision. *See id.* ¶¶ 13 and 18; Exs. C and E. And each Plaintiff also intends to take a retest pursuant to their agreement. *See* FAC ¶ 49; Opp. Br. at 31.

Plaintiffs cannot have it both ways. They cannot accept the benefits of the agreement containing the release but avoid their obligations under the agreement by claiming their releases are unenforceable. *See Schmidt*, 696 F. Supp. 2d at 64 ("[T]he record shows that Schmidt has sought to keep the benefits of the Agreement without also accepting its obligations. … Accordingly, Schmidt is precluded from attacking the validity of the Settlement Agreement and the release of claims contained therein."); *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 175 (D.D.C. 2007) ("[B]ecause economic duress merely renders a contract voidable—as opposed to void—a plaintiff who accepts the benefits of a contract entered into under economic distress cannot later seek to have the contract rescinded."), *aff'd*, 2008 WL 4068606 (D.C. Cir. May. 17, 2008) (per curiam); *La France v. Georgetown Univ. Hosp.*, No. 87-3400-RCL, 1988 WL 135066, at *4 (D.D.C. Dec. 9, 1988) ("Because he accepted the benefits of that [severance] agreement, plaintiff cannot be heard to complain that the contract was invalid.") (citation omitted).

**B.     Plaintiffs Were Not Under "Economic Duress" When They Entered Into Their Agreements with NBME Containing the Binding Releases.**

Given that Plaintiffs have not attempted to void, and cannot now attempt to void, their agreements with NBME—including the binding releases in those agreements—there is no need to further address their "economic duress" argument. But NBME will do so in the interest of completeness.

"Duress is a defense to a contract action. The party who seeks to set aside a contract on this basis can succeed only if he adduces sufficient proof of (1) an improper threat and (2) the lack

of a reasonable alternative." *Osborne*, 904 A.2d at 339 (citation omitted).[3] Plaintiffs acknowledge their releases in the amended complaint, *see* FAC ¶ 49, but they allege no facts in the FAC suggesting the agreements were the product of "economic duress," and the arguments they now raise in their opposition brief also fail to demonstrate either element of duress. *See Bailey v. Verizon Commc'ns, Inc.*, 544 F. Supp. 2d 33, 36 (D.D.C. 2008) (dismissing claims based on signed release where plaintiff "has not sufficiently asserted the presence of mistake or duress that would render the release invalid").

First, there is no basis for any claim that NBME made an "improper threat." According to Plaintiffs, NBME's "threat" to "forbid Plaintiffs from sitting for NBME's exam," was improper because this "would do nothing to further NBME's business." Opp. Br. at 33 (citing Restatement (Second) of Contracts § 176(2)(a)). This appears to be a reference to NBME's explanation that any individual with an invalidated score who did not enter into the proffered agreement would be temporarily barred from retaking the USMLE, for three years.[4] There is nothing improper about such a testing suspension. Limiting the ability of an examinee with scores of questionable validity (and who appears to be connected to unauthorized prior access to exam content) from retaking the

---

[3] Plaintiffs refer to employment cases as being particularly relevant because (according to Plaintiffs) this, too, is an "employment case." Opp. Br. at 32-33 (relying on employment cases from Delaware, Illinois, Texas, and Maryland). Actually, employment-related cases—cases related to disputes between actual employees and their employers that address issues such as covenants not to compete and employment termination—are more telling in how distinguishable they are from *this* dispute between examinees and a standardized testing company that invalidated their exam scores. Notably, Plaintiffs make no effort to distinguish the release cases cited by NBME that involved examinees and standardized tests, in which the courts enforced releases to which the examinees had agreed as a condition to registering to test. *See* NBME Br. at 11.

[4] Plaintiffs' reference to a "permanent[ ] bar" from testing, *see* Opp. Br. at 34, does not accurately represent the record. Plaintiffs would not have been permanently barred from taking the USMLE if they did not sign the agreement containing the release. Rather, they would be temporarily barred from doing so, for a period of three years. *See* Second Ward Decl. (Dkt. 23), Ex. B at 1.

USMLE helps NBME protect the security of the test and the integrity of exam results. Plaintiffs argue that the three-year bar from testing is disingenuous because NBME is willing to allow a retest for those examinees who entered into the agreement, *see* Opp. Br. at 33-34, but in that context, the retest is being allowed as part of a controlled process for addressing NBME's score validity concerns and is subject to all the provisions of the agreement (including, for example, the examinee's agreement to cooperate with any further USMLE program investigation). If an examinee with exam scores of questionable validity is not willing to agree to follow those procedures, then NBME has a valid reason to immediately restrict their future access to the USMLE.[5] NBME's so-called "threat" is not the type of malicious, unconscionable, or vindictive act contemplated in the Restatement provision relied upon by Plaintiffs. *See* Restatement (Second) of Contracts § 176 at cmt. f ("Subsection (2) deals with threats that are improper if the resulting exchange is not on fair terms. Clause (a) is concerned with cases in which a party threatens to do an act that would not significantly benefit him but would harm the other party. If, on the recipient's refusal to contract, the maker of the threat were to do the threatened act, it would therefore be done maliciously and unconscionably, out of pure vindictiveness.").

Plaintiffs' argument that NBME's purported "threat" constitutes economic duress because it is part of the allegedly discriminatory act challenged in their lawsuit is equally misguided. *See* Opp. Br. at 34. The duress analysis focuses on the circumstances of the contracting process itself.

---

[5] As explained in one of the employment-related cases cited by Plaintiffs:

> Graymar had a legitimate interest in protecting its trade secrets and customer information. If Smith refused to assent to the covenant not to compete, Graymar could only protect its proprietary information by making it unavailable to Smith. Were Smith denied access to such material, he could not effectively perform his duties.

*Simko, Inc. v. Graymar Co.*, 55 Md. App. 561, 569 (1983).

*See Jung v. Ass'n of American Med. Colleges*, 300 F. Supp. 2d 119, 151 (D.D.C. 2004) ("[P]laintiffs' argument that the NRMP's conduct was 'wrongful' in executing the Student Match Contract because the contract allegedly formed part of the antitrust conspiracy is irrelevant to the duress analysis. The 'wrongful' act for these purposes must relate to any intentional pressure or threats applied by the contracting party to enter into the agreement, not to the alleged 'wrongfulness' of the underlying contract.") (applying Illinois law). Plaintiffs do not—and cannot—argue that the process here was unfair, where they were given 15 calendar days to consider whether to enter the agreement, *see* Ward Decl. Ex. A, and this already lengthy deadline was further extended voluntarily by NBME, *see* Dkt. 9. *Compare Wright*, 503 F. Supp. 2d at 175 n.7 ("[P]laintiff fails to elucidate why five days was an insufficient amount of time for him to make a 'rational and informed' decision regarding the Agreement."). In addition, Dr. Giri was represented by counsel when she decided to agree to the release, and Dr. Shrestha either was represented by counsel or had plenty of time to seek the advice of counsel before agreeing to waive all claims relating to the invalidation of her scores.

Second, Plaintiffs' "economic duress" argument also fails because Plaintiffs had a reasonable alternative to agreeing to NBME's proffered agreement containing the release. As previously explained, Plaintiffs could have ignored the agreement and instead challenged the score cancellation in court (just as they are attempting to do now). *See* NBME Br. at 12. Plaintiffs say this is not a reasonable alternative because it would require them to forego "the practice of medicine in their chosen country indefinitely," Opp. Br. at 34, but this argument concedes that Plaintiffs could have practiced medicine outside the United States. Plaintiffs do not need passing USMLE results to practice in their home country or in other countries, which would enable them to avoid any claimed economic duress. *Cf. Jung*, 300 F. Supp. 2d at 151 (rejecting argument by

medical school student plaintiffs that they lacked "free will" in entering the Student Match Contract because "they either could sign the contract or 'surrender their plan to become physicians and forfeit the time and money that they had invested in medical school,'" and noting that "'where consent to an agreement is secured merely because of hard bargaining positions or financial pressures, duress does not exist'") (citation omitted). Moreover, Plaintiffs are, in fact, pursuing relief related to the score invalidations by way of litigation (including seeking monetary relief). Their own actions thus show their recognition that litigation was a reasonable alternative to entering into the agreement with the release of claims, thereby contradicting their current allegation of "economic duress." *See Osborne*, 904 A.2d at 341 ("[S]imply asserting that litigation is an unreasonable remedy is not enough. The assertion must be supported by facts establishing specific financial harm that make litigation an unreasonable alternative."); *Wright*, 503 F. Supp. 2d at 175 n.7 ("The mere fact that plaintiff was presented with the arguably difficult choice of signing a settlement agreement or foregoing interim relief while the FSGB considered the merits of his grievance appeal does not serve to make plaintiff a victim of duress.") (citation omitted).

Plaintiffs nevertheless assert that the Court should not dismiss their claims based on their releases because "it is at the very least plausible to infer that Plaintiffs' waivers were the result of economic duress." Opp. Br. at 35. None of the allegations in their FAC (or in the additional argument in their opposition brief), however, show economic duress. Plaintiffs also have not attempted to void the agreements containing the releases that waived their claims and have instead ratified those agreements, thereby foreclosing their attempted reliance on the doctrine of "economic duress" in any event. Based upon those releases, this action should be dismissed with prejudice.

## II.    Plaintiffs Cannot Pursue Their Title VII and Section 1981 Claims for Other Reasons.

As noted in NBME's opening brief, there are other impediments to Plaintiffs' claims against NBME, in addition to their binding releases. Dr. Giri's claims fail because Title VII and Section 1981 do not apply extraterritorially to her claims. Dr. Giri's and Dr. Shrestha's Title VII claims both fail because NBME is not their employer and NBME is not subject to Title VII liability by virtue of providing a licensing examination. Finally, Dr. Giri and Dr. Shrestha fail to state a claim for discrimination under Title VII or Section 1981.[6]

### A.    Plaintiffs Fail to Show that Dr. Giri Can Pursue Her Extraterritorial Claims Under Title VII and Section 1981.

Plaintiffs have not satisfied their burden of showing that Title VII or Section 1981 extends extraterritorially to Dr. Giri's claims under the alleged facts of this case.

#### 1.    Plaintiffs fail to show that Title VII applies extraterritorially to Dr. Giri's claim.

Plaintiffs cannot credibly argue that Dr. Giri was present in the United States at the time of her alleged injury and thus subject to the protections of Title VII on this basis. *See* Opp. Br. at 7-8. Dr. Giri's only alleged physical presence in the U.S. came when she sat for the Step 3 exam (she was not present in the U.S. at any time related to Steps 1 and 2 CK). *See* FAC ¶ 13.[7] But Dr. Giri's Title VII claim does not challenge any actions by NBME related to her Step 3 test-day experience in the U.S.; the challenged act is NBME's invalidation of Dr. Giri's scores on Step 1, Step 2 CK, and Step 3 of the USMLE. *See* FAC ¶ 76 ("Defendant NBME interfered with Plaintiffs'

---

[6] Plaintiffs ignored the additional impediments to Dr. Shrestha's claims in inaccurately declaring in the extraterritoriality section of their opposition brief that "NBME concedes that Title VII and Section 1981 protect Dr. Shrestha" and "this case may proceed as a putative class action with Dr. Shrestha as the lead plaintiff." Opp. Br. at 7.

[7] According to her reply brief in support of her motion for preliminary injunction, Dr. Giri "return[ed] to Nepal after Step Three was completed." Dkt. 17 at 4; *see also* Opp. Br. at 7 (referencing Dr. Giri's preliminary injunction reply brief).

employment as physicians explicitly because of Plaintiffs' Nepali national origin, race, or both, **by invalidating the scores** necessary to pursue employment.") (emphasis added). Dr. Giri does not claim to have been in the United States at the time of her alleged injury—the challenged score invalidations.

Plaintiffs nevertheless argue that, because Dr. Giri happened to be in the United States to take the Step 3 exam around the time that NBME allegedly was analyzing background data of at least some examinees from Nepal, thereby purportedly "actively discriminating against Nepali people," her Title VII claim does not invoke extraterritorial reach. Opp. Br. at 8.[8] Plaintiffs proclaim there is "no ... case" holding that Title VII does *not* apply in this peculiar circumstance, *id.*, but there also is no case holding that Title VII *does* apply in this context. In other words, Plaintiffs' invitation to treat Dr. Giri as being "present in the U.S. at the time of discrimination" because she took Step 3 at a time when NBME was presumably investigating scores from examinees from Nepal has no legal support.

Plaintiffs fall back on Dr. Giri's purportedly strong connection with the U.S. ("because Dr. Giri studied U.S. medical practices and took three exams designed exclusively for U.S. employment, including one administered only physically with the United States") and the use of the USMLE by licensing authorities in the U.S. ("The USMLE is, after all, the *US*MLE") to argue she is entitled to the protections of Title VII. Opp. Br. at 8-9. Plaintiffs' invitation to apply Title VII any time a plaintiff has "[e]xtensive domestic contacts," *id.* at 9, advocates for the type of court-made rule the Supreme Court and D.C. Circuit have expressly warned against. *See EEOC v.*

---

[8] This Court previously rejected Plaintiffs' theory that NBME's analysis of its examination data could be considered an "adverse action." Mem. Op. and Order (Dkt. 20) at 18-19. Wisely, this is not the basis of Plaintiffs' alleged Title VII injury. *See* FAC ¶ 76 (claiming injury from the invalidation of their scores).

*Arabian Oil Co.*, 499 U.S. 244, 259 (1991) ("Congress, should it wish to do so, may similarly amend Title VII [to extend its reach] and in doing so will be able to calibrate its provisions in a way that we cannot."); *cf. Ofori-Tenkorang v. American Intern. Group, Inc.*, 460 F.3d 296, 305 (2d Cir. 2006) (rejecting a "substantial contacts" analysis in the context of Section 1981 claims). The sole case cited by Plaintiffs to support this argument, moreover, merely opines that "[g]iven the [plaintiff's] extensive contacts with the United States at all stages of the recruitment, hiring and employment process, it is not clear that the extension of Title VII protection to plaintiff would amount to extra-territorial application of that law." *Olvera-Morales v. Sterling Onions, Inc.*, 322 F. Supp. 2d 211, 221 (N.D.N.Y. 2004). This equivocal musing from a New York district court, made in response to a very different set of facts, provides little to no support for Plaintiffs' position.[9]

Plaintiffs also continue to rely on *Hartman v. Wick*, 678 F. Supp 312 (D.D.C. 1988) for their extraterritoriality argument. *See* Opp. Br. at 9-10. NBME previously explained why the decision in *Hartman* is not only outdated but also incorrect, *see* NBME Br. at 17, and Plaintiffs fail to take on—much less refute—those arguments, *see* Opp. Br. at 10.

Plaintiffs also rely on the Fourth Circuit's decision in *Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184 (4th Cir. 1998) (en banc) (per curiam), which they describe as holding "that a foreign national who applies for a job in the United States is protected by Title VII." Opp. Br. at 10. But that was not the holding of *Egbuna*. Rather, the Fourth Circuit held that the plaintiff could not

---

[9] Unlike Dr. Giri, the plaintiff in *Olvera-Morales* was hired to work in the United States and subsequently worked in the United States under the federal guest worker visa program, and her Title VII claim was asserted against her actual employer. *See id.* Plaintiffs curiously criticize NBME for "ignoring" *Olvera-Morales*, Opp. Br. at 9—an inapposite, out-of-circuit district court case that, to the best of NBME's knowledge, has never been cited, much less found persuasive, by any D.C. court.

pursue a Title VII retaliation claim because he did not have employment authorization at the time

of his employer's allegedly discriminatory conduct. *See* 153 F.3d at 187-88. And Plaintiffs once

again are relying on a case with entirely distinguishable facts; the plaintiff in *Egbuna* was

physically present in the United States at the time of the alleged employment discrimination by his

former employer.[10]

Plaintiffs next describe NBME's opening brief as "focusing on *Reyes-Gaona*." Opp. Br. at

10. From that shaky premise,[11] they argue that the *Reyes-Gaona* analysis, "which draws negative

inferences from Congress's action in response to Supreme Court decisions … takes NBME in the

exact opposite direction it wants to go." *Id*. According to Plaintiffs:

> The only negative inference that follows here is this one: In *Aramco*, the Court held
> that *the place of employment* controls the application of Title VII; Congress
> responded by displacing that background rule, but *only* as to United States citizens
> employed by U.S. employers abroad; therefore, the place of employment continues
> to control in all other circumstances.

Opp. Br. at 10-11 (original emphases).

Contrary to Plaintiffs' assertion, the Supreme Court did not hold in *Aramco* that "the place

of employment controls application of Title VII." Not surprisingly, Plaintiffs cite no part of the

opinion to show such a holding. As for the state of the law following Congress's post-*Aramco*

amendment of Title VII, courts—including the Supreme Court and the D.C. Circuit—have

explained that Congress's limited amendment of Title VII following *Aramco* supports narrow

extraterritorial application of the statute as specified by Congress, not the expansive approach

---

[10] *Sodipo v. Caymas Systems Inc.*, cited by Plaintiffs, *see* Opp. Br. at 11-12, is yet another
inapposite decision involving a plaintiff who was working in the United States at the time of the
alleged discrimination by his employer.

[11] Although NBME did cite to *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861 (4th Cir. 2001),
its purported "focus" on the Fourth Circuit's decision consisted of two "cf." cites. *See* NBME Br.
at 16, 17 n.7.

described by Plaintiffs. *See* NBME Br. at 14-15 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 n.8 (2010) (addressing reach of Title VII); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 421 (D.C. Cir. 2005) (same) and *U.S. v. Garcia Sota*, 948 F.3d 356, 358 (D.C. Cir. 2020) (addressing statutory interpretation)). Plaintiffs do not respond to *Morrison*, *Shekoyan*, or *Garcia-Sota* in their opposition brief.

Plaintiffs' "place of employment" argument further ignores that the extraterritoriality analysis also examines the parties and interests that are protected under the statute. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 349-50 (2016) (analyzing whether statute at issue "provides a clear indication that Congress intended to create a private right of action for injuries suffered outside the United States"). As this Court has noted, Title VII's "private right of action seeks to protect only the interests of U.S. citizens and U.S. residents." *Nakhid v. American Univ.*, No. 19-3268-APM, 2021 WL 4169355, at *6 (D.D.C. Sept. 14, 2021).

Plaintiffs decry the limitations imposed by operation of the presumption against extraterritoriality, *see* Opp. Br. at 12, but cannot disclaim the incongruity created under their own approach to Title VII, which would "protect foreign nationals who merely submit an application for a job in the United States from abroad even as it excludes foreign nationals who are actually employed by U.S. employers abroad." *Nakhid*, 2021 WL 4169355, at *6.[12] All this shows is that

---

[12] Plaintiffs contend there would not be a massive extension of Title VII exposure under their interpretation because "it would protect only job applicants who can articulate a bona fide case of discrimination, which may be rare because U.S. employers are not only permitted but *required* to consider an applicant's immigration status and authorization to work in the United States, something that is presently quite difficult … for most people in the world [to] achieve." Opp. Br. at 12-13. This overlooks that "Federal law … prohibits employers from conducting the Form I-9 and E-Verify processes before the employee has accepted an offer of employment." *See* EEOC, "Pre-Employment Inquiries and Citizenship," *at* https://www.eeoc.gov/pre-employment-inquiries-and-citizenship. It also assumes only "bona fide" claims will be raised and indeed ignores the strained context in which Dr. Giri herself (and on behalf of a putative class) is attempting to assert a Title VII claim against NBME. *See* Section II.B.1, *supra*. Indeed, if the Court agrees that

it is best left to Congress to provide a clear indication of any extraterritorial statutory reach. And there is no clear indication in the statute that Title VII applies in the context of Dr. Giri's claim.

### 2.   Plaintiffs fail to show that Section 1981 applies extraterritorially to Dr. Giri's claim.

Plaintiffs' brief, one-paragraph response to NBME's Section 1981 extraterritoriality argument is readily dispensed with. Plaintiffs make no effort to address the cases and analysis in NBME's opening brief. Instead, their only argument is that Dr. Giri's limited presence in the United States while taking the Step 3 examination somehow makes Section 1981 applicable to her claim, even though her Section 1981 claim does not allege any discrimination relating to her test-day experience. *See* FAC ¶ 81; Opp. Br. at 13 ("Dr. Giri … bases her claim on NBME's revocation of her score on Step 3").[13]

Section 1981, by its terms, only applies to "persons *within the jurisdiction of the United States.*" 42 U.S.C. § 1981(a) (emphasis added). Dr. Giri was not within the jurisdiction of the United States at the time of NBME's challenged act—the invalidation of her USMLE scores—and therefore she cannot pursue a Section 1981 claim. *See* NBME Br. at 18-20 (and cases cited); *see also Rodrigues v. Martin Marietta Corp.*, No. 86-3403, 1987 WL 44766, at *2 (6th Cir. Sept. 16, 1987) (holding plaintiff could not pursue Section 1981 claim based on allegedly discriminatory act that occurred when he was outside the U.S.; although the plaintiff had been employed for a period of time in the U.S., at the time "he was within the jurisdiction of the United States, [he] received the same employment benefits enjoyed by United States citizens under the same type of

---

Title VII does not apply to this dispute between examinees and a standardized testing company, then it would not need to decide whether Title VII applies extraterritorially to Dr. Giri's inapposite Title VII claim.

[13] Based upon this description of her claim, Dr. Giri appears to abandon any Section 1981 claim related to the invalidation of her scores on Step 1 and Step 2 CK.

contract"; also rejecting argument that plaintiff's rights under Section 1981 "attached at the moment of his hiring in Ohio") (per curiam); *Wang v. Gen'l Motors, LLC*, 371 F. Supp. 3d 407, 416-17 (E.D. Mich. 2019) (following *Rodrigues* and other cases limiting extraterritorial application of Section 1981 claims).

Plaintiffs have not overcome the presumption against extraterritorial application of federal law with respect to Dr. Giri's Section 1981 claim.

**B.     Plaintiffs Fail to State a Claim Under Title VII or Section 1981.**

As discussed below, Plaintiffs fail to show how the narrow, fact-specific employment "interference" theory of Title VII liability applied in *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) extends to this dispute. They also fail to state viable claims for discrimination under Title VII (even if applicable here) or Section 1981. The Court reached this very conclusion when analyzing the likelihood-of-success factor on Dr. Giri's motion for a preliminary injunction. *See* Mem. Op. and Order at 12-20. Plaintiffs assert that a "different lens" is warranted when evaluating their allegations in the context of NBME's motion to dismiss, *see* Opp. Br. at 21, but they do not explain why, particularly where they have attached NBME's preliminary injunction declarations as exhibits to their FAC and thus embraced the very facts noted by the Court in its preliminary injunction ruling.

Plaintiffs have failed to state a claim under either Title VII or Section 1981.

**1.     Plaintiffs fail to state a claim under Title VII because NBME is not their employer or otherwise subject to Title VII with respect to the USMLE.**

Plaintiffs confirm they are relying on the D.C. Circuit's decision in *Sibley* as the basis for their Title VII claim. *See* Opp. Br. at 14. They do not discuss the facts and analysis in *Sibley*, however, and thus make no effort to explain how NBME's role in providing a standardized test that happens to be used by third parties as part of the medical residency application process is at

all analogous to the situation in *Sibley*, where a hospital was alleged to have actively blocked private duty nurses from entering into specific employment relationships with patients in its hospital. It was in that fact-specific context that the D.C. Circuit extended Title VII liability to a non-employer, and that context is not present here.

Instead, Plaintiffs rely on an Illinois district court opinion in which the court applied a *Sibley*-based "interference" analysis. *See* Opp. Br. at 14, 15 (discussing *Morrison v. American Bd. of Psychiatry & Neurology, Inc.*, 908 F. Supp. 583 (N.D. Ill. 1996)). *Morrison* is not persuasive, however. The district court applied an expansive view of the "interference" theory to deny the defendants' motion to dismiss the plaintiff's Title VII claims against an entity that administered a board certification exam that she had been unable to pass, which she alleged resulted in adverse employment consequences. *Id.* at 585-87. The *Morrison* court's generous approach to *Sibley* cannot be squared with the Seventh Circuit's limiting description—and questioning—of the *Sibley* "interference" theory in an opinion that preceded *Morrison*. *See EEOC v. State of Illinois*, 69 F.3d 167, 169 (7th Cir. 1995) (explaining that the cases applying an "interference" theory—including *Sibley*—"are ones in which the defendant **so far controlled the plaintiff's employment relationship** that it was appropriate to regard the defendant **as the de facto or indirect employer of the plaintiff**, as where a hospital prevents a nurse from being employed by a hospital patient") (citations omitted; emphases added). Based upon the Seventh Circuit's "retreat[ ] from *Sibley*," a 2002 decision from the same court that decided *Morrison* rejected the analysis applied in *Morrison* and held that "interference liability is not a viable theory of relief under Title VII." *Kerr v. WGN Continental Broadcasting Co.*, 229 F. Supp. 2d 880, 885-89 (N.D. Ill. 2002). The *Morrison* court applied an overly expansive view of the fact-specific "interference" analysis in *Sibley* and is an outlier in all respects.

Plaintiffs get no further with their other case citations. In *Dunn v. St. Louis Cty.*, No. 87-1524, 1989 WL 35541 (E.D. Mo. Mar. 31, 1989), the court denied the Greater St. Louis County Fire Academy's motion for summary judgment on the plaintiff's Title VII claim where the plaintiff alleged that "defendants' conduct denied her certification as a firefighter" because they used "a sex-based performance test." *Id.* at *1. The court's decision was based on the plaintiff's showing that the Fire Academy not only offered a certification test but "set[ ] the standards for employment and training requirements in conjunction with defendant St. Louis County and the St. Louis County First Standards Commission," which raised a question of fact as to whether an actual employer-employee relationship existed. *Id.* at *2. NBME, in marked contrast, has no such alleged (or actual) relationship with medical residency programs.

In *Taylor v. Pompeo*, No. 19-cv-2987-CRC, 2021 WL 7904001 (D.D.C. Jan. 6, 2021), another case cited by Plaintiffs, the plaintiff alleged that various federal government agencies (the Department of Defense, the Department of State, and the Air Force) controlled the medical clearance process necessary for him to be employed by another federal government agency (the Department of Justice), and claimed he was denied clearance to work based on disability discrimination. *Id.* at *4. There was no issue in that case that *some* agency of the federal government was a properly-named defendant, and the court declined to decide on a motion to dismiss which agency was the responsible party. *Id.* at 4. The facts and issues in that case, involving collaborative acts between various agencies of the U.S. government—including the plaintiff's actual prospective employer, the Department of Justice—bear no resemblance to this dispute.

*Association of Mexican-American Educators ("AMAE") v. California*, 231 F.3d 572 (9th Cir. 2000), another case cited by Plaintiffs, actually lays bare their misguided *Sibley*-based Title

VII theory. According to Plaintiffs, in *AMAE* "the Ninth Circuit held that Title VII applies to discrimination in an exam required for employment by another entity." Opp. Br. at 15 (citing *AMAE*, 231 F.3d at 577). This superficial description of the court's decision, apparently pulled from the introductory paragraph of the court's lengthy opinion, ignores the Ninth Circuit's actual holding and analysis. Although not precedential here in any event, it is worth noting the facts of that case and how the Ninth Circuit applied the "interference" theory under Title VII.

In *AMAE*, the State of California required passing scores on the California Basic Education Skills Test ("CBEST") by all public elementary and secondary school teachers in California. 231 F.3d at 577-78. Plaintiffs challenged the validity of the CBEST under Title VI and Title VII, claiming that minority candidates disproportionately failed the test. *See id.* at 578. Although the court discussed the applicability of Title VII "to the CBEST," the test itself was not a party to the case (as it presumably is not a legal entity, just as the USMLE is not a legal entity). The issue, rather, was whether the State of California was subject to the Title VII claim tied to the CBEST where it did not have a direct employment relationship with the plaintiffs, who were employees of individual school districts in California. *See id.* at 579-80.

Applying an "employment interference" analysis drawn from *Sibley*, the Ninth Circuit concluded that the state defendants could be held subject to Title VII due to "***the peculiar degree of control*** the State of California exercises over local school districts." *Id.* at 581 (emphasis added). This included not only general legislative oversight but also control over the day-to-day operations of local school districts, including "'district organization, elections, and governance; educational programs, instructional materials, and proficiency testing; sex discrimination and affirmative action; admission standards; compulsory attendance; school facilities; rights and responsibilities of students and parents; holidays; school health, safety, and nutrition; teacher credentialing and

certification; rights and duties of public school employees; and the pension system for public school teachers.'" *Id.* at 581-82 (citation omitted). "Against that background of 'plenary' state control," the Ninth Circuit concluded the State of California was in a position to interfere with employment decisions by local school districts and that the state engaged in such interference by dictating who the school districts court hire through its CBEST requirement. *Id.* at 582. The court analogized the relationship between the State of California and local school districts to the relationship between a corporate parent and its wholly-owned subsidiaries and found that "[t]he 'parent' state *has participated extensively in, and influenced, the employment policies and practices of the 'subsidiary' local school districts*; therefore, the state is covered by Title VII." *Id.* at 582 (emphasis added).

Plaintiffs here do not, and cannot, allege that NBME plays any such role in the operations of medical residency programs. Indeed, their own allegations show that NBME plays no role in the medical residency match process. *See, e.g.,* FAC ¶¶ 9, 15 (alleging that the Educational Commission for Foreign Medical Graduates ('ECFMG') certifies international medical graduates for participation in the residency match); *id.* ¶ 14 (identifying the National Resident Matching Program as the entity administering the residency match process); *id.* ¶ 16 (referencing residency programs ranking the applicants they prefer); *id.* ¶ 17 (referencing "residency programs' matching decisions"). In the residency matching process and beyond, NBME and medical schools operate independently of one another, not in any way resembling a parent/subsidiary-type relationship or a relationship comparable to that of the State of California and local school districts in *AMAE*.

The *AMAE* decision also addressed the broader question of Title VII liability in the licensure context. The State of California argued it was not subject to Title VII "because the CBEST is merely a licensing examination[,]" relying on cases such as *Haddock v. Board of Dental*

*Exam'rs*, 777 F.2d 462 (9th Cir. 1985); *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017 (5th

Cir. 1990); and *George v. New Jersey Bd. of Veterinary Med. Exam'rs*, 794 F.2d 113 (3d Cir.

1986). *Id.* at 582. In response, the Ninth Circuit opined:

> There is no overarching 'licensing' exception to Title VII. The cases that
> Defendants cite stand for a related but narrower proposition—that Title VII does
> not apply when *the only* connection among the licensing agency, the plaintiff, and
> the universe of prospective employers is the agency's implementation of a general
> licensing examination. In such cases, to borrow the words of the *Sibley* court, the
> agency does not have a 'highly visible nexus with the creation and continuance of
> direct employment relationships between third parties,' such as would subject it to
> Title VII under an 'interference' theory.

*Id.* at 583 (original emphasis ) (citing *Sibley*, 488 F.2d at 1342).[14] If one accepts the Ninth Circuit's

description of cases involving licensing exams, and its distinction between those cases and the

holding in *Sibley*, NBME is like the licensing entities that the Ninth Circuit described as *not being*

covered by Title VII. NBME's only connection between Plaintiffs and medical residency programs

(or any state licensing agency, for that matter) is NBME's "implementation" of the USMLE.

Plaintiffs' argument that the licensing cases cited by NBME are irrelevant, *see* Opp. Br. at

16, is incorrect. NBME's provision of an examination that is relied upon by medical residency

programs (or licensing entities) does not mean that NBME's exam-related activities puts it in a

position to interfere (or results in interference) with employment relationships between examinees

and medical residency programs within the meaning of *Sibley*. Plaintiffs' contrary argument that

---

[14] Plaintiffs question the applicability of *George v. New Jersey Bd. of Veterinary Med. Exam'rs* to
this case because NBME is not a state actor and thus is not exercising police power, *see id.* at 16-
17, but then proceed to argue that any such act of police power is irrelevant. *See id.* at 16-17. They
also revert to the *Morrison* opinion to argue "'it is doubtful whether the licensing exception can
survive in intellectual harmony with the *Sibley* theory.'" *See* Opp. Br. at 17 (citing *Morrison*, 908
F. Supp. at 585 n.11). The Ninth Circuit would clearly disagree with Plaintiffs in this regard, given
its opinion in *AMAE*, and for reasons previously discussed *Morrison* cannot support the weight
given to it by Plaintiffs.

"NBME *does* 'make … decisions about' plaintiffs' employment," Opp. Br. at 16, is factually unsupported and incorrect. NBME only makes decisions about the USMLE.[15]

Because NBME is not subject to Title VII liability under a *Sibley* "interference" theory, there is no reason to address on NBME's motion to dismiss whether the "interference" theory remains legally viable today. *See* Opp. Br. at 17-18. NBME is not subject to Title VII liability with respect to the administration of the USMLE, and Plaintiffs' Title VII claim fails on this basis.

### 2. Plaintiffs fail to state a "profiling" claim for discrimination.

Plaintiffs make clear they are proceeding under the "profiling" framework they previously put forth—and the Court previously rejected—on their motion for preliminary injunction. *See* Opp. Br. at 19-22. Again relying on *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), as they did in their preliminary injunction papers, Plaintiffs assert that NBME discriminated against them by "isolating Nepali citizens," taking "adverse action against Nepalis whose scores it questioned," and then taking "no action against anyone else." Opp. Br. at 22.

Assuming solely for purposes of this motion that *Floyd* even applies in this context (*Floyd* was a Fourth Amendment and Fourteenth Amendment challenge to New York City's "stop and frisk" policing policy),[16] NBME's actions relative to Plaintiffs' challenged test scores do not constitute unlawful profiling. The district court in *Floyd* held that the New York police

---

[15] Plaintiffs sound an alarm that NBME would be free to blatantly discriminate against certain groups if it were not subject to Title VII liability with respect to providing the USMLE. *See* Opp. Br. at 16. Putting aside the fact that decades of test administration of the USMLE and its predecessor medical licensing exams reflect no such discrimination, residency programs and state medical boards surely would not tolerate such discrimination and would look to other options if NBME (or any other testing entity) acted in such a manner.

[16] The *Floyd* court itself distinguished terminology specific to Title VII actions from the legal issues in that case. *See* 959 F. Supp. 2d at 570 n.86. Plaintiffs also discuss employment cases and "bona fide occupational qualification" issues, *see* Opp. Br. at 19-20, which are also far afield from this standardized test dispute and merely underscore their entirely inapt Title VII claim.

department's policy to "target 'male blacks 14 to 21' for stops *in general* based on local crime suspect data" violated the Equal Protection Clause of the Fourteenth Amendment. 959 F. Supp. 2d at 663 (original emphasis); *see also id.* at 563 ("A police department may not target a racially defined group for stops *in general*—that is, for stops based on suspicions of wrongdoing—simply because members of that group appear frequently in the police department's suspect data.") (original emphasis). The court distinguished, however, the lawful practice of using racial information from the victim's description as part of a search for a particular perpetrator. *Id.* at 663-64 (discussing *Brown v. City of Oneonta, New York*, 235 F.3d 769 (2d Cir. 2000)).

To the extent there is any analogy to be made to *Floyd*, NBME's analysis of testing data for examinees with a connection to Nepal reflects the lawful activity described by the *Floyd* court, not unlawful racial profiling. *See* Mem. Op. and Order (Dkt. 20) at 19 ("[A]s discussed previously, the Board's decisions did not rely on a propensity inference based on ethnicity or national origin. Rather, its decisions differentiated on the basis of test-takers' connection to a geographic region where organized cheating occurred, an approach that *Floyd* expressly sanctioned.") Plaintiffs do not reference this aspect of the Court's prior ruling, much less try to dissuade the Court from reaching the same conclusion now. *See* Opp. Br. at 20-21.

Plaintiffs do, however, address the Court's other explanation for why NBME's pre-invalidation review of its own testing data—"the point at which it allegedly considered ethnicity and national origin to narrow its field of vision"—did not constitute adverse action that would subject it to liability. *See* Opp. Br. at 20-21 (discussing Mem. Op. and Order at 19). Plaintiffs invite the Court to "consider a different lens" whereby "[f]iltering a pool for early potential adverse action to members of a certain race or national origin group and subjecting that group to scrutiny that others are spared violates the law, at least where, as here, that scrutiny eventually results in a

concrete adverse action against *only* members of that group." Opp. Br. at 21. But Plaintiffs ignore the specific facts of this case. NBME initially looked into Nepal—and other locations—based on anonymous tips it received specifically tied to those locations. On closer review, there was strikingly anomalous data associated with Nepal. Plaintiffs think they have a better way of protecting test security (in which they ironically advocate for a citizenship-based approach, *see* Opp. Br. at 22), but their arguments are misplaced because they ignore the actual circumstances presented in this case (circumstances which they expressly endorsed by attaching the NBME declarations to their FAC).[17]

Plaintiffs' fallback analysis relying on the standard *McDonnell-Douglas* burden-shifting framework, *see* Opp. Br. at 25-28, is also misplaced given that *their* case is a "direct discrimination" "profiling" case, where they have embraced NBME's explanations for what it did and why it did so. Indeed, Plaintiffs themselves argue that *McDonnell-Douglas* doesn't apply because they are bringing a "direct discrimination" case. Opp. Br. at 23-24. This argument by Plaintiffs therefore requires no further analysis.

### 3.   Plaintiffs fail to state a claim for discrimination based on ethnicity under Section 1981.

Plaintiffs concede that "Section 1981 does not forbid national-origin discrimination; it forbids only discrimination on the basis of race or ethnicity." Opp. Br. at 30. Plaintiffs then invite the Court to "infer" that "NBME discriminated on the basis of race or ethnicity" because this case is only at the motion to dismiss stage. *Id.* This approach ignores the requirement that a "plaintiff must allege some facts that demonstrate that his race was the reason for [a] defendant's actions."

---

[17] Plaintiffs' reliance on an inapposite First Amendment case to prove the viability of their discrimination claims is equally unconvincing. *See* Opp. Br. at 22 (discussing *True the Vote, Inc. v. IRS*).

*Ndondji v. InterPark*, 768 F. Supp. 2d 263, 274 (D.D.C. 2011) (citations omitted). Plaintiffs make no effort to distinguish or address *Ndondji* or the numerous cases cited by NBME in its opening brief on this point, including the Court's own prior statements in ruling on Dr. Giri's motion for preliminary injunction. *Compare* NBME Br. at 23-26 *with* Opp. Br. at 30-31.

Plaintiffs continue to try to repackage what is, at most and generously viewed, a national origin-based discrimination claim (based on reference to citizenship) into a racial discrimination claim. But their own case authority explains the dispositive distinction. *See Covington v. FMC & Assocs., LLC*, No. 22-1441-RDM, 2023 WL 513184, at *7 (D.D.C. Aug. 10, 2023) ("'National origin discrimination is cognizable under § 1981 only if based on racial or ethnic characteristics associated with the national origin in question.'") (quoting *Wesley v. Howard Univ.*, 3 F. Supp. 2d 1, 3 (D.D.C. 1998) and *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). In *Covington*, the court found that the plaintiff effectively pleaded a race-discrimination claim under Section 1981 "by alleging he was subjected to discrimination on the basis of his race and skin color, and [contrasting] himself with 'lighter-skinned' employees from Nepal, Sudan, and Ethiopia." *Id.* Plaintiffs make no such race-based allegations here.

Plaintiffs cite the Seventh Circuit's decision in *Lalvani v. Cook County, Illinois*, 269 F.3d 785, 789 (7th Cir. 2001), where, according to Plaintiffs, the court "appl[ied], without comment, protections of § 1981 to a plaintiff from India." Opp. Br. at 31. That is not an accurate description of the opinion. The court described the plaintiff as being "of Asian Indian descent;" described the basis of alleged discrimination as plaintiff's "Asian-Indian ethnicity;" *see* 269 F.3d at 787, 789, and referenced the potentially "similarly situated" candidate as a "Caucasian woman" (*i.e.*, race-based claims), *see id*. Plaintiffs, in contrast, allege that NBME treated test-takers differently because they were "associated with Nepal," FAC ¶ 81, and argue that they were treated less

favorably than "test-takers from India, Jordan, Pakistan, or any other country ….," Opp. Br. at 1, which again, are references to geographic locations, not references to race (including ethnicity or ancestry). *See also* Opp. Br. at 5 (referring to alleged "national-origin-based analysis").

Plaintiffs also rely on three Seventh Circuit cases and the concurring opinion of one Justice in *Saint Francis College v. Al-Khazraji* for their argument that "'Nepali'—like 'Indian,' 'Italian,' and 'Iranian'—can be a designation of both ethnicity and national origin." Opp. Br. at 31. This argument gets them nowhere because, even if Nepali is a reference to ethnicity, it is a term offered solely by Plaintiffs in one conclusory and inapt statement in paragraph 81 of the FAC—one that bears no connection to any factual allegations that would plausibly support a claim that NBME discriminated against them based on their ethnicity rather than (allegedly) based on their citizenship.

Plaintiffs' invitation for the Court to "infer" a Section 1981 claim, *see* Opp. Br. at 30-31, ignores their pleading obligations. They have failed to state a claim under Section 1981.

## **CONCLUSION**

Plaintiffs' First Amended Complaint should be dismissed with prejudice.

Dated:  July 8, 2024

Respectfully submitted,

/s/ Robert A. Burgoyne
Robert A. Burgoyne (D.C. Bar No. 366757)
Caroline M. Mew (D.C. Bar No. 467354)
Perkins Coie LLP
700 13th St., NW, Suite 800
Washington, DC 20005
T: (202) 654-6200
F:  (202) 654-6211
RBurgoyne@perkinscoie.com
CMew@perkinscoie.com

Counsel for the National Board of Medical Examiners